## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ERIKA M. KITZMILLER, | ) | Civil Action No. 25-8634 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| BARNARD COLLEGE and | ) | |
| THE TRUSTEES OF COLUMBIA | ) | |
| UNIVERSITY IN THE CITY OF | ) | |
| NEW YORK, | ) | FILED ELECTRONICALLY |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

### COMPLAINT IN CIVIL ACTION

AND NOW comes Plaintiff, Erika M. Kitzmiller ("Dr. Kitzmiller"), by and through undersigned counsel, and files this Complaint in Civil Action, stating as follows:

### I. PARTIES

1.      Dr. Kitzmiller is an adult individual currently residing in the State of Illinois who, during the time relevant to this Complaint, resided in the Borough of Manhattan, City of New York, State of New York.

2.      Barnard College ("Barnard") is an institution of post-secondary education with its primary place of business at 3009 Broadway, New York, New York, 10027.

3.      The Trustees of Columbia University in the City of New York ("Columbia") operate an institution of post-secondary education with its primary place of business at 116th Street and Broadway, New York, New York 10027.

4.      Barnard and Columbia operate jointly in the employment of faculty.

5.      According to Barnard's Mission Statement, "Barnard College aims to provide the highest-quality liberal arts education to promising and high-achieving young women, offering the

unparalleled advantages of an outstanding residential college in partnership with a major research university [i.e. Columbia University]."

6.      Barnard's course bulletin states that "Barnard is an official college of Columbia University."

7.      Regarding this partnership, Barnard states on its website: "Barnard College and Columbia University have a historic relationship that's unique in American higher education. Students share academic resources along with extracurricular activities, athletic fields, and even dining halls.  At Barnard, you'll benefit from a college experience that offers small, intimate classes in a collaborative environment dedicated to women, along with access to the vast academic resources of Columbia University, just across the street."

8.      According to Barnard's website: "Students from Barnard and Columbia share course catalogs and can take classes at either campus."

9.      With respect to faculty, Barnard advertises on its website that "Barnard Professors are Columbia Professors, Too," including that "[a]ll tenured Barnard professors are also tenured at Columbia University, where they're free to pursue their academic interests with full access to the world-class resources of a large research university."  In addition, Columbia publishes the names of Barnard faculty members who have received tenure at Columbia.

10.      Standards for tenure and promotion for Barnard faculty and Columbia faculty are the same: the faculties have the same responsibilities in terms of teaching, scholarship, and service, and are evaluated according to the same standards for tenure by the same committees.

11.      Barnard's "Conflict of Interest and Commitment" policy (obtained from the Barnard website in 2023) relating to impermissible outside employment states, "Columbia is not considered

to be a separate non-profit institution, and faculty may create courses for and collaborate freely with the Columbia University academic community."

12.    According to the Columbia University Faculty Handbook, professors may count the years where they taught only at Barnard for purposes of assessing seniority and tenure at Columbia and vice versa.

13.    Columbia maintains an advisory committee, the Tenure Review Advisory Committee ("TRAC"), which includes both Barnard and Columbia faculty members, that evaluates promotion for both Barnard and Columbia faculty.

14.    Columbia and Barnard "cooperate in their instructional appointments...with the goal of reducing duplication and maximizing the effectiveness of the resources of the two institutions."

15.    Appointments to Barnard's faculty must be approved by Barnard's Provost, President, and Board of Trustees, as well as by Columbia.

16.    Barnard degrees are bestowed by Columbia.  The Columbia University Statutes stipulate that Columbia University's Senate and Board of Trustees control "the conditions upon which degrees shall be conferred and to recommend candidates" at Barnard.  In particular, the University Statutes stipulate that Barnard's degree has an equal value as a Columbia degree.

17.    The campuses are not separate, and Barnard and Columbia ID cards both provide access to both campuses.  The University Statutes state explicitly that there is "common access to faculty and courses and joint utilization of facilities between the college and the University." Similarly, "libraries of the University and of the college shall be open upon equal terms to all students and faculty of either institution." The Columbia interdepartmental mail system delivers letters at no cost between Barnard and Columbia's campuses.

18.    The front gates of Barnard state "Barnard College of Columbia University."

19.    The Columbia University Admissions website listing of all its admissions offices includes Barnard.

20.    Many Columbia majors critically incorporate Barnard courses and staff. In particular, the Urban Studies department where Dr. Kitzmiller worked explicitly describes itself as a "Barnard-Columbia" program. Columbia courses can be taught by Barnard faculty members and can enroll Barnard students. Conversely, Barnard courses can be taught by Columbia faculty and can enroll Columbia students.

21.    Barnard and Columbia share an academic calendar.

22.    Barnard professors frequently include "Columbia" in their email signature and publication affiliations.

23.    The official Barnard logo includes the words "Columbia University."

24.    The official Barnard logo, including "Columbia University," also appears on Barnard's pay stubs.

25.    The Barnard website lists its affiliation with "Columbia University" throughout.

26.    Under Columbia's statutes, the administrations of Barnard and Columbia are linked, and the Barnard President reports directly to Columbia's President.

27.    Barnard's president has a rank of Dean at Columbia and serves with the consent of the President of Columbia University.

28.    The Columbia President is an ex officio member of Barnard's Board of Trustees. The Columbia President may attend meetings of the Barnard faculty and must be provided copies of the minutes of all Barnard faculty meetings.

4

29.     Barnard faculty appointments require approval from Columbia's Board of Trustees, and the Columbia Faculty Senate controls Barnard's degree conferrals.

30.     Certain employment benefits of Columbia and Barnard are linked. Barnard faculty are often provided accommodations in Columbia faculty housing and both faculty use a common parking system. However, Barnard faculty are only allowed access to lower "B and C" class apartments within the Columbia housing system.

31.     Approximately 33-50% of Dr. Kitzmiller's salary as a faculty member in the Barnard Education Studies Program was paid by Columbia's Engineering School.

32.     At all relevant times, both Columbia and Barnard jointly employed Dr. Kitzmiller within the meaning of all applicable statutes.

## II.  JURISDICTION

33.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343 because this case includes claims arising under federal law that are brought to recover damages for deprivation of equal rights.

34.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

35.     This Court has personal jurisdiction over Barnard and Columbia because both are incorporated and reside in this District, regularly transact business in this District, and committed acts within this District that caused injury to persons and/or property within this District.

## III.  VENUE

36.     The matters complained of in this Complaint occurred in the Borough of Manhattan (New York County) in the Southern District of New York; therefore, venue is appropriate in this

Court.

## IV. ADMINISTRATIVE EXHAUSTION

37.    Dr. Kitzmiller filed a complaint with the Equal Employment Opportunity Commission on April 4, 2024 against Barnard and Columbia.

38.    This complaint was docketed at 520-2024-04436 and 520-2024-04437 and raises claims for, *inter alia*, race, sex, religion, and age discrimination, and for retaliation.

39.    Investigation of this complaint was transferred to the New York Division of Human Rights (NYDHR) on October 1, 2024, pursuant to the work sharing agreement between the two agencies.

40.    Dr. Kitzmiller filed an amended complaint adding a class claim in violation of the Equal Pay Act with the NYDHR on February 3, 2025.

41.    As soon as Dr. Kitzmiller's claims are administratively exhausted she will file an amended complaint raising claims under the appropriate federal, state, and local anti-discrimination laws.

## V. FACTS

42.    Born in 1977, Dr. Kitzmiller was a first-generation college graduate.

43.    Dr. Kitzmiller received a Bachelor of Arts degree from Wellesley College and a Masters of Public Administration from the University of Pennsylvania.

44.    Dr. Kitzmiller holds a Ph.D. in Education and a Ph.D. in History, both received in 2012 from the University of Pennsylvania.

45.    Dr. Kitzmiller also earned a Graduate Certificate in Urban Studies from the University of Pennsylvania; this is the highest credential offered in that subject by that institution.

46.    From 2012-2013, Dr. Kitzmiller was a Clinical Professor of Education Policy and Teacher Education at Drexel University.

47.    From 2013-2016, Dr. Kitzmiller was a postdoctoral fellow at Harvard University.

48.    From 2015 -2016, Dr. Kitzmiller served as an Adjunct Professor of Urban Studies at Barnard.

49.    From 2016-2019, Dr. Kitzmiller was a Lecturer in Social Studies Education at the Teachers College, Columbia University.

50.    From 2018-2020, Dr. Kitzmiller was a Lecturer of Mid-Career Educational Leadership at the University of Pennsylvania.

51.    From 2019 through June 2024, Dr. Kitzmiller was a Term Assistant Professor of Education Studies at Barnard and Columbia.

52.    As a Term Assistant Professor, Dr. Kitzmiller was a member of a faculty union-Barnard Contingent Faculty-UAW Local 2110 Union.

53.    Dr. Kitzmiller performed extremely well.

54.    For example, at Barnard, Dr. Kitzmiller authored a well-regarded book published by the University of Pennsylvania Press as well as five peer-reviewed articles, two national policy briefs, one book chapter, and eleven op-ed pieces.

55.    Dr. Kitzmiller also was the Principal Investigator for studies into educational policy funded by the National Science Foundation and Russell Sage Foundation.

56.    Despite the fact that she was just a Term Assistant Professor, which is a contingent (non-tenure track) position, during her career Dr. Kitzmiller has secured $667,525 in funding, an extremely impressive amount for a non-tenure track faculty member at a liberal arts college, which

includes grants from the National Science Foundation (NSF), the Russell Sage Foundation, the Spencer Foundation, the National Academy of Education, and Barnard internal funding.

57.    Dr. Kitzmiller has received consistently high student evaluations for her teaching. There has been high demand for enrollment in her courses, and her courses have been consistently over-enrolled.

58.    Dr. Kitzmiller demonstrated strong support for undergraduate research, having supported twenty-five Barnard and Columbia students in research positions and nine Barnard and Columbia students in independent studies.  She has served as the mentor at Barnard for four computing fellows, five Athena Center fellows, three Laidlaw fellows, and one Mellon-Mays fellow.

59.    In 2019, Columbia promised Dr. Jacobs (Dr. Kitzmiller's spouse) that Barnard would consider Dr. Kitzmiller fairly for a tenure-track position.  In reliance on this promise, Dr. Jacobs stayed at Columbia despite being recruited by and receiving offers from other Universities.  Also, as a result of this promise, Dr. Kitzmiller stayed at Barnard, despite receiving offers for outside employment.

60.    In 2019, Dr. Kitzmiller complained to Barnard Provost Dr. Linda Bell that childhood tuition benefits were higher for Columbia faculty than for Barnard faculty, but Provost Bell incredibly professed not to know of this difference.

61.    In 2019, Dr. Kitzmiller likewise complained to Dr. Thea Renda Abu El-Haj ("Dr. Abu El-Haj"), a Barnard Professor and Chair of the Education Studies Program, that childhood tuition benefits were higher for Columbia faculty than for Barnard faculty to which Dr. Abu El-Haj simply stated in writing that, "Barnard is a different institution from Columbia benefit-wise."

62.    Dr. Kitzmiller has learned that contingent (non-tenure track) faculty and staff at

Columbia receive K-12 school benefits for their children but contingent faculty at Barnard do not, which reflects Barnard's relatively anti-family environment and clear inequities.

63.    Dr. Kitzmiller commented to Provost Bell that it was difficult to secure large federal grant funding as a Term Faculty member, that she could do even better as a tenure track member, and asked for support outside of her program with career development.  Provost Bell agreed that Dr. Kitzmiller would be more successful with grant funding and contribute more for Barnard if she had a tenure-track position.  Provost Bell agreed to assign her a mentor.  However, Dr. Kitzmiller never was assigned a mentor by Provost Bell or anyone else.

64.    Dr. Bell also encouragingly indicated that Term Faculty had been promoted to tenure-track positions in the past, and that Dr. Kitzmiller was in a strong position to be promoted so given her credentials, teaching, and scholarship.

65.    While working at Barnard, Dr. Kitzmiller was repeatedly subjected to harassment and discrimination.

66.    In the winter of 2020, Dr. Abu El-Haj visited Dr. Kitzmiller's office, falsely and bizarrely noted that some wall posters were "anti-Muslim," and implied that Dr. Kitzmiller was anti-Muslim as well.  Dr. Abu El-Haj is a supporter of the Boycott, Divestment, Sanctions (BDS) movement.  The BDS movement included anti-Semitic campaign aspects about delegitimizing and pressuring Israel, through the diplomatic, financial, professional, academic and cultural isolation of Israel, Israeli individuals, Israeli institutions, and, increasingly, Jews who support Israel's right to exist.  Subsequently Dr. Abu El-Haj was hostile to Dr. Kitzmiller without a legitimate basis.

67.    In 2020, Dr. Abu El-Haj actually told Dr. Kitzmiller that it was important that she (Dr. Kitzmiller) put up pictures of her children in her office thus signifying her maternal status.  She

indicated that putting up these pictures was important if Dr. Kitzmiller was to consider herself a feminist.

68.    Subsequently, in May 2022, Dr. Abu El-Haj and other faculty were at a dinner meeting where the main guest was the president of a foundation who happened to be Muslim. Dr. Kitzmiller did not know this. After dinner, Dr. Abu El-Haj publicly reproached and humiliated Dr. Kitzmiller for ordering a glass of wine (which most guests did) at dinner. Dr. Abu El-Haj told Dr. Kitzmiller she should have asked the Muslim guest's permission to order alcohol before doing so.

69.    In an April 2021 meeting of the faculty of the Education Studies program, in connection with Dr. Kitzmiller's requests to lift the class cap of twenty students for her in-demand courses, Dr. Kitzmiller told Dr. Abu El-Haj and others that the caps were preventing racial minority students, who sometimes registered late for the semester due to financial challenges, from taking the required classes and thus preventing them from majoring or minoring in Education Studies. Several of her Black students had shared these concerns directly with Dr. Kitzmiller. She said that in the meeting.

70.    The enrollment caps were unnecessary since Dr. Kitzmiller effectively had taught classes to more than twenty students previously at Barnard and always received high ratings on her teaching evaluations.

71.    Dr. Abu El-Haj made clear that she did not appreciate that Dr. Kitzmiller had framed the caps as a racial equity issue and even told Dr. Kitzmiller that she "would be happier at another institution" and "should consider leaving Barnard."

72.    In response to Dr. Kitzmiller's challenge to the enrollment cap, Professor Maria Rivera Maulucci, Ph.D., Chair of Education Studies, told Dr. Kitzmiller that she could not be a

"good teacher" with more than 20 students in her course.

73.     In May 2021, Dr. Kitzmiller likewise told Provost Bell that the student caps were preventing racial minority students, who sometimes registered late for the semester due to financial challenges, from taking the classes and preventing them from majoring or minoring in Education Studies.

74.     Dr. Abu El-Haj indicated to Dr. Kitzmiller that she was frustrated that Dr. Kitzmiller met with Provost Bell to discuss this issue.

75.     In 2021, Dr. Kitzmiller and her junior colleagues in the Education Studies Program met with Barnard's Ombuds to discuss inequitable policies and practices in the Education Studies program including towards racial minorities.  They did so because Dr. Abu El-Haj asked them to meet with the Ombuds as a means of improving the program meetings.

76.     Jennifer Rosales suggested to Dr. Abu El-Haj that the faculty meet with the Ombuds to address their concerns about the program.

77.     The three non-tenure track faculty, Dr. Kitzmiller, Dr. Miranda, and Dr. Throop, independently told the Ombuds that they were concerned about sharing their perspectives and statements because they feared retaliation from Dr. Abu El-Haj and Dr. Rivera Maulucci.  As a result, the Ombuds never visited the program meetings to discuss and mediate the climate issues.

78.     On September 12, 2022, Dr. Sian Beilock, then the President of Barnard and now the President of Dartmouth College, publicly praised Dr. Kitzmiller during her convocation address, noting that "Professor Erika Kitzmiller [helped] educators address learning delays caused by the pandemic."

79.     Dr. Kitzmiller's peer-reviewed and public scholarship on learning delays caused by

11

the pandemic focused on racial inequalities in schools, and solutions to address these inequalities.

80.    Dr. Kitzmiller had organized and participated in anti-racism pedagogy workshops conducted on Barnard's campus.

81.    Dr. Kitzmiller received many positive messages from Barnard colleagues congratulating her on being recognized in President Beilock's Convocation speech.  She even received a personal email from President Beilock following the speech.  President Beilock said she was "a fan" of Dr. Kitzmiller and her work.

82.    Dr. Kitzmiller was known throughout the Barnard community, according to comments made by the Title IX coordinator, Dr. Elizabeth Scott-Francis, as an advocate for under-represented and racial minority students.

83.    Similarly, the Barnard Ombuds told Dr. Kitzmiller, "It sounds like you are just trying to make Barnard a better place."

84.    On September 21, 2022 when Dr. Kitzmiller met Dr. Abu El-Haj about academic matters, Dr. Abu El-Haj raised Dr. Kitzmiller's recognition from President Beilock at the convocation, and insultingly asked Dr. Kitzmiller, "Did you hear about your little shout out from Sian?" In response, Dr. Abu El-Haj stated: "I don't even know how she [President Beilock] would know who you are."

85.    In context, Dr. Abu El-Haj's dismissive remark regarding the President's "shout out" above should be seen as diminishing Dr. Kitzmiller for her anti-racial discriminatory speech and advocacy.

86.    In a meeting of Barnard's Education Studies program in the fall of 2022, Dr. Kitzmiller offered a colleague advice on how to write a book proposal after which Dr. Abu El-Haj

gratuitously stated in front of other faculty: "Well, Erika, we aren't as famous as you."

87.    In 2022, two open tenure-track Assistant Professor positions were posted for which Dr. Kitzmiller was qualified: one was in the Education Studies Program and the other was a joint appointment in Education Studies and Urban Studies Programs.

88.    Securing either of these positions would amount to a significant promotion and career opportunity for Dr. Kitzmiller.

89.    The Search Committee Chair for both positions was Dr. Abu El-Haj who at the time was Chair of Barnard's Education Studies Department.

90.    During Dr. Kitzmiller's 2022 annual review Dr. Abu El-Haj indicated that there was "nothing" that Dr. Kitzmiller needed to do to improve her candidacy for available tenure-track positions at Barnard.

91.    Relatedly, Dr. Abu El-Haj also stated that the ability to earn tenure at Columbia is the most important factor when choosing new tenure-track faculty.

92.    The job description for the joint position in Education Studies and Urban Studies matched well with Dr. Kitzmiller's research interests and proficient performance.

93.    Dr. Kitzmiller applied for both positions.

94.    Dr. Kitzmiller was not hired for either position.

95.    Instead of Dr. Kitzmiller, Barnard and Columbia instead hired less qualified significantly younger applicants, under forty years old, who in contrast to Dr. Kitzmiller did not have children.

96.    Barnard/Columbia hired Nora Gross, Ph.D., as Assistant Professor of Education Studies.

97.     Based on information and belief, Dr. Gross is approximately eight or more years younger than Dr. Kitzmiller and at the time of selection did not have children.

98.     Barnard/Columbia hired Amelia Simone Herbert, Ph.D., as Assistant Professor of Education and Urban Studies.

99.     Based on information and belief, Dr. Herbert is approximately six or more years younger than Dr. Kitzmiller, and at the time of selection did not have children.

100.    As Dr. Kitzmiller understands, she was one of six finalists for the positions.

101.    Dr. Kitzmiller was given an on-campus interview.

102.    During her 2022 job interview, Barnard Vice Provost Alex Cooley ("Dr. Cooley") told Dr. Kitzmiller that she was well-positioned to earn tenure at Columbia at that time based on her scholarship.

103.    Dr. Cooley said he was well qualified to make this determination regarding Dr. Kitzmiller's status because he served on Columbia's University-wide Tenure Review Advisory Committee ("TRAC").

104.    One member of both search committees, Professor Leslie Sharpe, was tasked with interviewing Dr. Kitzmiller.

105.    Dr. Sharpe told Dr. Kitzmiller that some departments, such as Anthropology in which she is a member, are not divided between Barnard and Columbia: "They are contiguous, meaning they are one department."

106.    Dr. Sharp is also a senior research scientist in the Department of Sociomedical Sciences at Columbia University Medical Center.

107.    Dr. Sharp questioned Dr. Kitzmiller about her research.

14

108.    Dr. Kitzmiller told Dr. Sharp that she (Dr. Kitzmiller) was conducting research at a majority-Black Title I (low-income) school in Philadelphia where 100% of graduates went on to college, but many of those students did not complete college.

109.    Dr. Sharp challenged Dr. Kitzmiller with hostility and said, "That cannot be true," and said that she did not believe that a majority-Black school could be a place where 100% of students went to college after graduation.

110.    Dr. Kitzmiller replied to Dr. Sharp that, "I have been conducting research there for 4 years. I have the statistics. It is true."

111.    Afterwards, Dr. Kitzmiller met Dr. Jennifer Rosales, Barnard's Vice President for Inclusion and Engaged Learning and Chief Diversity Officer (as did all six finalists).

112.    Dr. Kitzmiller told Dr. Rosales that Dr. Sharp challenged Dr. Kitzmiller's claim that 100% of the students at a majority Black high school where Dr. Kitzmiller conducted research went onto college.

113.    Dr. Rosales stated that "Leslie seemed like an odd choice to be on the committee," and that she had a reputation on campus for being anti-Black.  Dr. Rosales gave an example of Dr. Sharp's vocally-prejudiced conduct and said that there were others.

114.    During Dr. Kitzmiller's final interview with the search committee, Dr. Abu El-Haj criticized Dr. Kitzmiller's husband, Dr. Joshua Jacobs, a Columbia Associate Professor in the Department of Biomedical Engineering, for being a bad husband and father which was false and upset Dr. Kitzmiller.

115.    Dr. Abu El-Haj has never met Dr. Jacobs and knows nothing personal about him except that he is Jewish.

15

116.    Dr. Kitzmiller was the only finalist interviewed on-campus who was removed from consideration for the joint appointment in Education Studies and Urban Studies.

117.    On November 21, 2022, Dr. Abu El-Haj told Dr. Kitzmiller that her application for this position would not be considered because she was "not urban enough," which was false and pretextual.

118.    Regarding the ludicrous lack of "urbanness" charge against Dr. Kitzmiller, she was the only finalist with any educational credential in the field of urban studies, a Certificate in Urban Studies from the University of Pennsylvania.

119.    Dr. Kitzmiller's doctoral dissertation was selected as one of five to receive honors from Penn's Institute of Urban Research in 2012.

120.    Dr. Kitzmiller's doctoral advisor, Dr. Michael B. Katz, was one of the leading figures in the field of urban studies and urban history; he founded the Urban Studies program at the University of Pennsylvania, a program internationally recognized for its research and teaching.

121.    Dr. Kitzmiller taught in the Urban Studies program at Barnard in 2015-16 and received outstanding teaching evaluations.

122.    At the University of Pennsylvania, Dr. Kitzmiller received a student-nominated university-wide teaching prize for her work teaching urban history.

123.    At Barnard, Dr. Kitzmiller's exemplary teaching was recognized in campus-wide events sponsored by Barnard's Center for Engaged Pedagogy.

124.    Dr. Kitzmiller has two Ph.D.'s, one in education and one in history, and a Masters in Public Administration (M.P.A.) from the University of Pennsylvania, all of which focus on urban scholarship and teaching.

125.    Dr. Kitzmiller was a Caperton Fellow at Harvard's W.E.B. Du Bois Institute. This fellowship is awarded to scholars focusing on the study of race and democracy.

126.    Dr. Kitzmiller has been awarded numerous postdoctoral fellowships and other grants from Harvard University, the National Academy of Education/Spencer Foundation, and the University of Pennsylvania for her book manuscript, "The Roots of Educational Inequality," which is the first book to trace the history of an urban high school in the context of its neighborhood and city over the 20th Century.

127.    Dr. Kitzmiller's book has been nominated for numerous book prizes, including from the Urban History Association; it was published by the University of Pennsylvania Press, one of the preeminent university presses in urban studies/urban history.  Recently, it was named a finalist and runner-up for the prestigious History of Education Society's Outstanding Book Award.  The book has received favorable reviews in the Journal of American History, Journal of Urban Affairs, Planning Perspectives, and Teachers College Record.

128.    Dr. Kitzmiller has been researching urban public schools and neighborhoods for nearly two decades, and she has been teaching in them for 25 years.

129.    Dr. Kitzmiller has received over $600,000 in funding, plus well over $575,000 more in funding previously pending, and currently has $250,000 in funding pending to do this work.

130.    For the joint assistant professorship in the Urban Studies Program and the Education Studies Program, Barnard and Columbia failed to hire Dr. Kitzmiller and instead hired Dr. Herbert, a less qualified significantly younger applicant, under forty years old, who in contrast to Dr. Kitzmiller did not have children.

131.    The successful candidate, Dr. Hebert, did not have any peer-reviewed publications

(in contrast to Dr. Kitzmiller who had an impressive publication record) and was Dr. Abu El-Haj's doctoral advisee.

132.    The justifications for the failure to hire Dr. Kitzmiller for this position are a pretext.

133.    On December 22, 2022, Dr. Kitzmiller learned that her second application for employment in the Education Studies Assistant Professorship had been rejected.

134.    A significantly younger candidate, under forty years old, who did not have children at the time was selected over Dr. Kitzmiller.

135.    The successful candidate was Dr. Nora Gross who only recently received her Ph.D. from the University of Pennsylvania in 2020.  Dr. Gross did not have a published book in contrast to Dr. Kitzmiller.  She also did not have as much experience as Dr. Kitzmiller in teaching or research.  She did not have Dr. Kitzmiller's grant funding and fellowship record.

136.    The justifications for the failure to hire Dr. Kitzmiller for this position are a pretext.

137.    The search procedures for these openings failed to conform to Barnard's rules and procedures, which are publicly posted on Barnard's website.

138.    As stated in Barnard's Academic Code as well as in Barnard's Faculty Handbook, "[r]ecommendations on appointments, reappointments, promotions, and tenure must be made by a majority vote of the department's Professors and Associate Professors holding rank higher than that of the person being considered."

139.    The composition of the search committees violated Barnard's Academic Code and Faculty Handbook as three members held the lower or equal ranks of Assistant Professor or Senior Lecturer.

140.    Shamefully, one non-tenure track member of the search committees actually was the

brother-in-law of Dr. Abu El-Haj, the search chair.

141.    Another member of the search committee was Dr. Abu El-Haj's direct report.

142.    Dr. Abu El-Haj evaluated her own student's application, rather than recusing herself as required by Barnard's policy, and this younger less well-qualified individual ("Dr. Hebert") was eventually awarded the position.

143.    Therefore, three members of the search committee had conflicts of interest and/or the appearance of conflicts.

144.    Barnard's faculty search policies state that applicants are eliminated from a search "using the wording of the advertisement and the specific criteria established at the beginning of the search" and that the "rationale for eliminating each candidate must be documented."

145.    Barnard policy states that during on-campus interviews the "candidate must also meet with the Provost." However, Provost Bell did not meet with Dr. Kitzmiller during her on-campus interview.

146.    According to policy, Barnard faculty search committees must involve the counterpart departments at Columbia before and during the search, as well as during the final selection process. However, the Columbia counterpart departments were never involved in these searches.

147.    At the completion of a search, faculty appointments must be approved by the Barnard Provost, President, and Board of Trustees, as well as by Columbia.

148.    Dr. Kitzmiller was 44 at the time of the search.

149.    It is notable that there were six finalists, three who were under the age of 40 and three who were over the age of 40.

150.    The three candidates over the age of 40 are all mothers of school-aged children while

none of the candidates under 40 were mothers at the time of the search.

151. During the search, one of the candidates under 40 accepted a position at the University of Wisconsin and, thus, withdrew her application from consideration.

152. The Search Committee recommended the two remaining candidates under the age of 40 who did not have children while it did not recommend any of the candidates over 40 who are mothers.

153. Dr. Rachel Throop was a non-tenure-track Professor in Barnard's Education Studies Program.

154. Dr. Throop told Dr. Kitzmiller that Dr. Abu El-Haj admitted that Barnard prefers to hire people who recently received their Ph.D. and "right out" of their Ph.D. programs, which reflects ageism.

155. Similarly, Dr. Miranda, who was a non-tenure track Professor in Barnard's Education and Urban Studies Program, told Dr. Kitzmiller in October 2023 that Dr. Abu El-Haj said that Barnard preferred to hire tenure-track faculty who were younger and fresh out of their Ph.D. programs.

156. When Dr. Kitzmiller spoke to Dr. Abu El-Haj about how to prepare her job talk, Dr. Abu El-Haj told Dr. Kitzmiller that unlike the other candidates who were instructed to discuss one key research contribution she should focus on multiple projects "since she was so far removed from [her] Ph.D.," which was reflective of disparate treatment and ageism.

157. On April 3, 2024, Barnard Professor Maria Rivera Maulucci, who had been on both search committees for the positions that were unfairly denied to Dr. Kitzmiller, harassed Dr. Kitzmiller in front of the entire program faculty during its monthly meeting.

158.    Professor Maulucci linked Barnard's financial problems to the need for the Education Studies Program to increase student enrollment.

159.    Dr. Kitzmiller indicated that a factor limiting enrollment is classroom space as she had interest from 30 or more students in many of her classes but sometimes had to turn students away because there were not enough large classrooms available. Dr. Kitzmiller shared that she had spoken with Provost Bell about this problem several months earlier.

160.    Professor Maulucci said that Barnard could free up large classrooms by offering more evening classes.

161.    Then Dr. Maulucci gratuitously and discriminatorily remarked, "Erika, you have young children. That dictates the times that you are available to teach. We need people to teach at night and you won't want to do that with children."

162.    Dr. Kitzmiller responded: "The fact that I have children has never affected when I am available to teach. I want to be clear about that."

163.    Dr. Maulucci responded: "Well that [having young children] affected when I taught. It doesn't anymore because my children are grown. We have people in the program that have young children so it might affect them."

164.    Dr. Kitzmiller responded that she wanted to be clear: "My children have never dictated when I teach. I have taught in the evenings many times. I am teaching in the evening today."

165.    Professor Maulucci's comment, which was false, was disturbing and prejudiced against mothers who have young children like Dr. Kitzmiller.

166.    This is a discriminatory theme that also infected the search processes which resulted in Dr. Kitzmiller's failures-to-hire.

167.    Other contingent faculty in Barnard's Education Studies Program were also subjected to discrimination.

168.    Dr. Throop was a first-generation college graduate, is over 40, and the mother of two small children.

169.    Dr. Throop had been told for years that she was well-positioned to apply for a tenure-track role should one become available, but Dr. Abu El-Haj discouraged her from applying for either of the two tenure-track positions at issue here.

170.    Dr. Abu El-Haj assured Dr. Throop that she could convert her non-tenure-track position into a permanent lecture line, but failed to do so.

171.    In Spring 2023, Dr. Throop was told that she did not have a contract for the following year, and only received one later on when another non-tenure-track professor named Dr. Chandler Miranda unexpectedly left prior to the end of her contract to take a tenured position with Molloy University.

172.    Dr. Miranda is a mother of two children.

173.    Dr. Miranda applied for both of the open assistant professorships.

174.    With respect to her application for the joint Assistant Professorship of Urban Studies and Education Studies, search committee member Aaron Passell (who was Dr. Abu El-Haj's brother in law) told Dr. Miranda that the "timing just wasn't right" for her to secure a tenure track position and in any event she was "not urban enough."  Dr. Miranda told another member of the search committee that she did not receive a position because she was "mommy tracked."

175.    In May 2023, Dr. Maria Maulucci, a tenured Barnard professor and the new Chair of Education Studies, told Dr. Miranda that it was better for her to have accepted the job at Molloy

University than to stay at Barnard because she would see in time that she would be a better mother and spend more time with her kids as a professor at Molloy.

176.    Dr. Miranda told search committee member Nick Smith (who was an Assistant Professor) that she believed she did not get the job because of when she had children.  He did not deny this.

177.    Dr. Natalia Ortiz ("Dr. Ortiz"), who turned 40 in 2023 and is the mother of two children, applied for the tenure track job but did not receive an interview.

178.    Dr. Ortiz advocated for a permanent lectureship at Barnard, but was never granted that position; she left Barnard and accepted a non-tenure track position at New York University.

179.    On December 22, 2022, after learning that her application was rejected, Dr. Kitzmiller emailed Barnard President Sian Beilock and Provost Linda Bell about the search.  President Beilock told Kitzmiller to meet with Provost Bell about her concerns.

180.    Dr. Jennifer Rosales advised Dr. Kitzmiller on January 5, 2023 to meet with the Barnard Title IX office "for your [Dr. Kitzmiller's] protection before you meet with [Provost] Linda Bell."

181.    Dr. Rosales was knowledgeable about the events that occurred during the faculty searches because she participated in the search processes and discussed the events afterwards with Dr. Kitzmiller.

182.    On January 12, 2023, Dr. Kitzmiller filed a complaint with Barnard's Office of Nondiscrimination and Title IX.  She alleged discrimination on the basis of race, age, parental status, marital status, and retaliation.

183.    After interviewing Dr. Kitzmiller, the Director of Barnard's Office of

Nondiscrimination and Title IX, Dr. Elizabeth Scott-Francis, said that there are "climate" concerns about the Education Studies Program that needed to be addressed, which evidently pertained to race, age, and/or gender.

184.    Dr. Scott-Francis further told Dr. Kitzmiller that the conflicts of interest among the members of the Search Committees that considered her recent applications would not even be allowed in a staff hiring committee.

185.    Dr. Scott-Francis stated that she would conduct a thorough probe, including interviewing witnesses, and told Dr. Kitzmiller to expect a final report that would describe what she found in the investigation.

186.    On January 31, 2023, Dr. Kitzmiller met with Provost Bell and outlined the discrimination and conflicts of interest that she experienced during the search. Provost Bell said that Dr. Kitzmiller had raised "serious concerns" about the search process and outcomes.

187.    However, Dr. Scott-Francis conducted only an "inquiry," not an investigation, into Dr. Kitzmiller's complaints and declined to provide a report.

188.    Barnard's policies distinguished between an "inquiry" and an "investigation."

189.    Under Barnard's policy at the time, an inquiry is time limited and "should not take longer than five-to-ten (5-10) business days."

190.    When Dr. Kitzmiller met with Dr. Scott-Francis in January 2023, Dr. Kitzmiller asked her to interview Dr. Rachel Throop, who could be expected to be supportive on the question of the search favoring younger faculty.

191.    In March 2023, Dr. Kitzmiller learned from Dr. Scott-Francis that she never interviewed Dr. Throop.

192.    In March 2023, Dr. Kitzmiller met with then Barnard President Sian Beilock and voiced concerns about the Office of Nondiscrimination and Title IX investigation because one of her two suggested witnesses, Dr. Rachel Throop, was not contacted.  President Beilock responded that they could not discuss the "investigation" while it was under way, which was a pretext because the process unbeknownst to Dr. Kitzmiller had been downgraded to an inquiry.

193.    Next, while Barnard's Office of Nondiscrimination was reviewing Dr. Kitzmiller's complaint, another incident occurred.  In March 2023, Dr. Shose Kessi, the Dean of Humanities and Professor of Psychology at the University of Cape Town, South Africa, had been invited to facilitate a Gildersleeve workshop on racial issues in education at Barnard.  Dr. Kitzmiller wrote the grant to bring Dr. Kessi to Barnard for this honor.   Dr. Kessi was Dr. Kitzmiller's colleague.

194.    During the Gldersleeve workshop, when Dr. Kitzmiller noted an African American female professor who feared losing her professorship in Florida for teaching critical race theory, Dr. Abu El-Haj demonstrated hostility by publicly exploding at Dr. Kitzmiller and bizarrely accused her of being anti-Palestinian, a baseless falsehood that was racist in itself, and not on topic.

195.    Dr. Kitzmiller asked Dr. Elizabeth Scott-Francis, Director of Barnard's Office of Nondiscrimination and Title IX, to investigate Dr. Abu El-Haj's outburst.  Dr. Scott-Francis agreed, requested, and received Dr. Kessi's contact information from Dr. Kitzmiller but then never even contacted her.  There have been no known consequences for Dr. Abu El-Haj who unnecessarily, viciously, and publicly humiliated Dr. Kitzmiller in an open forum.

196.    In March, 2023, Dr. Scott-Francis interviewed Professor Yolanda Sealey-Ruiz ("Dr. Sealey-Ruiz"), a professor at Teachers College, Columbia University, because Dr. Kitzmiller suggested that Dr. Sealey-Ruiz could provide information relevant to Dr. Kitzmiller's complaint

including her observations and concerns regarding Dr. Abu El-Haj retaliating and harassing Dr. Kitzmiller for her racial advocacy.

197.    Shortly after talking to Dr. Sealey-Ruiz, Dr. Scott-Francis terminated the investigation, termed it an inquiry, and refused to provide information about this or any interviews.

198.    The process conducted by Dr. Scott-Francis continued for about five months and is thus even longer than expected in an "investigation," which should be completed "...within thirty to forty (30-40) business days," according to Barnard's policy at the time.

199.    It was not until May 12, 2023 that Dr. Scott-Francis provided a final response that was negative, result-oriented, and pretextual.

200.    The effect of this cessation was to allow the Office of Nondiscrimination and Title IX not to follow its own rules, not to put evidence corroborating Dr. Kitzmiller in writing, and not to conduct interviews to gather supportive testimony.

201.    In addition to prematurely terminating its probe, the Barnard Office of Nondiscrimination and Title IX violated additional Barnard policies in responding to Dr. Kitzmiller's complaint.

202.    The evidence gathered by Dr. Scott-Francis apparently was not reviewed by an outside pool of individuals (as is required by Barnard's nondiscrimination policy) nor was Dr. Kitzmiller given the opportunity to respond to any findings or to provide a formal appeal.

203.    According to Dr. Scott-Francis and Barnard's policy, Dr. Kitzmiller should have been provided with a report that would "include a summary of relevant information of each interview, provide a summary of factual information, and include any relevant documentation collected."

204.    Dr. Kitzmiller never received this report from Dr. Scott-Francis, and the apparent

failure of Dr. Scott-Francis to conduct a complete investigation constitutes a violation of Barnard's internal rules, and a cover-up.

205.    Dr. Kitzmiller was also retaliated against for complaining about these issues.

206.    In the past before it was clear that Dr. Kitzmiller was challenging her adverse treatment, the Barnard Provost's Office helped her to secure grant funding, which is in the interest of the College and University.

207.    On December 14, 2023, Dr. Kitzmiller emailed Provost Linda Bell requesting permission to submit a grant proposal for up to $600,000 in funding with the WT Grant Foundation, which a staff member from Barnard's Institutional Funding & Sponsored Research Office had approached Dr. Kitzmiller about. Dr. Kitzmiller asked Provost Bell if she would support the grant. Provost Bell never responded.

208.    On December 23, 2023, Dr. Kitzmiller sent an email to Provost Bell about a grant proposal involving the Columbia Global Center in Amman, Jordan that could bring hundreds of thousands of dollars to the University. Dr. Kitzmiller asked Provost Bell if she would support the grant. Provost Bell never responded.

209.    On January 5, 2024, Dr. Kitzmiller sent an email to new Barnard President Laura Rosenbury informing her that she (Dr. Kitzmiller) had been selected as a semifinalist for a large Spencer Foundation grant, one of the most competitive and prestigious grants in her field. President Rosenbury never responded.

210.    On January 5, 2024, Dr. Kitzmiller sent an email to Provost Bell informing her that she (Dr. Kitzmiller) had been selected as a semifinalist for the Spencer grant. Provost Bell never responded.

211. So eager were Barnard officials to discriminate against Dr. Kitzmiller, that they became uninterested in her financial support even when it would benefit the institution.

212. Historically, Columbia faculty have earned higher salaries than their Barnard counterparts.

213. Admission to Barnard College is restricted to women students.

214. Standards for tenure and promotion for Barnard faculty and the faculty at Columbia (where all admittees are not female) are the same.

215. Dr. Kitzmiller was a Term Assistant Professor (non-tenure track) in the Barnard Education Studies Program from 2019 to 2024.

216. Dr. Kitzmiller and her colleagues in the 2022-2023 searches were candidates for tenure track assistant professorship at Barnard.

217. At Columbia, Assistant Professor salaries are higher than those of Barnard faculty at that rank, with even wider discrepancies at upper tenured levels. According to Barnard and Columbia's submissions to National Council for Education Statistics's Integrated Postsecondary Data System (IPEDS) for the 2022-2023 academic year, Assistant Professors salaries are higher at Columbia by an average of $35,764 compared to Barnard.

218. Dr. Kitzmiller heard a Barnard sociology professor say that if she were in Columbia's Sociology Department she would be making a salary of $120,000, but she makes only $90,000 because she is in Barnard's Sociology Department.

219. Barnard faculty receive lesser benefits than Columbia faculty including for childcare, education, housing, insurance, and retirement.

220. The pay-and-benefits disparity is related to the fact that Barnard faculty teach a female

student body; it results in second class professor status, and violates Title VII of the Civil Rights Act of 1964, the Federal Equal Pay Act, the New York State Equal Pay Law, and the New York City Human Rights Law.

221.    The lower paid faculty population at Barnard is mostly female (65%) while the higher paid faculty at Columbia is mostly male (39% female), according to IPEDS for the 2022-2023 academic year.

222.    The faculties at Barnard and Columbia have the same responsibilities in terms of teaching, scholarship, and service, and are evaluated according to the same standards for tenure and by the same final committees, yet, Barnard faculty receive poorer economic treatment.

223.    Dr. Kitzmiller is not the first to raise questions and concerns about the salary and benefits inequities. A group of women, known as the Columbia Women's Liberation, issued a report documenting the salary differentials between Barnard and Columbia faculty. The report was published in the Barnard Alumnae Magazine in the Spring of 1970. In 1995, Barnard's Faculty Finance Committee wrote a letter to the Board of Trustees saying, "the increasing disparity between Barnard and Columbia salaries is particularly demoralizing...and implies that teaching women has less value than teaching men." The 2013 Report of the Faculty Finance and Resource Committee, which Provost Bell worked with, stated that one of the goals of the committee was to "make and maintain Barnard salaries competitive with Columbia Arts and Sciences."

224.    In addition to treating its mostly female faculty worse than Columbia's mostly male faculty, there is additional sex discrimination within Barnard. At Barnard, women are concentrated in non-tenure-track faculty positions, where they receive lower pay and short-term contracts, with no room for professional advancement.

225.    Seventy-five percent (75%) of Barnard's non-tenure-track faculty are women, according to IPEDS for the 2022-2023 academic year.

226.    In her time at Barnard, Dr. Kitzmiller did not receive any training on the Equal Pay Act, nor does she know of any such training for faculty or staff.

227.    Under New York law, employers must provide their employees with a sexual harassment prevention training at least once per calendar year.  In her time at Barnard, Dr. Kitzmiller did not receive any training on non-discrimination of mothers and/or women who are older; nor does she know of any such training for faculty or staff. The failure to provide the required training is a violation of New York law.

228.    As a result of Defendants' actions, Dr. Kitzmiller has suffered economic and emotional distress damages.

229.    Plaintiff demands a jury trial.

## VI.  COUNTS

### COUNT I
### Intentional Discrimination on the Basis of Sex
### Violation of Title IX 20 U.S.C. § 1681 et seq.
### (Plaintiff v. Defendants)

230.    The preceding paragraphs are incorporated as if set forth at length herein.

231.    Dr. Kitzmiller is a member of a protected class, female.

232.    Dr. Kitzmiller also is a member of a protected class based on her parental, family, and/or marital status as she is female, a mother of two children, and married.

233.    Dr. Kitzmiller was qualified for her position(s) at Barnard/Columbia.

234.    Barnard is an education program or activity that receives Federal financial assistance for purposes including maintaining and enhancing the Education Studies Program and the Urban

Studies Program and, therefore, a covered entity under Title IX. 20 U.S.C. § 1687(2)(A).

235.    Columbia is an education program or activity that receives Federal financial assistance and, therefore, is a covered entity under Title IX. 20 U.S.C. § 1687(2)(A).

236.    Dr. Kitzmiller was qualified for the Assistant Professor positions in the Education Studies Program position based on her qualifications and experience.

237.    Dr. Kitzmiller applied for this position.

238.    Dr. Kitzmiller suffered an adverse action when Defendants failed to hire her for this position.

239.    Dr. Kitzmiller also was qualified for the joint Assistant Professor position in the Education Studies and Urban Studies Programs based on her qualifications and experience.

240.    Dr. Kitzmiller applied for the position.

241.    Dr. Kitzmiller suffered an adverse action when Defendants failed to hire her for the position.

242.    Ample facts reflect a discriminatory intent.

243.    By way of example, Defendants' hiring decisions were based sex and on the parental, family, or marital status of applicants for employment.

244.    For example, Search Committee members expressed an aversion to female applicants and/or faculty members with children like Dr. Kitzmiller, including they allegedly were not available or not as available to teach night classes which could increase revenue because of their childcare responsibilities.

245.    The Search Committee did not recommend hiring any candidate who had children.

246.    The Search Committee recommended only candidates who did not have children.

247.    The Defendants ultimately hired a female without children (Dr. Gross) for the position of Assistant Professor in the Education Studies Program.

248.    The Defendants ultimately hired a female without children (Dr. Herbert) for the position of the joint Assistant Professor in the Education Studies and Urban Studies Programs.

249.    Defendants' justifications for the failure to hire Dr. Kitzmiller are a pretext for discrimination.

250.    As a result of the discrimination Dr. Kitzmiller has suffered damages including, but not limited to, the loss of employment wages and benefits, out-of-pocket expenses, emotional distress, harm to reputation, and other compensatory damages.

251.    Dr. Kitzmiller seeks all remedies and damages permitted under Title IX, including, but not limited to, back pay, front pay, emotional distress, medical harm, reputation harm damages, reinstatement, attorney's fees, costs, and pre-judgment and post-judgment interest.

## COUNT II
### Retaliation
### Violation of Title IX 20 U.S.C. § 1681 et seq.
### (Plaintiff v. Defendants)

252.    The preceding paragraphs are incorporated as if set forth at length herein.

253.    Barnard is an education program or activity that receives Federal financial assistance for purposes including maintaining and enhancing the Education Studies Program and the Urban Studies Program and, therefore, a covered entity under Title IX.  20 U.S.C. § 1687(2)(A).

254.    Columbia is an education program or activity that receives Federal financial assistance and, therefore, is a covered entity under Title IX.  20 U.S.C. § 1687(2)(A).

255.    Dr. Kitzmiller engaged in activity protected under Title IX including when she complained that Barnard faculty received lesser benefits than Columbia faculty, and filed complaints

32

of discrimination with the Office of Nondiscrimination and Title IX.

256.    Following the protected activity, Dr. Kitzmiller suffered adverse actions including that Defendants failed to hire her for either Assistant Professor tenure track position, failed to support her grant activity, and failed to properly investigate her discrimination claims.

257.    A causal connection exists based on timing, antagonism, and pretext.

258.    Defendants' justifications for the failure to hire Dr. Kitzmiller are a pretext for retaliation.

259.    As a result of the retaliation Dr. Kitzmiller has suffered damages including, but not limited to, the loss of employment wages and benefits, out-of-pocket expenses, emotional distress, harm to reputation, and other compensatory damages.

260.    Dr. Kitzmiller seeks all remedies and damages permitted under Title IX, including, but not limited to, back pay, front pay, emotional distress, medical harm, reputation harm damages, reinstatement, attorney's fees, costs, and pre-judgment and post-judgment interest.

### COUNT III
### RETALIATION
### Violation of 42 U.S.C. § 1981
### Plaintiff v. Defendants

261.    The preceding paragraphs are incorporated as if set forth at length herein.

262.    Dr. Kitzmiller files this action under 42 U.S.C. § 1981 against Defendants for retaliation for engaging in activity protected under Section 1981 (including complaints that college policies disadvantaged minority students) by failing to hire her for either tenure track position.

263.    Dr. Kitzmiller engaged in protected conduct including when she advocated on behalf of minority students and complained that certain college policies, including caps on class size, disadvantaged minority students.  She complained the caps were preventing racial minority students,

who sometimes registered late for the semester due to financial challenges, from taking the classes and preventing them from majoring or minoring in Education Studies. The enrollment caps were unnecessary since Dr. Kitzmiller effectively had taught classes to more students previously and always received high ratings.

264.    Following the protected activity, Dr. Kitzmiller suffered an adverse action including that Defendants failed to hire her for either Assistant Professor tenure track position.

265.    A causal connection exists based on timing, antagonism, and pretext.

266.    For example, in response, Dr. Abu El-Haj made clear that she did not appreciate that Dr. Kitzmiller had framed the caps as a racial equity issue and even told Dr. Kitzmiller that she "would be happier at another institution" and "should consider leaving Barnard."

267.    Professor Maulucci told Dr. Kitzmiller that she could not be a "good teacher" with more than twenty students in her course which was demonstrably false.

268.    Defendants' justifications for the failures to hire Dr. Kitzmiller are a pretext for retaliation.

269.    As a result of the discrimination Dr. Kitzmiller has suffered damages including, but not limited to, the loss of employment wages and benefits, out-of-pocket expenses, emotional distress, harm to reputation, and other compensatory damages.

270.    Dr. Kitzmiller seeks all remedies and damages permitted under Section 1981, including, but not limited to, back pay, front pay, emotional distress, medical harm, reputation harm damages, reinstatement, attorney's fees, costs, and pre-judgment and post-judgment interest.

## COUNT IV
## RACE DISCRIMINATION
### Violation of 42 U.S.C. § 1981
### Plaintiff v. Defendants

271.    The preceding paragraphs are incorporated as if set forth at length herein.

272.    Dr. Kitzmiller is a member of a protected class, Caucasian/White.

273.    Barnard is a covered entity for purposes of Section 1981.

274.    Columbia also is a covered entity for purposes of Section 1981.

275.    Dr. Kitzmiller was qualified for the joint Assistant Professor position in the Education Studies and Urban Studies Programs based on her qualifications and experience.

276.    Dr. Kitzmiller applied for the position.

277.    Dr. Kitzmiller suffered an adverse action when Defendants failed to hire her for the position.

278.    There are facts to imply a discriminatory intent.

279.    Defendants' hiring decisions were based on race.

280.    For example, Search Committee Chair Dr. Abu El-Haj told Dr. Kitzmiller that her application for this position would not be considered because she was "not urban enough," which was false and pretextual.

281.    Dr. Kitzmiller later was told in a May 12, 2023 email that "urbanness" was used by the Search Committee as "related to a candidate's scholarship used as an objective criterion to evaluate all candidates during the search process." This was absurd, subjective, and not part of the job search criteria.

282.    Regarding the false lack of "urbanness" charge against Dr. Kitzmiller, she was the only finalist with any educational credential in the field of urban studies, a Certificate in Urban

Studies from the University of Pennsylvania.

283.    Dr. Kitzmiller's doctoral dissertation was selected as one of five to receive honors from Penn's Institute of Urban Research.

284.    Dr. Kitzmiller's doctoral advisor, Dr. Michael B. Katz, was a leading figure in the field of urban studies and urban history; he founded the Urban Studies program at the University of Pennsylvania, a program internationally recognized for its research and teaching.

285.    Dr. Kitzmiller taught in the Urban Studies program at the University of Pennsylvania and at Barnard in 2015-16 and received exemplary teaching evaluations.

286.    At the University of Pennsylvania, Dr. Kitzmiller received a student-nominated university-wide teaching prize for her work teaching urban history.

287.    Dr. Kitzmiller has two Ph.D.'s, one in education and one in history, and a Masters in Public Administration (M.P.A.), all of which focus on urban scholarship and teaching.

288.    Defendants' justifications for the failure to hire Dr. Kitzmiller are a pretext for discrimination.

289.    As a result of the discrimination Dr. Kitzmiller has suffered damages including, but not limited to, the loss of employment wages and benefits, out-of-pocket expenses, emotional distress, harm to reputation, and other compensatory damages.

290.    Dr. Kitzmiller seeks all remedies and damages permitted under Section 1981, including, but not limited to, back pay, front pay, emotional distress, medical harm, reputation harm damages, reinstatement, attorney's fees, costs, and pre-judgment and post-judgment interest.

## COUNT V
## DISCRIMINATION ON THE BASIS OF RACE/RELIGION
### Violation of 42 U.S.C. § 1981
### Plaintiff v. Defendants

291.    The preceding paragraphs are incorporated as if set forth at length herein.

292.    Dr. Kitzmiller is married to Dr. Jacobs who is Jewish.

293.    Dr. Kitzmiller asserts that she was subjected to employment discrimination because her husband is Jewish.

294.    Barnard is a covered entity for purposes of Section 1981.

295.    Columbia also is a covered entity for purposes of Section 1981.

296.    Dr. Abu El-Haj is an individual subject to liability under Section 1981.

297.    Dr. Kitzmiller was qualified for the Assistant Professor position in the Education Studies Program based on her qualifications and experience.

298.    Dr. Kitzmiller applied for the position.

299.    Dr. Kitzmiller suffered an adverse action when Defendants failed to hire her for the position.

300.    Dr. Kitzmiller also was qualified for the joint Assistant Professor position in the Education Studies and Urban Studies Programs based on her qualifications and experience.

301.    Dr. Kitzmiller applied for the position.

302.    Dr. Kitzmiller suffered an adverse action when Defendants failed to hire her for the position.

303.    There are facts to imply a discriminatory intent.

304.    Plaintiff was subjected to employment discrimination because her husband is Jewish.

305.    For example, in the winter of 2020, Dr. Abu El-Haj visited Dr. Kitzmiller's office,

falsely and bizarrely noted that some wall posters were "anti-Muslim," and implied that Dr. Kitzmiller was anti-Muslim as well.  Dr. Abu El-Haj is a supporter of the Boycott, Divestment, Sanctions (BDS) movement.  The BDS movement contains anti-Semitic aspects aimed at delegitimizing and pressuring Israel, through the diplomatic, financial, professional, academic and cultural isolation of Israel, Israeli individuals, Israeli institutions, and, increasingly, Jews who support Israel's right to exist.  Subsequently Dr. Abu El-Haj was hostile to Dr. Kitzmiller without a legitimate basis.  Search Committee Chair Dr. Abu El-Haj told Dr. Kitzmiller that her application for the joint Urban Studies-Education position would not be considered because she was "not urban enough," which was false and pretextual.

306.    In April 2021, in connection with Dr. Kitzmiller's requests to lift the class cap of twenty students for her in-demand courses, Dr. Kitzmiller told Dr. Abu El-Haj and members of her program that the caps were preventing racial minority students, who sometimes registered late for the semester due to financial challenges, from taking the classes and preventing them from majoring or minoring in Education Studies.

307.    The enrollment caps were unnecessary since Dr. Kitzmiller effectively had taught classes to more students previously and always received high ratings.

308.    Dr. Abu El-Haj made clear that she did not appreciate that Dr. Kitzmiller had framed the caps as a racial equity issue and even told Dr. Kitzmiller that she "would be happier at another institution" and "should consider leaving Barnard."

309.    During Dr. Kitzmiller's interview process, Dr. Abu El-Haj vocally presumed that Dr. Kitzmiller's husband, Dr. Jacobs, a Columbia professor, was a bad husband and father, although she did not know anything personal about him besides that he was Jewish.

310.    Defendants' justifications for the failure to hire Dr. Kitzmiller are a pretext for discrimination.

311.    As a result of the discrimination Dr. Kitzmiller has suffered damages including, but not limited to, the loss of employment wages and benefits, out-of-pocket expenses, emotional distress, harm to reputation, and other compensatory damages.

312.    Dr. Kitzmiller seeks all remedies and damages permitted under Section 1981, including, but not limited to, back pay, front pay, emotional distress, medical harm, reputation harm damages, reinstatement, attorney's fees, costs, and pre-judgment and post-judgment interest.

**COUNT VI**
**DISCRIMINATION ON THE BASIS OF RACE**
**Violation of Title VI, 42 U.S.C. § 2000d et seq.**
**Plaintiff v. Defendant**

313.    The preceding paragraphs are incorporated as if set forth at length herein.

314.    Dr. Kitzmiller files this action under Title VI against Defendants for retaliation for engaging in activity protected under Title VI (including complaints that college policies disadvantaged minority students) by failing to hire her for either tenure track position.

315.    Barnard is a program or activity receiving Federal financial assistance and therefore a covered entity for purposes of Title VI.

316.    Columbia is a program or activity receiving Federal financial assistance and therefore a covered entity for purposes of Title VI.

317.    Dr. Kitzmiller engaged in protected conduct including when she advocated on behalf of minority students and complained that certain college policies, including caps on class size, disadvantaged minority students.  She complained the caps were preventing racial minority students, who sometimes registered late for the semester due to financial challenges, from taking the classes

and preventing them from majoring or minoring in Education Studies. The enrollment caps were unnecessary since Dr. Kitzmiller effectively had taught classes to more students previously and always received high ratings.

318.    Following the protected activity, Dr. Kitzmiller suffered an adverse action including that Defendants failed to hire her for either Assistant Professor tenure track position.

319.    A causal connection exists based on timing, antagonism, and pretext.

320.    For example, in response, Dr. Abu El-Haj made clear that she did not appreciate that Dr. Kitzmiller had framed the caps as a racial equity issue and even told Dr. Kitzmiller that she "would be happier at another institution" and "should consider leaving Barnard."

321.    Professor Maulucci told Dr. Kitzmiller that she could not be a "good teacher" with more than 20 students in her course which was demonstrably false.

322.    Defendants' justifications for the failures to hire Dr. Kitzmiller are a pretext for retaliation.

323.    As a result of the discrimination Dr. Kitzmiller has suffered damages including, but not limited to, the loss of employment wages and benefits, out-of-pocket expenses, emotional distress, harm to reputation, and other compensatory damages.

324.    Dr. Kitzmiller seeks all remedies and damages permitted under Title VI, including, but not limited to, back pay, front pay, emotional distress, medical harm, reputation harm damages, reinstatement, attorney's fees, costs, and pre-judgment and post-judgment interest.

**COUNT VII**
**DISCRIMINATION ON THE BASIS OF RACE**
**Violation of Title VI, 42 U.S.C. 2000d et seq.**
**Plaintiff v. Defendant**

325.    The preceding paragraphs are incorporated as if set forth at length herein.

326.    Dr. Kitzmiller is a member of a protected class, Caucasian/White.

327.    Barnard is a program or activity receiving Federal financial assistance and therefore a covered entity for purposes of Title VI.

328.    Columbia is a program or activity receiving Federal financial assistance and therefore a covered entity for purposes of Title VI.

329.    Dr. Kitzmiller also was qualified for the joint Assistant Professor position in the Education Studies and Urban Studies Programs based on her qualifications and experience.

330.    Dr. Kitzmiller applied for the position.

331.    Dr. Kitzmiller suffered an adverse action when Defendants failed to hire her for the position.

332.    There are facts to imply a discriminatory intent.

333.    Defendants' hiring decisions were based on race.

334.    For example, Search Committee Chair Dr. Abu El-Haj told Dr. Kitzmiller that her application for this position would not be considered because she was "not urban enough," which was false and pretextual.

335.    Regarding the false lack of "urbanness" charge against Dr. Kitzmiller, she was the only finalist with any educational credential in the field of urban studies, a Certificate in Urban Studies from the University of Pennsylvania.

336.    Dr. Kitzmiller's doctoral dissertation was selected as one of five to receive honors from Penn's Institute of Urban Research.

337.    Dr. Kitzmiller's doctoral advisor, Dr. Michael B. Katz, was a leading figure in the field of urban studies and urban history; he founded the Urban Studies program at the University of

Pennsylvania, a program internationally recognized for its research and teaching.

338.    Dr. Kitzmiller taught in the Urban Studies program at Barnard in 2015-16 and received exemplary teaching evaluations.

339.    At the University of Pennsylvania, Dr. Kitzmiller received a student-nominated university-wide teaching prize for her work teaching urban history.

340.    Dr. Kitzmiller has two Ph.D.'s, one in education and one in history, and a Masters in Public Administration (M.P.A.), all of which focus on urban scholarship and teaching.

341.    Defendants' justifications for the failure to hire Dr. Kitzmiller are a pretext for discrimination.

342.    As a result of the discrimination Dr. Kitzmiller has suffered damages including, but not limited to, the loss of employment wages and benefits, out-of-pocket expenses, emotional distress, harm to reputation, and other compensatory damages.

343.    Dr. Kitzmiller seeks all remedies and damages permitted under Title VI, including, but not limited to, back pay, front pay, emotional distress, medical harm, reputation harm damages, reinstatement, attorney's fees, costs, and pre-judgment and post-judgment interest.

## COUNT VIII
## BREACH OF CONTRACT
### Plaintiff v. Defendants

344.    The preceding paragraphs are incorporated as if set forth at length herein.

345.    A contract exists between Dr. Kitzmiller and the Defendants consisting of the Defendants' policies and procedures.

346.    As stated in Barnard's Academic Code as well as in Barnard's Faculty Handbook, "[r]ecommendations on appointments, reappointments, promotions, and tenure must be made by a

majority vote of the department's Professors and Associate Professors holding rank higher than that of the person being considered."

347.    The composition of the search committees at issue violated Barnard's Academic Code and Faculty Handbook as three members held the lower ranks of Assistant Professor, Senior Lecturer, or Lecturer.

348.    Barnard prohibits conflicts of interest between applicants for hire and promotion and individuals involved in the recommendation and/or decision process.

349.    Here there were several conflicts of interest that were not remedied, including that Dr. Abu El-Haj evaluated her own student's application, rather than recusing herself as required by Barnard's policy, and this younger less well-qualified individual was eventually awarded the position.

350.    Barnard's policies stipulate that search committee members recuse themselves from evaluating their own students.  Dr. Kitzmiller was told by Vice Provost Edward Barnaby that recusal did not occur in this case, which is a blatant violation of Barnard's policies.  This nonrecusal was consequential because the search chair's student was eventually hired for the position, even as she had no published papers at the time of the search.

351.    Shamefully, one non-tenure track member of the search committees actually was the brother-in-law of Dr. Abu El-Haj, the search chair. He was further conflicted because he had repeatedly and publicly voiced frustration that he had been denied promotion to a tenure-track position from his current non-tenure-track role.

352.    Another member of the search committee was Dr. Abu El-Haj's direct report.

353.    In January 2023, Barnard's Title IX administrator Dr. Scott-Francis told Dr. Kitzmiller that the conflicts of interest among the members of the Search Committees that considered her recent

applications would not even be allowed in a staff hiring committee.

354.    Barnard policy stipulates that the search pools be narrowed based on criteria in the wording of the advertisement.  However, Dr. Kitzmiller was informed that she was not considered for the joint Education/Urban Studies position because she was "not urban enough."  This was improper because the advertisement did not discuss the "urbanness" of the candidate.

355.    As a result of Defendants' breaches of contract, Dr. Kitzmiller suffered damages including that she was not fairly evaluated and not hired for either of the tenure track positions.

356.    Dr. Kitzmiller demands all remedies and damages available to her for breach of contract.

**COUNT IX**
**Breach of Contract**
**Plaintiff v. Defendants**

357.    The preceding paragraphs are incorporated as if set forth at length herein.

358.    A contract exists between Dr. Kitzmiller and the Defendants consisting of the Defendants' policies and procedures.

359.    Those policies and procedures include, but are not limited to, Barnard's Title IX and anti-discrimination policies and procedures.

360.    Following the failures-to-hire, Dr. Kitzmiller followed every possible protocol at Barnard to get the issues resolved.

361.    On December 23, 2022, Dr. Kitzmiller emailed President Sian Beilock and Provost Linda Bell about the search.  President Beilock told Dr. Kitzmiller to discuss her concerns with Provost Bell.

362.    In January 2023, Dr. Kitzmiller filed a complaint with Barnard's Office of

Nondiscrimination and Title IX.  She did so at the suggestion of Barnard's Chief Diversity Officer Dr. Jennifer Rosales who participated in the search and knew of Dr. Kitzmiller's experiences.

363.    In March 2023, Dr. Kitzmiller met with then-President Beilock and Provost Bell.

364.    Dr. Rosales advised Dr. Kitzmiller on January 5, 2023 to meet with the Barnard Title IX office "for your [Dr. Kitzmiller's] protection before you meet with [Provost] Linda Bell."

365.    Dr. Rosales was knowledgeable about the events that occurred during the search because she participated in the search process and discussed the events afterwards with Dr. Kitzmiller.

366.    After interviewing Dr. Kitzmiller, the Director of Barnard's Office of Nondiscrimination and Title IX, Dr. Elizabeth Scott-Francis, said that there are "climate" concerns about the Education Studies Program that needed to be addressed.

367.    Dr. Scott-Francis stated that she would conduct a thorough probe, including interviewing witnesses, and told Dr. Kitzmiller to expect a final report that would describe what she found in the investigation including redactions in cases of confidential search information.

368.    However, Dr. Scott-Francis conducted only an "inquiry," not an investigation, into Dr. Kitzmiller's complaints and declined to provide a report.

369.    Barnard's policies distinguished between an "inquiry" and an "investigation."

370.    Under Barnard's policy at the time, an inquiry is time limited and "should not take longer than five-to-ten (5-10) business days."

371.    When Dr. Kitzmiller met with Dr. Scott-Francis in January 2023, Dr. Kitzmiller asked her to interview Dr. Rachel Throop, who could be expected to be supportive on the question of the search favoring younger faculty.

45

372.    In March 2023, Dr. Kitzmiller learned from Dr. Scott-Francis that she never interviewed Dr. Throop.

373.    In March 2023, Dr. Kitzmiller met with then Barnard President Sian Beilock and voiced concerns about the Office of Nondiscrimination and Title IX investigation because one of her suggested witnesses, Dr. Rachel Throop, was not contacted. President Beilock responded that they could not discuss the "investigation" while it was under way.

374.    In March 2023, Dr. Shose Kessi, the Dean of Humanities and Professor of Psychology at the University of Cape Town, South Africa, facilitated a Gildersleeve workshop on racial issues in education at Barnard. Dr. Kitzmiller wrote the grant to bring Dr. Kessi to Barnard for this honor.

375.    When Dr. Kitzmiller noted an African American female professor who feared losing her professorship in Florida for teaching critical race theory, Dr. Abu El-Haj demonstrated hostility by publicly exploding at Dr. Kitzmiller and bizarrely accusing her of being anti-Palestinian, a baseless falsehood that was racist in itself, and not on topic.

376.    Dr. Kitzmiller asked Dr. Elizabeth Scott-Francis, Director of Nondiscrimination and Title IX and Title IX Coordinator, to investigate Dr. Abu El-Haj's outburst. Dr. Scott-Francis agreed, requested, and received Dr. Kessi's contact information from Dr. Kitzmiller but then never even contacted her. There have been no known consequences for Dr. Abu El-Haj who unnecessarily, viciously, and publicly humiliated Dr. Kitzmiller in an open forum.

377.    The process conducted by Dr. Scott-Francis continued for about five months and is thus even longer than expected in an "investigation," which should be completed "...within thirty to forty (30-40) business days," according to Barnard policy at the time.

378.    It was not until May 12, 2023 that Dr. Scott-Francis provided a final response that was

negative, result- oriented, and pretextual.

379.    Dr. Scott-Francis interviewed Professor Yolanda Sealey-Ruiz ("Dr. Sealey-Ruiz"), a professor at Teachers College, Columbia University, because Dr. Kitzmiller suggested that Dr. Sealey-Ruiz could provide information relevant to Dr. Kitzmiller's complaint including her observations and concerns regarding Dr. Abu El- Haj retaliating and harassing Dr. Kitzmiller for her racial advocacy.

380.    Shortly thereafter Dr. Scott-Francis terminated the investigation and refused to provide information about this or any interviews.

381.    The effect of this cessation was to allow the Office of Nondiscrimination and Title IX not to follow its own rules, not to put evidence corroborating Dr. Kitzmiller in writing, and not to conduct interviews to gather supportive testimony.

382.    The evidence gathered by Dr. Scott-Francis apparently was not reviewed by an outside pool of individuals (as is required by Barnard's nondiscrimination policy) nor was Dr. Kitzmiller given the opportunity to respond to any findings or to provide a formal appeal.

383.    According to Barnard's policy, Dr. Kitzmiller should have been provided with a report "that will include a summary of relevant information of each interview, provide a summary of factual information, and include any relevant documentation collected."

384.    Dr. Kitzmiller never received this report from Dr. Scott-Francis, and the apparent failure of Dr. Scott-Francis to conduct a complete investigation constitutes a violation of Barnard's internal rules, and a cover-up.

385.    As a result of Defendants' breaches of contract, Dr. Kitzmiller suffered damages including, but not limited to, that she was deprived of a fair investigation and subjected to additional

harassment.

386.    Dr. Kitzmiller demands all remedies and damages available to her for breach of contract.

**COUNT X**
**FRAUD**
**Plaintiff v. Defendants**

387.    The preceding paragraphs are incorporated as if set forth at length herein.

388.    In order to state a claim for fraud under New York law, a plaintiff must plead that the defendant made a material misrepresentation or omission of a fact, with knowledge of that fact's falsity and with an intent to induce reliance; plaintiff must also plead justifiable reliance and damages.

389.    Barnard and/or Columbia represented that it would adhere to its Title IX policy and conduct a throughout investigation into Dr. Kitzmiller's complaints regarding sex discrimination.

390.    Contrary to the aforementioned representations, Barnard/Columbia failed to properly investigate Dr. Kitzmiller's complaints.

391.    Barnard/Columbia acted with the knowledge that they would not properly investigate Dr. Kitzmiller's complaints.

392.    Barnard/Columbia acted with the intent to preclude Dr. Kitzmiller from filing subsequent complaints regarding sex discrimination.

393.    Dr. Kitzmiller relied on the representations made by Barnard/Columbia.

394.    Dr. Kitzmiller suffered damages on account of her reliance.

395.    Dr. Kitzmiller demands all remedies and damages available to her for fraud.

## COUNT XI
## FRAUD
### Plaintiff v. Defendants

396.    The preceding paragraphs are incorporated as if set forth at length herein.

397.    In order to state a claim for fraud under New York law, a plaintiff must plead that defendant made a material misrepresentation or omission of a fact, with knowledge of that fact's falsity and with an intent to induce reliance; plaintiff must also plead justifiable reliance and damages.

398.    Barnard and/or Columbia represented that the faculty searches for the Educational Studies and Urban Studies-Educational Studies openings would be fair, open, and conducted consistently with College and University procedures.

399.    Contrary to the aforementioned representations, Barnard/Columbia conducted a sham search that was intended to result in the hiring of Dr. Abu-El Haj's former student.

400.    Barnard and/or Columbia acted with the knowledge that the outcome of the search was pre-determined.

401.    Barnard and/or Columbia acted with the intent to preclude Dr. Kitzmiller from filing subsequent complaints regarding the search process.

402.    Dr. Kitzmiller relied on the representations made by Barnard and/or Columbia.

403.    Dr. Kitzmiller suffered damages on account of her reliance.

404.    Dr. Kitzmiller demands all remedies and damages available to her for fraud.

Respectfully Submitted,

LIEBER HAMMER HUBER PAUL & HOFFMAN, P.C.


s/James B. Lieber
James B. Lieber
Pa. I.D. No. 21748
Pro Hac Vice Admission Pending
Thomas M. Huber
Pa. I.D. No. 83053
Pro Hac Vice Admission Pending
1722 Murray Avenue, 2nd Floor
Pittsburgh, PA 15217
(412) 687-2231 (telephone)
(412) 687-3140 (fax)