## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ERIKA M. KITZMILLER, | ) | Civil Action No. 25-8634 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| BARNARD COLLEGE and | ) | |
| THE TRUSTEES OF COLUMBIA | ) | |
| UNIVERSITY IN THE CITY OF | ) | |
| NEW YORK, THEA ABU EL-HAJ, | ) | FILED ELECTRONICALLY |
| MARIA RIVERA MAULUCCI, | ) | |
| ELIZABETH SCOTT-FRANCIS, | ) | |
| ANGELA OLINTO, LINDA BELL, | ) | |
| SIAN BEILOCK,  LAURA ANN | ) | |
| ROSENBURY, and LESLIE A. SHARP, | ) | |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

## AMENDED COMPLAINT IN CIVIL ACTION

AND NOW comes Plaintiff, Erika M. Kitzmiller ("Dr. Kitzmiller"), by and through undersigned counsel, and files this Amended Complaint in Civil Action, stating as follows:

## I.  PARTIES

1.      Dr. Kitzmiller is an adult individual currently residing in the State of Illinois who, during the time relevant to this Amended Complaint, resided in the Borough of Manhattan, City of New York, State of New York.

2.      Barnard College ("Barnard") is a private liberal arts college for women with its primary place of business at 3009 Broadway, New York, New York, 10027.

3.      The Trustees of Columbia University in the City of New York ("Columbia") operate a private Ivy League research university with its primary place of business at 116th Street and Broadway, New York, New York 10027.

4.      Dr. Thea Renda Abu El-Haj is a Professor and former Chair of the Education Studies Program with a professional address of Barnard College Columbia University, 336B Milbank Hall, 3009 Broadway, New York, NY 10027 and, based on information and belief, is a citizen of the State of New York.

5.      Dr. Maria Rivera Maulucci is a Professor and Chair of the Education Studies Program with a professional address of Barnard College Columbia University, 706 Milstein Center, 3009 Broadway, New York, NY 10027 and, based on information and belief, is a citizen of the State of New York.

6.      Dr. Elizabeth Scott-Francis is the former Director of Barnard's Office of Nondiscrimination and Title IX and now the Title IX Coordinator and director of outreach and support for Virginia Commonwealth University with a professional address of 912 W. Grace St., 2nd Floor, Richmond, VA 23284-3022 and, based on information and belief, is a citizen of the State of Virginia.

7.      Dr. Angela V. Olinto is Professor of Astronomy and of Physics and Provost of Columbia University with a professional address of 535 W. 116th Street, 205 Low Memorial Library, New York, NY 10027 and, based on information and belief, is a citizen of the State of New York.

8.      Dr. Linda A. Bell is a Professor of Economics at Barnard who previously served as Provost and Dean of the Faculty from 2012-2024 with a professional address at 3009 Broadway, New York, NY 10027 and, based on information and belief, is a citizen of the State of New York.

9.      Dr. Sian Beilock is a former President of Barnard College at Columbia University and now the President of Dartmouth College with a professional address at 6016 McNutt Hall,

2

Hanover, New Hampshire 03755 and, based on information and belief, is a citizen of the State of New Hampshire.

10.     Dr. Laura Ann Rosenbury is the President of Barnard College with a professional address of 3009 Broadway, New York, NY 10027-6598 and, based on information and belief, is a citizen of the State of New York.

11.     Dr. Leslie A. Sharp is Professor of Anthropology at Barnard and a Senior Research Scientist of Sociomedical Sciences at Columbia University Medical School.

12.     Barnard and Columbia operate jointly or as a single employer in the employment of faculty.

13.     According to Barnard's Mission Statement, "Barnard College aims to provide the highest-quality liberal arts education to promising and high-achieving young women, offering the unparalleled advantages of an outstanding residential college in partnership with a major research university [*i.e.* Columbia University]."

14.     Barnard and Columbia are closely affiliated and Barnard asserts in its official Course Catalog that "Barnard is an official college of Columbia University."

15.     Regarding this partnership, Barnard states on its website: "Barnard College and Columbia University have a historic relationship that's unique in American higher education. Students share academic resources along with extracurricular activities, athletic fields, and even dining halls. At Barnard, you'll benefit from a college experience that offers small, intimate classes in a collaborative environment dedicated to women, along with access to the vast academic resources of Columbia University, just across the street."

16.     According to Barnard's website: "Students from Barnard and Columbia share course catalogs and can take classes at either campus."

3

17.     With respect to faculty, Barnard advertises on its website that "Barnard Professors are Columbia Professors, Too," including that "[a]ll tenured Barnard professors are also tenured at Columbia University, where they're free to pursue their academic interests with full access to the world-class resources of a large research university." In addition, Columbia publishes the names of Barnard faculty members who have received tenure at Columbia.

18.     Standards for tenure and promotion for Barnard faculty and Columbia faculty are the same: the faculties have the same responsibilities in terms of teaching, scholarship, and service, and are evaluated according to the same standards for tenure by the same committees.

19.     Barnard's "Conflict of Interest and Commitment" policy (obtained from the Barnard website in 2023) relating to impermissible outside employment states, "Columbia is not considered to be a separate non-profit institution, and faculty may create courses for and collaborate freely with the Columbia University academic community."

20.     According to the Columbia University Faculty Handbook, professors may count the years where they taught only at Barnard for purposes of assessing seniority and tenure at Columbia and vice versa.

21.     Columbia maintains an advisory committee, the Tenure Review Advisory Committee ("TRAC"), which includes both Barnard and Columbia faculty members, that considers faculty appointments to both Barnard and Columbia.  Columbia faculty members are also required to sit on Barnard hiring committees.

22.     The University Statutes and intercorporate agreement between Barnard and Columbia specifies a role for Columbia in managing Barnard hiring.

23.     Columbia and Barnard "cooperate in their instructional appointments. with the goal of reducing duplication and maximizing the effectiveness of the resources of the two

4

institutions."

24.     Appointments to Barnard's faculty must be approved by Barnard's Provost, President, and Board of Trustees, as well as by Columbia.

25.     Barnard degrees are bestowed by Columbia. The Columbia University Statutes stipulate that Columbia University's Senate and Board of Trustees control "the conditions upon which degrees shall be conferred and to recommend candidates" at Barnard. In particular, the University Statutes stipulate that Barnard's degree has an equal value as a Columbia degree.

26.     The campuses are not separate, and Barnard and Columbia ID cards both provide access to both campuses. The University Statutes state explicitly that there is "common access to faculty and courses and joint utilization of facilities between the college and the University." Similarly, "libraries of the University and of the college shall be open upon equal terms to all students and faculty of either institution." The Columbia interdepartmental mail system delivers letters at no cost between Barnard and Columbia's campuses.

27.     The front gates of Barnard state "Barnard College of Columbia University."

28.     The Columbia University Admissions website listing of all its admissions offices includes Barnard.

29.     Many Columbia majors critically incorporate Barnard courses and staff. In particular, the Urban Studies Program where Dr. Kitzmiller worked explicitly describes itself as a "Barnard-Columbia" program. Columbia courses can be taught by Barnard faculty members and can enroll Barnard students. Conversely, Barnard courses can be taught by Columbia faculty and can enroll Columbia students.

30.    Barnard and Columbia share an academic calendar.

31.    Many Barnard professors include "Columbia" in their email signature and publication affiliations.

32.    The official Barnard logo includes the words "Columbia University."

33.    The official Barnard logo, including "Columbia University," also appears on Barnard's pay stubs.

34.    The Barnard website lists its affiliation with "Columbia University" throughout.

35.    Under Columbia's statutes, the administrations of Barnard and Columbia are linked, and the Barnard President reports directly to Columbia and is subordinate to the Columbia President.

36.    Barnard's President has a rank of Dean at Columbia and is "appointed by the Trustees of the college with the advice and consent of the President of the University."

37.    The Columbia President is an ex officio member of Barnard's Board of Trustees. The Columbia President may attend meetings of the Barnard faculty and must be provided copies of the minutes of all Barnard faculty meetings.

38.    Barnard faculty appointments require approval from Columbia's Board of Trustees.

39.    Certain employment benefits of Columbia and Barnard are linked. Barnard faculty often live in Columbia faculty housing and both faculty use a common parking system. However, Barnard faculty are only allowed access to lower "B and C" class apartments within the Columbia housing system.

40.    Prior to August 2025, the official Columbia website listing the official schools of

6

Columbia listed Barnard College (https://www.columbia.edu/content/academics/schools).

41.    The Barnard College commencement page states that the official commencement ceremony of Barnard is the Columbia University commencement ceremony (https://barnard.edu/commencement/about-ceremonies).

42.    At all relevant times, Columbia was Dr. Kitzmiller's joint employer or a single employer with Barnard within the meaning of all applicable statutes.

## II.  JURISDICTION

43.    This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343 because this case includes claims arising under federal law that are brought to recover damages for deprivation of equal rights.

44.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different states. Plaintiff is a citizen of the State of Illinois. Defendants have their principal places of business in the State of New York and are citizens of the State of New York. Accordingly, complete diversity of citizenship exists between the parties.

45.    This Court has supplemental jurisdiction over Plaintiff's state and city law claims pursuant to 28 U.S.C. § 1367(a).

46.    This Court has personal jurisdiction over Barnard and Columbia because both are incorporated and reside in this District, regularly transact business in this District, and committed acts within this District that caused injury to persons and/or property within this District.  The Court has personal jurisdiction over the individual defendants because they are citizens of the State

of New York and/or committed acts within this District that caused injury to persons within this District.

## III  VENUE

47.    The matters complained of in this Complaint occurred in the Borough of Manhattan (New York County) in the Southern District of New York; therefore, venue is appropriate in this Court.

## IV.  ADMINISTRATIVE EXHAUSTION

48.    Dr. Kitzmiller filed a charges of discrimination and retaliation with the Equal Employment Opportunity Commission (EEOC) on April 4, 2024 against Barnard and Columbia.

49.    This complaint was docketed at 520-2024-04436 and 520-2024-04437 and raises claims for, *inter alia*, race, sex, religion, and age discrimination, and for retaliation.

50.    Dr. Kitzmiller also filed charges of discrimination and retaliation in April 2024 with the New York State Division of Human Rights (NYSDHR) against Barnard and Columbia

51.    Investigation of this complaint was transferred to the NYSDHR on October 1, 2024, pursuant to the work sharing agreement between the two agencies, but subsequently was transferred back to the EEOC.

52.    By letter dated January 15, 2026, the NYSDHR dismissed Dr. Kitzmiller's charges against Barnard and Columbia for administrative convenience.

53.    On February 13, 2026, the EEOC issued Notice of Right to Sue letters for Charge Nos. 520-2024-04436 and 520-2024–4437.

54.    Plaintiff is filing this Amended Complaint within ninety (90) days of receipt of the Notice of Right to Sue letters.

8

## V. FACTS

A.      **Dr. Kitzmiller's Background.**

55.      Born in 1977, Dr. Kitzmiller is female and was a first-generation college graduate.

56.      Dr. Kitzmiller received a Bachelor of Arts degree from Wellesley College and a Masters of Public Administration from the University of Pennsylvania.

57.      Dr. Kitzmiller holds a Ph.D. in Education and a Ph.D. in History, both received in 2012 from the University of Pennsylvania.

58.      Dr. Kitzmiller also earned a Graduate Certificate in Urban Studies from the University of Pennsylvania; this is the highest credential offered in that subject by that institution.

59.      From 2012-2013, Dr. Kitzmiller was a Clinical Professor of Education Policy and Teacher Education at Drexel University.

60.      From 2013-2016, Dr. Kitzmiller was a postdoctoral fellow at Harvard University.

61.      From 2015 -2016, Dr. Kitzmiller served as an Adjunct Professor of Urban Studies at Barnard.

62.      From 2016-2019, Dr. Kitzmiller was a Lecturer in Social Studies Education at the Teachers College, Columbia University.

63.      From 2018-2020, Dr. Kitzmiller was a Lecturer of Mid-Career Educational Leadership at the University of Pennsylvania.

64.      Dr. Kitzmiller is married to former Columbia Associate Professor of Biomedical Engineering Dr. Joshua Jacobs and together they have two young children.

65.      Dr. Jacobs is Jewish.

9

**B.    Dr. Kitzmiller's Employment With Barnard/Columbia.**

66.    From 2019 through June 2024, Dr. Kitzmiller was a Term Assistant Professor of Education Studies at Barnard and Columbia.

67.    Columbia paid a portion of Dr. Kitzmiller's salary during the entire five year period she was at Barnard.

68.    According to Columbia, Columbia paid half of Dr. Kitzmiller's salary plus fringe benefits from 2019 through 2022, and one-third of her salary from 2022 through 2024.

69.    Dr. Kitzmiller is an educational historian and a leading scholar in the area of education and inequality.

70.    Dr. Kitzmiller performed extremely well.

71.    For example, Dr. Kitzmiller authored a well-regarded book published by the University of Pennsylvania Press as well as five peer-reviewed articles, two national policy briefs, one book chapter, and eleven op-ed pieces.

72.    Dr. Kitzmiller also was the Principal Investigator for studies into educational policy funded by the National Science Foundation and Russell Sage Foundation.

73.    Despite the fact that she was just a Term Assistant Professor, which is a contingent position, during her career Dr. Kitzmiller secured $667,525 in funding, an extremely impressive amount for a non-tenure track faculty member at a liberal arts college, which includes grants from leading outside funders including the National Science Foundation (NSF), the Russell Sage Foundation, the Spencer Foundation, the National Academy of Education, and also Barnard internal funding.

74.    Dr. Kitzmiller received consistently high student evaluations for her teaching.  There was high demand for enrollment in her courses, and her courses have been consistently over-subscribed.

75.    Dr. Kitzmiller demonstrated strong support for undergraduate research, having supported twenty-five Barnard and Columbia students in research positions and nine Barnard and Columbia students in independent studies. She has served as the mentor at Barnard for four computing fellows, five Athena Center fellows, three Laidlaw fellows, and one Mellon-Mays fellow.

76.    In 2019, Columbia promised Dr. Jacobs (Dr. Kitzmiller's spouse) that Barnard would consider Dr. Kitzmiller fairly for a tenure track position. In reliance on this promise, Dr. Jacobs stayed at Columbia despite being recruited by and receiving offers from other universities.

77.    Also, as a result of this promise, Dr. Kitzmiller stayed at Barnard, despite receiving offers for outside employment.

**C.    Dr. Kitzmiller Speaks Out on Issues of Gender and Racial Equality.**

78.    In 2019, Dr. Kitzmiller complained to Barnard Provost Dr. Linda Bell that childhood tuition benefits were higher for Columbia faculty than for Barnard faculty, but Provost Bell incredibly professed not to know of this difference.

79.    In 2019, Dr. Kitzmiller likewise complained to Dr. Thea Renda Abu El-Haj ("Dr. Abu El-Haj"), a Barnard Professor and Chair of the Education Studies Program, that childhood tuition benefits were higher for Columbia faculty than for Barnard faculty to which Dr. Abu El-Haj simply stated in writing that, "Barnard is a different institution from Columbia benefit-wise."

80.    Dr. Kitzmiller has learned that contingent (non-tenure track) faculty and staff at Columbia receive K-12 school benefits for their children but contingent faculty at Barnard do not,

which reflects Barnard's relatively anti-family environment and clear inequities.

81.    In the winter of 2020, Dr. Abu El-Haj visited Dr. Kitzmiller's office, falsely and bizarrely noted that some wall posters were "anti-Muslim," and implied that Dr. Kitzmiller was anti-Muslim as well.

82.    Dr. Abu El-Haj is a supporter of the Boycott, Divestment, and Sanctions (BDS) movement.  The BDS movement included anti-Semitic campaign aspects about delegitimizing and pressuring Israel, through the diplomatic, financial, professional, academic and cultural isolation of Israel, Israeli individuals, Israeli institutions, and, increasingly, Jews who support Israel's right to exist.

83.    Dr. Abu El-Haj was hostile to Dr. Kitzmiller without a legitimate basis.

84.    Dr. Abu El-Haj's research reflects an interest in Palestinian American identity and citizenship, including the book Unsettled Belonging: Educating Palestinian American Youth after 9/11.

85.    In 2020, Dr. Abu El-Haj actually told Dr. Kitzmiller that it was important that she (Dr. Kitzmiller) put up pictures of her young children in her office thus signifying her maternal status.  She indicated that putting up these pictures was important if Dr. Kitzmiller was to consider herself a feminist.

86.    On April 16, 2021, Dr. Kitzmiller reached out to Provost Bell to inquire about possible tenure track faculty openings; in so doing she forwarded a document outlining her accomplishments as a member of the Barnard faculty.

87.    Dr. Kitzmiller commented to Provost Bell that it was difficult to secure large federal grant funding as a Term Faculty member, that she could do even better as a tenure track member, and asked for support outside of her program with career development.  Provost Bell agreed that Dr.

Kitzmiller would be more successful with grant funding and contribute even more if she had a tenure track position.

88.    Dr. Bell also encouragingly indicated that Term Faculty had been promoted to tenure track positions in the past, and that Dr. Kitzmiller was in a strong position to be promoted so given her credentials, teaching, and scholarship.

89.    Provost Bell agreed to assign her a mentor. However, Dr. Kitzmiller never was assigned a mentor by Provost Bell or anyone else.

90.    In April 2021, in connection with Dr. Kitzmiller's requests to lift the class cap of twenty students for her in-demand courses, Dr. Kitzmiller told Dr. Abu El-Haj and members of her program that the caps were preventing racial minority students, who sometimes registered late for the semester due to financial challenges, from taking the classes and preventing them from majoring or minoring in Education Studies.

91.    The enrollment caps were unnecessary since Dr. Kitzmiller effectively had taught classes to more students previously and always received high ratings.

92.    Dr. Abu El-Haj made clear that she did not appreciate that Dr. Kitzmiller had framed the caps as a racial equity issue and even falsely told Dr. Kitzmiller that she "would be happier at another institution" and "should consider leaving Barnard." Dr. Abu El-Haj also expressed frustration that Dr. Kitzmiller met with Provost Bell.

93.    In response to Dr. Kitzmiller's challenge to the enrollment cap, Professor Maria Rivera Maulucci, Ph.D., Chair of Education Studies, falsely told Dr. Kitzmiller that she could not be a "good teacher" with more than 20 students in her course when in fact Dr. Kitzmiller already had taught larger classes well.

94.    In May 2021, Dr. Kitzmiller likewise told Provost Bell that the student caps were

13

preventing racial minority students, who sometimes registered late for the semester due to financial challenges, from taking the classes and preventing them from majoring or minoring in Education Studies.

95.     In 2021, Dr. Kitzmiller and her junior colleagues in the Education Studies Program met with Barnard's Ombudsperson in 2021 to discuss inequitable policies and practices in the Education Studies Program including towards racial minorities.

96.     Three non-tenure track faculty – Dr. Kitzmiller, Dr. Chandler Patton Miranda (Term Assistant Professor of Education and Urban Studies), and Dr. Rachel Throop (Term Assistant Professor) – independently told the Ombuds that they were concerned about sharing their perspectives and statements because they feared retaliation from Dr. Abu El-Haj and Dr. Rivera Maulucci. As a result, the Ombuds never visited the program meetings to discuss and mediate the climate issues.

97.     On September 12, 2022, Dr. Sian Beilock, then the President of Barnard College at Columbia University and now the President of Dartmouth College, noted during the convocation address that "Professor Erika Kitzmiller [helped] educators address learning delays caused by the pandemic."

98.     Dr. Kitzmiller's peer reviewed and public scholarship on learning delays caused by the pandemic focused on racial inequalities in schools, and solutions to these inequalities.

99.     Dr. Kitzmiller had organized and participated in anti-racism pedagogy workshops conducted on Barnard's campus.

100.     Dr. Kitzmiller became known throughout the Barnard community, according to comments made by the Title IX coordinator, Dr. Elizabeth Scott-Francis, as an advocate for under-represented and racial minority students.

101.    Similarly, the Ombudsperson told Dr. Kitzmiller, "It sounds like you are just trying to make Barnard a better place."

102.    On September 21, 2022 when Dr. Kitzmiller met Dr. Abu El-Haj about academic matters, Dr. Abu El-Haj raised Dr. Kitzmiller's recognition from President Beilock at the convocation, and insultingly stated: "I don't even know how she [President Beilock] would know who you are."

103.    In context, Dr. Abu El-Haj's dismissive remark regarding the President's "shout out" above can be seen as diminishing Dr. Kitzmiller for her anti-racial discriminatory speech and advocacy.

104.    In a program meeting in the fall of 2022, Dr. Kitzmiller offered a colleague advice on how to write a book proposal after which Dr. Abu El-Haj stated with hostility in front of other faculty: "Well, Erika, we aren't as famous as you."

**D.    Dr. Kitzmiller Applied For Two Tenure Track Positions.**

105.    In 2022, two open tenure track Assistant Professor positions were posted for which Dr. Kitzmiller was qualified: one was in the Education Studies Program and the other was a joint appointment in the Education Studies and Urban Studies Programs.

106.    Securing either of these positions would amount to a significant promotion and career opportunity for Dr. Kitzmiller.

107.    The Search Committee Chair for both positions was Dr. Abu El-Haj who at the time was Chair of the Education Studies Program.

108.    During Dr. Kitzmiller's 2022 annual review Chair Abu El-Haj indicated that there was "nothing" that Dr. Kitzmiller needed to do in order to improve her candidacy for available tenure track positions at Barnard.

109.    Relatedly, Dr. Abu El-Haj also stated that the ability to earn tenure at Columbia is the most important factor when choosing new tenure track faculty at Barnard.

110.    In the Fall of 2022, Dr. Kitzmiller met briefly with Dr. Abu El-Haj who stated, "You probably think you can do both jobs."

111.    The job description for the joint position in Education Studies and Urban Studies matched well with Dr. Kitzmiller's research interests and proficient performance.

112.    Dr. Kitzmiller applied for both positions.

**E.    Dr. Kitzmiller Was Not Hired For Either Position; Barnard/Columbia Instead Hired Less Qualified Younger Females Who Did Not Have Children.**

113.    Dr. Kitzmiller was not hired for either position.

114.    Instead of Dr. Kitzmiller, Barnard and Columbia hired less qualified significantly younger applicants, under forty years old, who in contrast to Dr. Kitzmiller did not have children.

115.    Barnard/Columbia hired Nora Gross, Ph.D., as Assistant Professor of Education Studies.

116.    Based on information and belief, Dr. Gross is approximately eight or more years younger than Dr. Kitzmiller and at the time of selection did not have children.

117.    Barnard/Columbia hired Amelia Simone Herbert, Ph.D., as Assistant Professor of Education and Urban Studies.

118.    Based on information and belief, Dr. Herbert is approximately six or more years younger than Dr. Kitzmiller, and at the time of selection did not have children.

119.    Dr. Herbert is African American.

120.    The Committee Members for the Educational Studies Position were Thea Abu El-Haj (Professor), Maria Rivera Maulucci (Professor), Lesley A. Sharp (Professor), and Lisa Edstrom

16

(Senior Lecturer, non-tenure track).

121.    The Committee Members for the Urban Studies-Educational Studies Position were Thea Abu El-Haj (Professor), Maria Rivera Maulucci (Professor), Lesley Sharp (Professor), Nick Smith (Assistant Professor), and Aaron Passell (Associate Director, non-tenure track).

122.    As Dr. Kitzmiller understands, she was one of six finalists for the positions.

123.    Dr. Kitzmiller was given an on-campus interview.

124.    During her 2022 job interview, Barnard Vice Provost Alex Cooley ("Dr. Cooley") told Dr. Kitzmiller that she was well-positioned to earn tenure at Columbia even at that moment based on her scholarship.

125.    Dr. Cooley said he was well qualified to make this determination regarding Dr. Kitzmiller's status because he served on Columbia's University-wide Tenure Review Advisory Committee ("TRAC").

126.    One member of both search committees, Professor Leslie A. Sharp, was tasked with interviewing Dr. Kitzmiller.

127.    Dr. Sharp has appointments at Columbia and Barnard.

128.    Dr. Sharp made clear to Dr. Kitzmiller that some departments, such as Anthropology in which she is a member, are not divided between Barnard and Columbia: "They are contiguous, meaning they are one department."

129.    Dr. Sharp also is a Senior Research Scientist in the Department of Sociomedical Sciences at Columbia University Medical Center.

130.    During Dr. Kitzmiller's interview, Dr. Kitzmiller told Dr. Sharp that she (Dr. Kitzmiller) was conducting research at a majority-Black Title I (low-income) school in Philadelphia where 100% of graduates went on to college.

131.     Dr. Sharp challenged Dr. Kitzmiller with hostility and insisted , "That cannot be true," and said that she did not believe that a Black-majority school could be a place where 100% of students went to college after graduation.

132.     Dr. Kitzmiller replied to Dr. Sharp that, "I have been conducting research there for 4 years. I have the statistics. It is true."

133.     Afterwards, Dr. Kitzmiller met Dr. Jennifer Rosales, Barnard's Vice President for Inclusion and Engaged Learning and Chief Diversity Officer (as did all six finalists).

134.     Dr. Kitzmiller told Dr. Rosales that Dr. Sharp falsely challenged Dr. Kitzmiller's claim that 100% of the students at a majority Black high school where Dr. Kitzmiller conducted research went onto college.

135.     Dr. Rosales stated that,  "Leslie seemed like an odd choice to be on the committee," and that she had a reputation on campus for being anti-Black. Dr. Rosales gave an example of Dr. Sharp's racially-prejudiced conduct and said that there were others.

136.     Immediately prior to  Dr. Kitzmiller's final interview with the search committee, Dr. Abu El-Haj criticized Dr. Kitzmiller's husband, Dr. Joshua Jacobs, a Columbia Associate Professor in the Department of Biomedical Engineering, for being a deficient husband and father which was false and upset Dr. Kitzmiller as apparently was intended at that critical moment.

137.     Dr. Abu El-Haj has never met Dr. Jacobs and knows nothing personal about him except that he is Jewish.

138.     Dr. Kitzmiller strangely was the only finalist interviewed on-campus who was removed from consideration for the joint appointment in Education Studies and Urban Studies.

139.    On November 21, 2022, Dr. Abu El-Haj told Dr. Kitzmiller that her application for this position would not be considered because she was "not urban enough," which was false and pretextual.

140.    Based on information and belief, the charge that Dr. Kitzmiller was "not urban enough" was a code for race—specifically Black or African American.

141.    Regarding the ludicrous lack of "urbanness" charge against Dr. Kitzmiller, she was the only finalist with any educational credential in the field of urban studies, a Certificate in Urban Studies from the University of Pennsylvania.

142.    Dr. Kitzmiller's doctoral dissertation was selected as one of five to receive honors from Penn's Institute of Urban Research in 2012.

143.    Dr. Kitzmiller's doctoral advisor, Dr. Michael B. Katz, was one of the leading figures in the field of urban studies and urban history; he founded the Urban Studies program at the University of Pennsylvania, a program internationally recognized for its research and teaching.

144.    Dr. Kitzmiller taught in the Urban Studies program at Barnard in 2015-16 and received outstanding teaching evaluations.

145.    At the University of Pennsylvania, Dr. Kitzmiller received a student-nominated university-wide teaching prize for her work teaching urban history.

146.    At Barnard, Dr. Kitzmiller's exemplary teaching was recognized in campus-wide events sponsored by Barnard's Center for Engaged Pedagogy.

147.    Dr. Kitzmiller has two Ph.D.'s, one in education and one in history, and a Masters in Public Administration (M.P.A.) from the University of Pennsylvania, all of which focus on urban scholarship and teaching.

19

148.    Dr. Kitzmiller was a Caperton Fellow at Harvard's W.E.B. Du Bois Institute. This fellowship is awarded to scholars focusing on the study of race and democracy.

149.    Dr. Kitzmiller has been awarded numerous postdoctoral fellowships and other grants from Harvard University, the National Academy of Education, Spencer Foundation, and the University of Pennsylvania for her book manuscript, "The Roots of Educational Inequality," which is the first book to trace the history of an urban high school in the context of its neighborhood and city over the 20th Century.

150.    Dr. Kitzmiller's book has been nominated for numerous book prizes, including from the Urban History Association, and was published by the University of Pennsylvania Press, one of the preeminent university presses in urban studies/urban history. Recently, it was named a finalist and runner-up for the prestigious History of Education Society's Outstanding Book Award. The book has received favorable reviews in the Journal of American History, Journal of Urban Affairs, Planning Perspectives, and Teachers College Record.

151.    Dr. Kitzmiller has been researching urban public schools and neighborhoods for nearly two decades, and she has been teaching in them for 25 years.

152.    Dr. Kitzmiller has received over $600,000 in funding, plus well over $575,000 more in funding previously pending, and currently had $250,000 in funding pending to do this work.

153.    For the joint assistant professorship in the Urban Studies Program and the Education Studies Program, Barnard and Columbia failed to hire Dr. Kitzmiller and instead hired Dr. Herbert, a less qualified significantly younger applicant, under forty years old, who is Black and African American and in contrast to Dr. Kitzmiller did not have children.

154.    The successful candidate, Dr. Herbert, did not have any peer-reviewed publications

20

(in contrast to Dr. Kitzmiller who had an impressive publication record) and was Dr. Abu El-Haj's doctoral advisee, which constituted a conflict of interest.

155.    The justifications for the failure to hire Dr. Kitzmiller for this position are a pretext.

156.    On December 22, 2022, Dr. Kitzmiller learned that her second application for employment in the Education Studies Assistant Professorship had been rejected.

157.    A significantly younger candidate, under forty years old, who did not have children at the time was selected over Dr. Kitzmiller.

158.    The successful candidate was Dr. Nora Gross who only recently received her Ph.D. from the University of Pennsylvania in 2020. Dr. Gross did not have a published book in contrast to Dr. Kitzmiller. She also did not have as much experience as Dr. Kitzmiller in teaching or research. She did not have Dr. Kitzmiller's grant funding and fellowship record.

159.    The justifications for the failure to hire Dr. Kitzmiller for this position are a pretext.

**F.    Barnard/Columbia Failed To Follow Its Hiring Rules And Procedures.**

160.    The search procedures for these openings failed to conform to Barnard's rules and were procedures, which were publicly posted on Barnard's website.

161.    As stated in Barnard's Academic Code as well as in Barnard's Faculty Handbook, "[r]ecommendations on appointments, reappointments, promotions, and tenure must be made by a majority vote of the department's Professors and Associate Professors holding rank higher than that of the person being considered."

162.    The composition of the search committees violated Barnard's academic regulations as three members held the lower or equal ranks to the position sought.

163.    Shamefully, one non-tenure track member of the search committees named  Aaron

Passell of the Barnard-Columbia Urban Studies Program actually is the brother-in-law of Dr. Abu El-Haj, the search chair but was not conflicted out, and should never have been chosen.

164.    Another member of the search committee was Dr. Abu El-Haj's direct report (Lisa Edstrom).

165.    Dr. Abu El-Haj evaluated her own student's application, rather than recusing herself as required by Barnard's policy, and this younger less well-qualified individual African American (Dr. Herbert) was eventually and cynically awarded the position.

166.    Therefore, three members of the search committees, including the Chair, had conflicts of interest and/or the appearance of conflicts.

167.    Barnard's faculty search policies state that applicants are eliminated from a search "using the wording of the advertisement and the specific criteria established at the beginning of the search" and that the "rationale for eliminating each candidate must be documented." The rogue standard "urbanness" was not in the advertisement.

168.    Barnard policy states that during on-campus interviews the "candidate must also meet with the Provost." However, Provost Bell did not meet with Dr. Kitzmiller during her on-campus interview while meeting with the other candidates.

169.    At the completion of a search, faculty appointments must be approved by the Barnard Provost, President, and Board of Trustees, as well as by Columbia.

## G.    Additional Evidence Of Age And Gender Stereotype Discrimination.

170.    Dr. Kitzmiller was 44 at the time of the search.

171.    It is notable that there were six finalists, three who were under the age of 40 and three who were over the age of 40.

22

172.    The three candidates over the age of 40 were all mothers of school-aged children while none of the candidates under 40 were mothers at the time of the search.

173.    During the search, one of the candidates under 40 accepted a position at the University of Wisconsin and, thus, withdrew her application from consideration.

174.    The Search Committee recommended the two remaining candidates under the age of 40 who did not have children while it did not recommend any of the candidates over 40 who were mothers.

175.    Dr. Rachel Throop was a non-tenure track Professor in Barnard's Education Studies Program.

176.    Dr. Throop told Dr. Kitzmiller that Dr. Abu El-Haj admitted that Barnard prefers to hire people who recently received their Ph.D. and "right out" of their Ph.D. programs, which reflects discrimination.

177.    Similarly, Dr. Miranda, who was a non-tenure track Professor in Barnard's Education and Urban Studies Program, told Dr. Kitzmiller in October 2023 that Dr. Abu El-Haj conceded that Barnard preferred to hire tenure track faculty who were younger and fresh out of their Ph.D. programs.

178.    When Dr. Kitzmiller spoke to Dr. Abu El-Haj about how to prepare her job interview, Dr. Abu El-Haj told Dr. Kitzmiller that unlike the other candidates who were instructed to discuss one key research contribution, she should focus on multiple projects "since she was so far removed from [her] Ph.D.," which was reflective of disparate treatment and ageism.

179.    On April 3, 2024, Barnard Professor Maria Rivera Maulucci, who had been on both search committees for the positions that were unfairly denied to Dr. Kitzmiller, harassed Dr.

23

Kitzmiller in front of the entire program faculty during its monthly meeting and made gender-based stereotypical comments about motherhood and caregiving.

180.    Professor Maulucci linked Barnard's financial problems to the need for the Education Studies Program to increase student enrollment.

181.    Dr. Kitzmiller was positioned to increase enrollment.

182.    Dr. Kitzmiller indicated that a factor limiting enrollment is classroom space as she had interest from 30 or more students in many of her classes but sometimes had to turn students away because there were not enough large classrooms available. Dr. Kitzmiller shared that she had spoken with Provost Bell about this problem several months earlier.

183.    Professor Maulucci said that Barnard could free up large classrooms by offering more evening classes.

184.    Then Dr. Maulucci presumptuously and discriminatorily remarked, "Erika, you have young children. That dictates the times that you are available to teach. We need people to teach at night and you won't want to do that with children."

185.    Dr. Kitzmiller responded: "The fact that I have children has never affected when I am available to teach. I want to be clear about that."

186.    Dr. Maulucci responded: "Well that [having young children] affected when I taught. It doesn't anymore because my children are grown. We have people in the program that have young children so it might affect them."

187.    Dr. Kitzmiller responded that she wanted to be clear: "My children have never dictated when I teach. I have taught in the evenings many times. I am teaching in the evening today."

188.    Professor Maulucci's comment, which was false, was disturbing and prejudiced

24

against mothers who have young children like Dr. Kitzmiller.

189.    This is a discriminatory theme that also infected the search processes which resulted in Dr. Kitzmiller's failure to be hired.

190.    Other contingent faculty in Barnard's Education Studies Program were also subjected to discrimination.

191.    Dr. Throop was a first-generation college graduate, is over 40, and the mother of two small children.

192.    Dr. Throop had been told for years that she was well-positioned to apply for a tenure track role should one become available, but Dr. Abu El-Haj discouraged her from applying for either of the two tenure track positions at issue here.

193.    Dr. Abu El-Haj assured Dr. Throop that she could convert her non-tenure track position into a permanent lecture line, but failed to do so.

194.    In Spring 2023, Dr. Throop was told that she did not have a contract for the following year, and received one only later on when another non-tenure track professor named Dr. Chandler Miranda unexpectedly left prior to the end of her contract to take a tenure track position with Molloy University.

195.    Dr. Miranda is a mother of two young children.

196.    Dr. Miranda applied for both of the open assistant professorships.

197.    With respect to her application for the joint Assistant Professorship of Urban Studies and Education Studies, search committee member Aaron Passell of the Barnard-Columbia Urban Studies Program (who is Dr. Abu El-Haj's brother in law) told Dr. Miranda that the "timing just wasn't right" for her to secure a tenure track position and in any event she was "not urban enough."

198.    Dr. Miranda told another member of the search committee that she did not receive a position because she was "mommy tracked."

199.    In May 2023, Dr. Maria Maulucci, a tenured Barnard professor and the new Chair of Education Studies, told Dr. Miranda that it was better for her to have accepted the job at Molloy University than to stay at Barnard because she would see in time that she would be a better mother and spend more time with her children as a professor at Molloy.

200.    Dr. Miranda was told by search committee member Nick Smith (who was an Assistant Professor) that she believed she did not get the job because of when she had children.

201.    Dr. Natalia Ortiz ("Dr. Ortiz"), who turned 40 in 2023 and is the mother of two children, applied for the tenure track job but did not receive an interview.

202.    Dr. Ortiz advocated for a permanent lectureship at Barnard, but was never granted that position; she left Barnard and accepted a non-tenure track position at New York University.

**H.    Plaintiff Filed An Internal Discrimination Complaint, Barnard Did Not Conduct A Proper Investigation In Breach Of Its Procedures, And Plaintiff Suffered Retaliation.**

203.    On December 22, 2022, after learning that her application was rejected, Dr. Kitzmiller emailed Barnard President Sian Beilock and Provost Linda Bell about the search. President Beilock told Kitzmiller to meet with Provost Bell about her concerns.

204.    As the Barnard President from July 2017 through June 2023, Dr. Beilock oversaw the Barnard Nondiscrimination and Title IX office and had authority to intervene.

205.    As the Barnard Provost from September 2012 through June 2024, Provost Bell oversaw the Nondiscrimination and Title IX office, had oversight over faculty hiring, and had authority to intervene.

206.    Vice President Jennifer Rosales advised Dr. Kitzmiller on January 5, 2023 to meet with the Barnard Title IX office "for your [Dr. Kitzmiller's] protection before you meet with [Provost] Linda Bell."

207.    Dr. Rosales was knowledgeable about the events that occurred during the faculty searches because she participated in the search processes and discussed the events afterwards with Dr. Kitzmiller.

208.    On January 12, 2023, Dr. Kitzmiller filed a complaint with Barnard's Office of Nondiscrimination and Title IX.  She alleged discrimination on the basis of race, age, parental status, marital status, and retaliation.

209.    After trying to schedule a meeting with Provost Bell in late December 2022 and early January 2023, Dr. Kitzmiller met with Provost Bell on January 31, 2023 and informed her of the discrimination she experienced. Provost Bell stated the concerns raised were "really serious," and she planned involving President Beilock and herself.

210.    After interviewing Dr. Kitzmiller, the Director of Barnard's Office of Nondiscrimination and Title IX, Dr. Elizabeth Scott-Francis, admitted that there are "climate" concerns about the Education Studies Program that needed to be addressed, which evidently pertained to race, age, and/or gender.

211.    Dr. Scott-Francis further told Dr. Kitzmiller that the conflicts of interest among the members of the Search Committees that considered her recent applications would not even be allowed in a staff hiring committee.

212.    Dr. Scott-Francis stated that she would conduct a thorough probe, including interviewing witnesses, and told Dr. Kitzmiller to expect a final report that would describe what she

found in the investigation.

213.    On January 31, 2023, Dr. Kitzmiller met with Provost Bell and outlined the discrimination and conflicts of interest that she experienced during the search. Provost Bell, who said that Dr. Kitzmiller had raised "serious concerns" about the search process and outcomes, nevertheless apparently did nothing.

214.    Without disclosure to Dr. Kitzmiller, Dr. Scott-Francis conducted only an "inquiry," not an investigation, into Dr. Kitzmiller's complaints and declined to provide a report.

215.    Barnard's policies distinguished between an "inquiry" and an "investigation."

216.    Under Barnard's policy at the time, an inquiry is time limited and "should not take longer than five-to-ten (5-10) business days."

217.    When Dr. Kitzmiller met with Dr. Scott-Francis in January 2023, Dr. Kitzmiller asked her to interview Dr. Rachel Throop, who could be expected to be supportive on the question of the search favoring younger non-maternal faculty.

218.    On February 22, 2023, President Beilock was notified of Dr. Kitzmiller's discrimination complaints as Dr. Jacobs emailed his discrimination complaint raising those issues to Barnard and copying President Beilock, who confirmed receipt, but apparently did nothing else.

219.    In March 2023, Dr. Kitzmiller learned from Dr. Scott-Francis that she never interviewed Dr. Throop.

220.    In March 2023, Dr. Kitzmiller met with then Barnard President Sian Beilock and voiced concerns about the Office of Nondiscrimination and Title IX investigation because one of her two suggested witnesses, Dr. Rachel Throop, was not contacted. President Beilock responded that they could not discuss the "investigation" while it was under way, which was a pretext because the

process unbeknownst to Dr. Kitzmiller had been degraded to an inquiry. President Beilock did not deny Plaintiff's concerns, and said that there could be additional steps after the Title IX office addressed it.

221.    While Barnard's Office of Nondiscrimination supposedly was reviewing Dr. Kitzmiller's complaint, another incident occurred. In March 2023, Dr. Shose Kessi, the Dean of Humanities and Professor of Psychology at the University of Cape Town, South Africa, had been invited to facilitate a Gildersleeve workshop on racial issues in education at Barnard. Dr. Kitzmiller wrote the grant to bring Dr. Kessi to Barnard for this honor. Dr. Kessi, a Black African woman, was Dr. Kitzmiller's friend and colleague.

222.    During the workshop, when Dr. Kitzmiller noted an African American woman professor who feared losing her professorship in Florida for teaching critical race theory, Dr. Abu El-Haj demonstrated extreme hostility by publicly exploding at Dr. Kitzmiller and bizarrely accused her of being anti-Palestinian, a baseless falsehood that was racist in itself, and not on topic.

223.    Dr. Kitzmiller asked Dr. Elizabeth Scott-Francis, Director of Barnard's Office of Nondiscrimination and Title IX, to investigate Dr. Abu El-Haj's outburst. Dr. Scott-Francis agreed, requested, and received Dr. Kessi's contact information from Dr. Kitzmiller but then never even contacted her. There have been no known consequences for Dr. Abu El-Haj who unnecessarily, viciously, and publicly humiliated Dr. Kitzmiller on a racial basis in an open forum.

224.    In March, 2023, Dr. Scott-Francis interviewed Professor Yolanda Sealey-Ruiz ("Dr. Sealey-Ruiz"), a professor at Teachers College, Columbia University, because Dr. Kitzmiller suggested that Dr. Sealey-Ruiz could provide information relevant to Dr. Kitzmiller's complaint including her observations and concerns regarding Dr. Abu El-Haj retaliating and harassing Dr.

Kitzmiller for her racial advocacy.

225.    Shortly after talking to Dr. Sealey-Ruiz, Dr. Scott-Francis terminated the investigation, termed it an inquiry, and refused to provide information about the Sealey-Ruiz interview or any interview as would have been required in an investigation.

226.    The process conducted by Dr. Scott-Francis continued for about five months and is thus even longer than expected in an "investigation," which should be completed "...within thirty to forty (30-40) business days," according to Barnard's policy.

227.    It was not until May 12, 2023 that Dr. Scott-Francis provided a final response that was negative, result-oriented, superficial and pretextual.

228.    The intent and effect of this cessation was to allow the Office of Nondiscrimination and Title IX not to follow its own rules, not to put evidence corroborating Dr. Kitzmiller in writing, and not to conduct or report interviews that challenged Barnard.

229.    In addition to prematurely terminating its probe, the Barnard Office of Nondiscrimination and Title IX violated additional Barnard policies in responding to Dr. Kitzmiller's complaint.

230.    The evidence gathered by Dr. Scott-Francis apparently was not reviewed by an outside pool of individuals (as is required by Barnard's nondiscrimination policy) nor was Dr. Kitzmiller given the opportunity to respond to any findings or to provide a formal appeal.

231.    According to Dr. Scott-Francis and Barnard's policy, Dr. Kitzmiller should have been provided with a report that would "include a summary of relevant information of each interview, provide a summary of factual information, and include any relevant documentation collected."

232.    Dr. Kitzmiller never received this report from Dr. Scott-Francis, and the apparent failure of Dr. Scott-Francis to conduct a complete investigation constitutes a violation of Barnard's

internal rules, as well as a cover-up.

233.    On May 18, 2023, Dr. Kitzmiller emailed President Beilock, Dr. Scott Francis, and Provost Bell complaining that the Title IX investigation was improperly conducted and that she was a victim of another angry incident of discrimination on March 27, 2023, but President Beilock did not reply.

234.    She again emailed them on May 25, 2023 that her title IX complaint was not handled according to Barnard policy and that search processes were not followed.  President Beilock did not reply.

235.    On May 29, 2023, Provost Bell confirmed receipt of Plaintiff's May 18 and 25 emails and stated that, "[i]t is my understanding that Elizabeth will be reaching out shortly to discuss the issues that you raise in these emails."

236.    On May 31, 2023, Dr. Kitzmiller sent a letter to President Beilock, Provost Bell, and Dr. Scott Francis describing additional discrimination concerns about violations of Barnard rules in the faculty search but received no reply.

237.    On June 9, 2023. Dr. Kitzmiller again emailed Dr. Scott Francis and copied Provost Bell, Executive Provost Edward Barnaby, President Beilock, and incoming President Rosenbury stating that her discrimination was not being investigated properly and she was a victim of retaliation from Abu El-Haj due to the March 27th incident but received no reply.

238.    On June 23, 2023, Dr. Kitzmiller sent a letter to Executive Provost Barnaby whom Dr. Scott-Francis said was Dr. Kitzmiller's point of contact with a copy to Provost Bell and President Rosenbury again complaining about the search and requesting a response (as previously promised)

but she received no response.

239.    Dr. Kitzmiller was also retaliated against for complaining about these issues.

240.    In the past before it was clear that Dr. Kitzmiller was challenging her adverse treatment, the Barnard Provost's Office helped her to secure grant funding, which is in the interest of Barnard and Columbia.

241.    On December 14, 2023, Dr. Kitzmiller emailed Provost Linda Bell requesting permission to submit a grant proposal for up to $600,000 in funding with the WT Grant Foundation, which a staff member from Barnard's Institutional Funding & Sponsored Research Office had approached Dr. Kitzmiller about. Dr. Kitzmiller asked Provost Bell if she would support the grant. Provost Bell never responded.

242.    On December 23, 2023, Dr. Kitzmiller sent an email to Provost Bell about a grant proposal involving the Columbia Global Center in Amman, Jordan that could bring hundreds of thousands of dollars to the University. Dr. Kitzmiller asked Provost Bell if she would support the grant. Provost Bell never responded.

243.    On January 5, 2024, Dr. Kitzmiller sent an email to new Barnard President Laura Rosenbury informing her that she (Dr. Kitzmiller) had been selected as a semifinalist for a large Spencer Foundation grant, one of the most competitive and prestigious grants in her field.  President Rosenbury never responded.

244.    On January 5, 2024, Dr. Kitzmiller sent an email to Provost Bell informing her that she (Dr. Kitzmiller) had been selected as a semifinalist for the Spencer grant. Provost Bell never responded.

245.    So eager were Barnard officials to discriminate against Dr. Kitzmiller, that they

32

became uninterested in her financial support even when it would benefit the institution.

246.    This was the first opportunity for Defendants to retaliate against Dr. Kitzmiller since she filed her internal discrimination complaint and participated in the Title IX inquiry/investigation.

247.    Columbia Provost Olinto oversees academic affairs of Columbia and oversees Barnard.  According to the University Statutes, Barnard's president is a Dean at Columbia, so the Barnard President sits under Provost Olinto.

248.    In March 2024, Dr. Jacobs notified incoming Provost Olinto of the discrimination experienced by Dr. Kitzmiller and that Barnard's probe was a sham.

249.    On April 7, 2024, Dr. Kitzmiller emailed President Rosenbury, Provost Bell, and Dr. Scott-Francis and complained of gender stereotype discrimination when during a discussion about financial problems and the need to increase student enrollment, Professor Rivera Maulucci claimed that Dr. Kitzmiller could not properly teach the large classes that Barnard needed because she was a mother and, thus, had special scheduling requirements, which was false and completely unfounded. Dr. Kitzmiller again complained of continued discrimination and harassment she was suffering.  She asked these administrators to address the situation and properly uphold the anti-harassment policy and federal, state, and local laws that protect women in the workplace from egregious and unwarranted harassment and discrimination.

250.    In response, President Rosenbury responded that she understood that Dr. Kitzmiller was working with Dr. Scott-Francis on the matter but took no further action.

251.    Throughout 2024 Provost Olinto publicly explained that discrimination was something Columbia took seriously.

252.    On September 12, 2024, Dr. Jacobs emailed Provost Olinto informing her that Dr. Kitzmiller's complaints were not handled properly including: "In 2023, Erika and I filed complaints

with the Barnard and Columbia Title IX/Nondiscrimination offices, but, shockingly, the complaints were not handled properly, in blatant violation of Columbia and Barnard's policies." Also, "However, the searches for the two tenure track positions were conducted improperly and violated federal, state, and local laws. My wife experienced discrimination during her interview process related to her age, gender, parenting, racial advocacy…."

253.    After follow up emails on September 27, 2024 and October 9, 2024, Dr. Jacobs met with Provost Olinto on October 25, 2024 and she told him that she planned to talk with new Barnard Provost Rebecca Walkowitz so that she was made aware of the issues and could address them, but apparently she never did.  Provost Olinto told Dr. Jacobs she talks to the Barnard Provost "on a regular basis."

254.    Dr. Jacobs sent follow up emails to Provost Olinto requesting assistance including on October 28, 2024, November 3, 2024, November 25, 2024, and June 8, 2025 but there was no response to any of those emails.

**I.    Barnard Professors Receive Substantially Less Than Columbia Professors.**

255.    Historically, Columbia faculty have earned higher salaries than their Barnard counterparts.

256.    Admission to Barnard College is restricted to women students.

257.    Standards for tenure and promotion for Barnard faculty and the faculty at Columbia (where all admittees are not female) are the same.

258.    Dr. Kitzmiller was a Term Assistant Professor (non-tenure track) in the Barnard Education Studies Program from 2019 to 2024.

259.    Dr. Kitzmiller and her colleagues in the 2022-2023 searches were candidates for tenure track assistant professorship at Barnard.

260.    At Columbia, Assistant Professor salaries are higher than those of Barnard faculty at that rank, with even wider discrepancies at upper tenured levels. According to Barnard and Columbia's submissions to National Council for Education Statistics's Integrated Postsecondary Data System (IPEDS) for the 2022-2023 academic year, Assistant Professors salaries are higher at Columbia by an average of $35,764 compared to Barnard.

261.    Dr. Kitzmiller heard from a Barnard sociology professor that if she were in Columbia's Sociology Department she would be making a salary of $120,000, but she makes only $90,000 because she is in Barnard's Sociology Department.

262.    Barnard faculty receive lesser benefits than Columbia faculty including for childcare, education, housing, insurance, and retirement.

263.    The pay-and-benefits disparity is related to the fact that Barnard faculty teach a female student body; it results in second class professor status, and violates Title VII of the Civil Rights Act of 1964, the Federal Equal Pay Act, the New York State Equal Pay Law, and the New York City Human Rights Law.

264.    The lower paid faculty population at Barnard is mostly female (65%) while the higher paid faculty at Columbia is mostly male (39% female), according to IPEDS for the 2022-2023 academic year.

265.    The faculties at Barnard and Columbia have the same responsibilities in terms of teaching, scholarship, and service, and are evaluated according to the same standards for tenure and by the same final committees, yet, Barnard faculty receive far poorer economic treatment.

266.    Dr. Kitzmiller is not the first to raise questions and concerns about the salary and benefits inequities.  A group of women, known as the Columbia Women's Liberation, issued a report

documenting the several salary differentials between Barnard and Columbia faculty that appeared in the Barnard Alumnae Magazine in the Spring of 1970. In 1995, Barnard's Faculty Finance Committee wrote a letter to the Board of Trustees saying, "the increasing disparity between Barnard and Columbia salaries is particularly demoralizing...and implies that teaching women has less value than teaching men." The 2013 Report of the Faculty Finance and Resource Committee, with whom Provost Bell worked , stated that one of the goals of the committee was to "make and maintain Barnard salaries competitive with Columbia Arts and Sciences."

267.    In addition to treating its mostly female faculty worse than Columbia's mostly male faculty, there is additional sex discrimination within Barnard. At Barnard, women are concentrated in non-tenure track faculty positions, where they receive lower pay and short term contracts, with no room for professional advancement.

268.    Seventy-five percent (75%) of Barnard's non-tenure track faculty are women, according to IPEDS for the 2022-2023 academic year.

269.    In her time at Barnard, Dr. Kitzmiller did not receive any training on the Equal Pay Act, nor does she know of any such training for faculty or staff.

270.    Under New York law, employers must provide their employees with a sexual harassment prevention training at least once per calendar year. In her time at Barnard, Dr. Kitzmiller did not receive any training on non-discrimination of mothers and/or women who are older; nor does she know of any such training for faculty or staff. The failure to provide the required training is a violation of New York law.

271.    As a result of Defendants' actions, Dr. Kitzmiller has suffered economic and emotional distress damages as well as severe family dislocation, humiliation, and undeserved reputation

injuries.

272.    Plaintiff demands a jury trial.

## VI. COUNTS

### COUNT I
**Intentional Discrimination on the Basis of Sex Violation of Title IX 20 U.S.C. § 1681 et seq.
(Plaintiff v. Barnard and Columbia)**

273.    The preceding paragraphs are incorporated as if set forth at length herein.

274.    Dr. Kitzmiller is a covered employee for Title IX purposes.

275.    Barnard is an education program or activity that receives Federal financial assistance including for maintaining and enhancing the Education Studies Program and the Urban Studies Program and, therefore, is a covered entity under Title IX. 20 U.S.C. § 1687(2)(A).

276.    Columbia is an education program or activity that receives Federal financial assistance and, therefore, is a covered entity under Title IX. 20 U.S.C. § 1687(2)(A).

277.    Columbia paid a portion of Dr. Kitzmiller's salary.

278.    At least one member of the search committee, Dr. Sharp, was employed by Columbia and Barnard.

279.    Columbia is a joint employer with Barnard and/or a single employer with Barnard.

280.    Dr. Kitzmiller suffered sex-based discrimination.

281.    The discrimination occurred in an education program or activity.

282.    The discrimination was intentional.

283.    Dr. Kitzmiller is a member of a protected class, female.

284.    Dr. Kitzmiller was qualified for the assistant professor positions based on her

education and experience.

285.    Dr. Kitzmiller applied for these positions.

286.    Dr. Kitzmiller suffered adverse actions when Defendants failed to hire her for these positions.

287.    The adverse actions occurred under circumstances giving rise to an inference of sex discrimination, including reliance on gender stereotypes about caregiving and motherhood.

288.    Instead of Dr. Kitzmiller, Barnard and Columbia hired less qualified applicants who in contrast to Dr. Kitzmiller did not have children (Dr. Gross and Dr. Herbert).

289.    The Search Committees did not recommend hiring any candidate who had children.

290.    The Search Committees recommended only candidates who did not have children.

291.    Search Committee members made statements reflecting stereotypes and assumptions about motherhood and caregiving.

292.    Statements included: "Erika, you have young children. That dictates the times that you are available to teach. We need people to teach at night and you won't want to do that with children." "Well that [having young children] affected when I taught. It doesn't anymore because my children are grown. We have people in the program that have young children so it might affect them."

293.    A Search Committee member said to another rejected candidate with children that it was better for her to have accepted the job at Molloy University than to stay at Barnard because she would see in time that she would be a better mother and spend more time with her kids as a professor at Molloy.

294.    The rejected candidate with children complained that she had been "mommy-tracked," and also told another Search Committee member that she did not get the job because of

when she had children which he did not deny.

295.    Defendants' justifications for the failures to hire Dr. Kitzmiller are a pretext for discrimination.

296.    The selected candidates were less well qualified.  For example, Dr. Gross did not have a published book in contrast to Dr. Kitzmiller. She also did not have as much experience as Dr. Kitzmiller in teaching or research. She did not have Dr. Kitzmiller's grant funding and fellowship record. Dr. Herbert did not have any peer-reviewed publications (in contrast to Dr. Kitzmiller who had an impressive publication record).

297.    Other contingent faculty in Barnard's Education Studies Program were also subjected to stereotypical sex discrimination including Dr. Throop, Dr. Miranda, and Dr. Ortiz.

298.    The Director of the Office of Nondiscrimination and Title IX, Dr. Scott-Francis, told Dr. Kitzmiller that there are "climate" concerns about the Education Studies Program that needed to be addressed; at Columbia and Barnard climate issues pertain to discrimination.

299.    As a result of the discrimination Dr. Kitzmiller has suffered damages including, but not limited to, the loss of employment wages and benefits, loss of career advancement opportunities, out-of-pocket expenses, emotional distress, harm to reputation, and other compensatory damages.

300.    Dr. Kitzmiller seeks all remedies and damages permitted under Title IX, including, but not limited to, back pay, front pay, attorney's fees, costs, pre-judgment and post-judgment interest, and such other relief as the Court deems just and proper.

**COUNT II**
**Intentional Discrimination on the Basis of Sex**
**Violation of NYC Human Rights Law**
**(Plaintiff v. Barnard, Columbia, Abu El-Haj, Maulucci, Sharp, Scott-Francis)**

301.    The preceding paragraphs are incorporated as if set forth at length herein.

302.    Dr. Kitzmiller is a covered employee under the New York City Human Rights Law.

303.    Barnard is a covered employer under the New York City Human Rights Law.

304.    Columbia is a covered employer under the New York City Human Rights Law.

305.    Dr. Abu El-Haj and Dr. Rivera Maulucci and Dr. Sharp were decision-makers in the failures to hire.

306.    The other individual defendants fostered, permitted, allowed, implemented and/or covered up the discrimination.

307.    Columbia is a joint employer with Barnard and/or a single employer with Barnard.

308.    Dr. Kitzmiller suffered sex-based discrimination.

309.    The discrimination was intentional.

310.    Dr. Kitzmiller is a member of a protected class, female.

311.    Dr. Kitzmiller was qualified for the assistant professor positions based on her education and experience.

312.    Dr. Kitzmiller applied for these positions.

313.    Dr. Kitzmiller suffered adverse actions when Defendants failed to hire her for these positions or other subsequent positions.

314.    The adverse actions occurred under circumstances giving rise to an inference of sex discrimination, including reliance on gender stereotypes about caregiving and motherhood.

315.    Instead of Dr. Kitzmiller, Barnard and Columbia hired less qualified applicants who

40

in contrast to Dr. Kitzmiller did not have children (Dr. Gross and Dr. Herbert).

316.    Search Committee members made statements reflecting stereotypes and assumptions about motherhood and caregiving.

317.    Dr. Kitzmiller was treated less well than other employees.

318.    Gender including motherhood and caregiving stereotypes played a role in that treatment.

319.    Defendants' justifications for the failures to hire Dr. Kitzmiller are a pretext for discrimination.

320.    As a result of the discrimination Dr. Kitzmiller has suffered damages including, but not limited to, the loss of employment wages and benefits, out-of-pocket expenses, emotional distress, harm to reputation, and other compensatory damages.

321.    Dr. Kitzmiller seeks all remedies and damages permitted under the New York City Human Rights Law including, but not limited to, back pay, front pay, emotional distress damages, punitive damages for malicious conduct, attorney's fees, costs, and pre-judgment and post-judgment interest.

**COUNT III**
**Intentional Discrimination on the Basis of Sex Violation of**
**New York State Human Rights Law**
**(Plaintiff v. Barnard, Columbia, Abu El-Haj, Sharp, and Rivera Maulucci)**

322.    The preceding paragraphs are incorporated as if set forth at length herein.

323.    Dr. Kitzmiller is a covered employee under the New York State Human Rights Law.

324.    Barnard is a covered employer under the New York State Human Rights Law.

325.    Columbia is a covered employer under the New York State Human Rights Law.

326.    Columbia is a joint employer with Barnard and/or a single employer with Barnard.

41

327.    Dr. Abu El-Haj, Dr. Rivera Maulucci, and Dr. Sharp were decision-makers in the failures to hire and, thus, are subject to liability under the New York State Human Rights Law.

328.    Dr. Kitzmiller suffered sex-based discrimination.

329.    The discrimination was intentional.

330.    Dr. Kitzmiller is a member of a protected class, female.

331.    Dr. Kitzmiller was qualified for the assistant professor positions based on her education and experience.

332.    Dr. Kitzmiller applied for these positions.

333.    Dr. Kitzmiller suffered adverse actions when Defendants failed to hire her for these positions.

334.    The adverse actions occurred under circumstances giving rise to an inference of sex discrimination, including reliance on gender stereotypes about caregiving and motherhood.

335.    Instead of Dr. Kitzmiller, Barnard and Columbia hired less qualified applicants who in contrast to Dr. Kitzmiller did not have children (Dr. Gross and Dr. Herbert).

336.    Search Committee members made statements reflecting stereotypes and assumptions about motherhood and caregiving.

337.    Defendants' justifications for the failures to hire Dr. Kitzmiller are a pretext for discrimination.

338.    Plaintiff's sex was a motivating factor in Defendants' decision.

339.    As a result of the discrimination Dr. Kitzmiller has suffered damages including, but not limited to, the loss of employment wages and benefits, loss of advancement opportunities, out-of-pocket expenses, emotional distress, harm to reputation, and other compensatory damages.

340.    Dr. Kitzmiller seeks all remedies and damages permitted under the New York State

Human Rights Law including, but not limited to, back pay, front pay, emotional distress damages, punitive damages for willful and wanton conduct and reckless indifference to protected rights, attorney's fees, costs, pre-judgment and post-judgment interest, and such other relief as the Court deems just and proper.

**COUNT IV**
**Intentional Discrimination on the Basis of Parental and Caregiver Status**
**Violation of NYC Human Rights Law**
**(Plaintiff v. Barnard, Columbia, Abu El-Haj, Sharp, and Rivera Maulucci)**

341.    The preceding paragraphs are incorporated as if set forth at length herein.

342.    Dr. Kitzmiller suffered discrimination on the basis of her parental and caregiver status of the mother of two small children.

343.    The discrimination was intentional.

344.    Dr. Kitzmiller is a member of a protected class related to being a parent and caregiver to two small children.

345.    Dr. Kitzmiller was qualified for the assistant professor positions based on her education and experience.

346.    Dr. Kitzmiller applied for these positions.

347.    Dr. Kitzmiller suffered adverse actions when Defendants failed to hire her for these positions.

348.    The adverse actions occurred under circumstances giving rise to an inference of discrimination on the basis of her status as a mother and caregiver.

349.    Instead of Dr. Kitzmiller, Barnard and Columbia hired less qualified applicants who in contrast to Dr. Kitzmiller did not have children and were not mothers or caregivers to small children (Dr. Gross and Dr. Herbert).

350.    The Search Committees did not recommend hiring any candidate who had children.

351.    The Search Committees recommended only candidates who did not have children.

352.    Search Committee members made statements reflecting stereotypes and assumptions about motherhood and caregiving.

353.    Statements included: "Erika, you have young children. That dictates the times that you are available to teach. We need people to teach at night and you won't want to do that with children." "Well that [having young children] affected when I taught. It doesn't anymore because my children are grown. We have people in the program that have young children so it might affect them."

354.    A Search Committee member said to another rejected candidate with children that it was better for her to have accepted the job at Molloy University than to stay at Barnard because she would see in time that she would be a better mother and spend more time with her kids as a professor at Molloy.

355.    The rejected candidate with children complained that she had been "mommy tracked," and another Search Committee member said that she did not get the job because of when she had children.

356.    Dr. Kitzmiller was treated less well than other employees.

357.    Parental and caregiving status stereotypes played a role in that treatment.

358.    Defendants' justifications for the failures to hire Dr. Kitzmiller are a pretext for discrimination.

44

359.    As a result of the discrimination Dr. Kitzmiller has suffered damages including, but not limited to, the loss of employment wages and benefits, loss of advancement opportunities, out-of-pocket expenses, emotional distress, harm to reputation, and other compensatory damages.

360.    Dr. Kitzmiller seeks all remedies and damages permitted under the New York City Human Rights Law including, but not limited to, back pay, front pay, emotional distress damages, punitive damages for malicious conduct, attorney's fees, costs, pre-judgment and post-judgment interest, and such other relief as the Court deems just and proper.

**COUNT V**
**Intentional Discrimination on the Basis of Race**
**Violation of 42 U.S.C. § 1981**
**(Plaintiff v. Barnard, Columbia, Abu El-Haj, Rivera Maulucci, and Sharp)**

361.    The preceding paragraphs are incorporated as if set forth at length herein.

362.    Dr. Kitzmiller is a member of a protected class, Caucasian/White.

363.    Barnard is a covered entity for purposes of Section 1981.

364.    Columbia also is a covered entity for purposes of Section 1981.

365.    Defendants Abu El-Haj, Sharp, and Scott-Francis are an individual subjects to liability for a violation of Section 1981.

366.    Dr. Kitzmiller was qualified for the joint Assistant Professor position in the Education Studies and Urban Studies Programs based on her qualifications and experience.

367.    Dr. Kitzmiller applied for the position.

368.    Dr. Kitzmiller suffered an adverse action when Defendants failed to hire her for the position.

369.    Defendants' decisions involved departures from normal hiring personnel and investigatory procedures, and disparate evaluation of Plaintiff's qualifications.

45

370.    Defendants intentionally interfered with Plaintiff's right to make and enforce an employment contract on equal terms with applicants outside of her protected class.

371.    The Defendants hired a less-qualified Black and African American candidate. For example, Dr. Herbert did not have any peer-reviewed publications (in contrast to Dr. Kitzmiller who had an impressive publication record).

372.    The Search Chair, Dr. Abu El-Haj, told Dr. Kitzmiller that she did not get the position because she was not "urban enough," a code word for race—specifically Black or African American.

373.    Regarding the false lack of "urbanness" charge against Dr. Kitzmiller, she was the only finalist with any educational credential in the field of urban studies, a Certificate in Urban Studies from the University of Pennsylvania.

374.    Dr. Kitzmiller's doctoral dissertation was selected as one of five to receive honors from Penn's Institute of Urban Research.

375.    Dr. Kitzmiller's doctoral advisor, Dr. Michael B. Katz, was a leading figure in the field of urban studies and urban history; he founded the Urban Studies program at the University of Pennsylvania, a program internationally recognized for its research and teaching.

376.    Dr. Kitzmiller taught in the Urban Studies program at Barnard in 2015-16 and received exemplary teaching evaluations.

377.    At the University of Pennsylvania, Dr. Kitzmiller received a student-nominated university-wide teaching prize for her work teaching urban history.

378.    At Barnard, Dr. Kitzmiller received exemplary teaching evaluations and was recognized for her work in campus-wide events sponsored by the Center for Engaged Pedagogy.

379.    Dr. Kitzmiller has two Ph.D.'s, one in education and one in history, and a Masters in Public Administration (M.P.A.) from the University of Pennsylvania, all of which focus on urban scholarship and teaching.

380.    Dr. Kitzmiller has been awarded numerous postdoctoral fellowships and other grants from Harvard University and the National Academy of Education/Spencer Foundation for her book manuscript, "The Roots of Educational Inequality," which is the first book to trace the history of an urban high school in the context of its neighborhood and city over the 20th Century.

381.    Dr. Kitzmiller's book has been nominated for numerous book prizes, including from the Urban History Association; it was published by the University of Pennsylvania Press, one of the preeminent university presses in urban studies/urban history. Recently, it was named a finalist and runner-up for the prestigious History of Education Society's Outstanding Book Award.  The book has received favorable reviews in the Journal of American History, Journal of Urban Affairs, Planning Perspectives, and Teachers College Record.

382.    Dr. Kitzmiller has been researching urban public schools and neighborhoods for nearly two decades, and she has been teaching in them for 25 years.

383.    Dr. Kitzmiller has received over $600,000.00 in funding, plus well over $575,000 more in funding previously pending, and currently has $250,000 in funding pending to do this work.

384.    But for Plaintiff's race, Defendant would not have denied Plaintiff the tenure track position.

385. Defendants' justifications for the failure to hire Dr. Kitzmiller are a pretext for discrimination.

386. As a result of the discrimination Dr. Kitzmiller has suffered damages including, but not limited to, loss of career advancement opportunities, the loss of employment wages and benefits, out-of-pocket expenses, emotional distress, harm to reputation, and other compensatory damages.

387. Plaintiff seeks all remedies and damages permitted under Section 1981 including, but not limited to, back pay, front pay, emotional distress damages, punitive damages for malicious conduct, attorney's fees, costs, pre-judgment and post-judgment interest, and such other relief as the Court deems just and proper.

**COUNT VI**
**Intentional Discrimination on the Basis of Race**
**Violation of NYC Human Rights Law**
**(Plaintiff v. Barnard, Columbia, Abu El-Haj, Rivera Maulucci, and Leslie A. Sharp )**

388. The preceding paragraphs are incorporated as if set forth at length herein.

389. Dr. Kitzmiller is a member of a protected class, Caucasian/White.

390. Dr. Kitzmiller was qualified for the joint Assistant Professor position in the Education Studies and Urban Studies Programs based on her qualifications and experience.

391. Dr. Kitzmiller applied for the position.

392. Dr. Kitzmiller suffered an adverse action when Defendants failed to hire her for the position.

393. The failure to hire occurred under circumstances giving rise to an inference of race discrimination.

394. The Defendants hired a less-qualified Black and African American candidate.

48

395.    The Search Chair, Dr. Abu El-Haj, told Dr. Kitzmiller that she did not get the position because she was not "urban enough," a code word for race—specifically Black or African American – this justification was false and pretextual for the reasons stated above.

396.     Dr. Kitzmiller was treated less well than other employees.

397.    Race played a role in that treatment.

398.    Defendants' justifications for the failure to hire Dr. Kitzmiller are a pretext for discrimination.

399.    Defendants discriminated against Dr. Kitzmiller/or fostered, permitted, allowed and/or covered up the discrimination.

400.    As a result of the discrimination Dr. Kitzmiller has suffered damages including, but not limited to, the loss of employment wages and benefits, loss of advancement opportunities, out- of-pocket expenses, emotional distress, harm to reputation, and other compensatory damages.

401.    Plaintiff seeks all remedies and damages permitted under the New York City Human Rights Law including, but not limited to, back pay, front pay, emotional distress damages, punitive damages for malicious conduct, attorney's fees, costs, pre-judgment and post-judgment interest, and such other relief as the Court deems just and proper.

## COUNT VII
### Intentional Discrimination on the Basis of Race
### Violation of New York State Human Rights Law
### (Plaintiff v. Barnard, Columbia, Abu El-Haj, Rivera Maulucci, and Sharp)

402.    The preceding paragraphs are incorporated as if set forth at length herein.

403.    Dr. Kitzmiller is a member of a protected class, Caucasian/White.

404.    Dr. Kitzmiller was qualified for the joint Assistant Professor position in the Education Studies and Urban Studies Programs based on her qualifications and experience.

49

405.    Dr. Kitzmiller applied for the position.

406.    Dr. Kitzmiller suffered an adverse action when Defendants failed to hire her for the position.

407.    The failure to hire occurred under circumstances giving rise to an inference of race discrimination.

408.    The Defendants hired a less-qualified Black and African American candidate.

409.    The Search Chair, Dr. Abu El-Haj, told Dr. Kitzmiller that she did not get the position because she was not "urban enough," a code word for race—specifically Black or African American–this justification was false and pretextual for the reasons stated above.

410.    Defendants' justifications for the failure to hire Dr. Kitzmiller are a pretext for discrimination.

411.    As a result of the discrimination Dr. Kitzmiller has suffered damages including, but not limited to, the loss of employment wages and benefits, loss of advancement opportunities, out- of-pocket expenses, emotional distress, harm to reputation, and other compensatory damages.

412.    Plaintiff seeks all remedies and damages permitted under the New York State Human Rights Law including, but not limited to, back pay, front pay, emotional distress damages, punitive damages for willful and wanton conduct and indifference to protected rights, attorney's fees, costs, pre-judgment and post-judgment interest, and such other relief as the Court deems just and proper.

## COUNT VIII
### Intentional Discrimination on the Basis of Age
### Violation of NYC Human Rights Law
### (Plaintiff v. Barnard, Columbia, Abu El-Haj, Rivera Maulucci, and Leslie A. Sharp )

413.    The preceding paragraphs are incorporated as if set forth at length herein.

414.    Dr. Kitzmiller suffered age-based discrimination.

415.    The discrimination was intentional.

416.    Dr. Kitzmiller is a member of the protected age class (forty and over).

417.    Dr. Kitzmiller was qualified for the assistant professor positions based on her education and experience.

418.    Dr. Kitzmiller applied for these positions.

419.    Dr. Kitzmiller suffered adverse actions when Defendants failed to hire her for these positions.

420.    The adverse actions occurred under circumstances giving rise to an inference of age discrimination.

421.    Instead of Dr. Kitzmiller, Barnard and Columbia hired less qualified applicants who are sufficiently younger to permit an inference of age discrimination.

422.    Dr. Kitzmiller was 44 at the time of the search.

423.    Barnard/Columbia hired Dr. Gross as Assistant Professor of Education.

424.    Based on information and belief, Dr. Gross is approximately 8 or more years younger than Dr. Kitzmiller and at the time of selection did not have children.

425.    Barnard/Columbia hired Dr. Herbert as Assistant Professor of Education and Urban Studies.

426.    Based on information and belief, Dr. Herbert is approximately 6 or more years younger than Dr. Kitzmiller, and at the time of selection did not have children.

427.    It is notable that there were six finalists, three who were under the age of 40 and three who were over the age of 40.

428.    The three candidates over the age of 40 were all mothers of school-aged children while none of the candidates under 40 were mothers at the time of the search.

429.    During the search, one of the candidates under 40 accepted a position at the University of Wisconsin and, thus, withdrew her application from consideration.

430.    The Search Committee recommended the two remaining candidates under the age of 40 who did not have children while it did not recommend any of the candidates over 40 who are mothers.

431.    Dr. Throop was a non-tenure track Professor in Barnard's Education Program.

432.    Dr. Throop told Dr. Kitzmiller that Dr. Abu El-Haj admitted that Barnard prefers to hire people who recently received their Ph.D. and "right out" of their Ph.D. programs, which reflects ageism.

433.    Similarly, Dr. Kitzmiller was told by Dr. Miranda in October 2023 that she heard Dr. Abu El-Haj say that Barnard preferred to hire tenure track faculty who were younger and fresh out of their Ph.D. programs.

434.    When Dr. Kitzmiller spoke to Dr. Abu El-Haj about how to prepare her job talk, Dr. Abu El-Haj told Dr. Kitzmiller that unlike the other candidates who were instructed to discuss one key research contribution she should focus on multiple projects "since she was so far removed from [her] Ph.D.," which was reflective of disparate treatment and ageism.

435.    Dr. Kitzmiller was treated less well than other employees.

436.    Age played a role in that treatment.

437.    Defendants' justifications for the failures to hire Dr. Kitzmiller are a pretext for discrimination.

438.    As a result of the discrimination Dr. Kitzmiller has suffered damages including, but not limited to, the loss of employment wages and benefits, loss of advancement opportunities, out-of-pocket expenses, emotional distress, harm to reputation, and other compensatory damages.

439.    Dr. Kitzmiller seeks all remedies and damages permitted under the New York City Human Rights Law including, but not limited to, back pay, front pay, emotional distress damages, punitive damages for malicious conduct, attorney's fees, costs, pre-judgment and post-judgment interest, and other relief deemed proper and just by the Court.

**COUNT IX**
**Intentional Discrimination on the Basis of Age**
**Violation of New York State Human Rights Law**
**(Plaintiff v. Barnard, Columbia, Abu El-Haj, Rivera Maulucci, and Sharp)**

440.    The preceding paragraphs are incorporated as if set forth at length herein.

441.    Dr. Kitzmiller suffered age-based discrimination.

442.    The discrimination was intentional.

443.    Dr. Kitzmiller is a member of the protected age class (forty and over).

444.    Dr. Kitzmiller was qualified for the assistant professor positions based on her education and experience.

445.    Dr. Kitzmiller applied for these positions.

446.    Dr. Kitzmiller suffered adverse actions when Defendants failed to hire her for these positions.

447.    The adverse actions occurred under circumstances giving rise to an inference of age discrimination.

448.    Instead of Dr. Kitzmiller, Barnard and Columbia hired less qualified applicants who are sufficiently younger to permit an inference of age discrimination.

449.    Dr. Kitzmiller was 44 at the time of the search.

450.    Barnard/Columbia hired Dr. Gross as Assistant Professor of Education.

451.    Based on information and belief, Dr. Gross is approximately 8 or more years younger than Dr. Kitzmiller and at the time of selection did not have children.

452.    Barnard/Columbia hired Dr. Herbert as Assistant Professor of Education and Urban Studies.

453.    Based on information and belief, Dr. Herbert is approximately 6 or more years younger than Dr. Kitzmiller, and at the time of selection did not have children.

454.    It is notable that there were six finalists, three who were under the age of 40 and three who were over the age of 40.

455.    The three candidates over the age of 40 are all mothers of school-aged children while none of the candidates under 40 were mothers at the time of the search.

456.    During the search, one of the candidates under 40 accepted a position at the University of Wisconsin and, thus, withdrew her application from consideration.

457.    The Search Committee recommended the two remaining candidates under the age of 40 who did not have children while it did not recommend any of the candidates over 40 who are mothers.

458.    Dr. Throop was a non-tenure track Professor in Barnard's Education Program.

459.    Dr. Throop told Dr. Kitzmiller that Dr. Abu El-Haj admitted that Barnard prefers to hire people who recently received their Ph.D. and "right out" of their Ph.D. programs, which reflects ageism.

460.    Similarly, Dr. Kitzmiller was told by Dr. Miranda in October 2023 that she heard Dr.

54

Abu El-Haj say that Barnard preferred to hire tenure track faculty who were younger and fresh out of their Ph.D. programs.

461.    When Dr. Kitzmiller spoke to Dr. Abu El-Haj about how to prepare her job talk, Dr. Abu El-Haj told Dr. Kitzmiller that unlike the other candidates who were instructed to discuss one key research contribution she should focus on multiple projects "since she was so far removed from [her] Ph.D.," which was reflective of disparate treatment and ageism.

462.    Defendants' justifications for the failures to hire Dr. Kitzmiller are a pretext for discrimination.

463.    As a result of the discrimination Dr. Kitzmiller has suffered damages including, but not limited to, the loss of employment wages and benefits, loss of advancement opportunities, out-of-pocket expenses, emotional distress, harm to reputation, and other compensatory damages.

464.    Dr. Kitzmiller seeks all remedies and damages permitted under the New York State Human Rights Law including, but not limited to, back pay, front pay, emotional distress damages, punitive damages for wanton and willful conduct and reckless indifference to protected rights, attorney's fees, costs, pre-judgment and post-judgment interest, and other relief deemed proper and just by the Court.

**COUNT X**
**Race and Ethnicity Association Discrimination**
**Violation of 42 U.S.C. § 1981**
**(Plaintiff v. Barnard, Columbia, and Abu El-Haj)**

465.    The preceding paragraphs are incorporated as if set forth at length herein.

466.    Dr. Kitzmiller asserts that she was subjected to employment discrimination because her husband is Jewish.

467.    Plaintiff is married to Dr. Jacobs, who is Jewish and of Jewish ancestry, a racial/ethnic

group protected under § 1981.

468.    Defendants were aware of Plaintiff's marriage to, and association with, her Jewish husband at the time it made the hiring decision.

469.    Dr. Kitzmiller was qualified for the Assistant Professor positions based on her qualifications and experience.

470.    Dr. Kitzmiller applied for the positions.

471.    Dr. Kitzmiller suffered an adverse action when Defendants failed to hire her for the positions.

472.    Defendants declined to hire Plaintiff for the tenure track positions and instead selected candidates outside the protected association who were less qualified.

473.    In the winter of 2020, Dr. Abu El-Haj visited Dr. Kitzmiller's office, falsely and bizarrely noted that some wall posters were "anti-Muslim," and implied that Dr. Kitzmiller was anti-Muslim as well.  Dr. Abu El-Haj is a supporter of the Boycott, Divestment and Sanctions (BDS) movement.  The BDS movement contains anti-Semitic aspects aimed at delegitimizing and pressuring Israel, through the diplomatic, financial, professional, academic and cultural isolation of Israel, Israeli individuals, Israeli institutions, and, increasingly, Jews who support Israel's right to exist.

474.    Subsequently Dr. Abu El-Haj was hostile to Dr. Kitzmiller without a legitimate basis.

475.    Dr. Abu El-Haj's research reflects an interest in Palestinian American identity and citizenship, including the book Unsettled Belonging: Educating Palestinian American Youth after 9/11.

476.    During Dr. Kitzmiller's interview process, Dr. Abu El-Haj vocally presumed that Dr. Kitzmiller's husband, Dr. Jacobs, a Columbia professor, was a bad husband and father, although she

did not know anything personal about him besides that he was Jewish.

477.    During the Gildersleeve workshop, when Dr. Kitzmiller noted an African American female professor who feared losing her professorship in Florida for teaching critical race theory, Dr. Abu El-Haj demonstrated hostility by publicly exploding at Dr. Kitzmiller and bizarrely accused her of being anti-Palestinian, a baseless falsehood that was racist in itself, and not on topic.

478.    Dr. Kitzmiller asked Dr. Elizabeth Scott-Francis, Director of Barnard's Office of Nondiscrimination and Title IX, to investigate Dr. Abu El-Haj's outburst.  Dr. Scott-Francis agreed, requested, and received Dr. Kessi's contact information from Dr. Kitzmiller but then never even contacted her. There have been no known consequences for Dr. Abu El-Haj who unnecessarily, viciously, and publicly humiliated Dr. Kitzmiller in an open forum.

479.    But for Plaintiff's association with her Jewish husband, Defendants would have offered Plaintiff the tenure track position that she deserved.

480.    By refusing to hire Plaintiff on this basis, Defendants intentionally interfered with Plaintiff's right to make and enforce an employment contract on equal terms in violation of 42 U.S.C. § 1981.

481.    As a result of Defendants' conduct, Dr. Kitzmiller has suffered damages including, but not limited to, the loss of employment wages and benefits, loss of advancement opportunities, out-of-pocket expenses, emotional distress, harm to reputation, and other compensatory damages.

482.    Dr. Kitzmiller seeks all remedies and damages permitted under Section 1981, including, but not limited to, back pay, front pay, emotional distress, medical harm, reputation harm damages, reinstatement, punitive damages, attorney's fees, costs, pre-judgment and post-judgment interest, and any other relief the Court deems just and proper.

## COUNT XI
### Race and Ethnicity Association Discrimination
### and/or Religious Discrimination Violation of
### New York City Human Rights Law
### (Plaintiff v. Barnard, Columbia, and Abu El-Haj)

483.    The preceding paragraphs are incorporated as if set forth at length herein.

484.    Dr. Kitzmiller asserts that she was subjected to employment discrimination because her husband is Jewish.

485.    Plaintiff is married to Dr. Jacobs, who is Jewish and of Jewish ancestry, a racial/ethnic group protected under the NYC Human Rights Law.

486.    Defendants were aware of Plaintiff's marriage to, and association with, her Jewish husband at the time it made the hiring decision.

487.    Dr. Kitzmiller was qualified for the Assistant Professor positions based on her qualifications and experience.

488.    Dr. Kitzmiller applied for the positions.

489.    Dr. Kitzmiller suffered an adverse action when Defendants failed to hire her for the positions.

490.    Defendants declined to hire Plaintiff for the tenure track positions and instead selected candidates outside the protected association.

491.    For example, in the winter of 2020, Dr. Abu El-Haj visited Dr. Kitzmiller's office, falsely and bizarrely noted that some wall posters were "anti-Muslim," and implied that Dr. Kitzmiller was anti-Muslim as well. Dr. Abu El-Haj is a supporter of the Boycott, Divestment, and Sanctions (BDS) movement. The BDS movement contains anti-Semitic aspects aimed at delegitimizing and pressuring Israel, through the diplomatic, financial, professional, academic and cultural isolation of

Israel, Israeli individuals, Israeli institutions, and, increasingly, Jews who support Israel's right to exist.

492.    Subsequently Dr. Abu El-Haj was hostile to Dr. Kitzmiller without a legitimate basis.

493.    During Dr. Kitzmiller's interview process, Dr. Abu El-Haj vocally presumed that Dr. Kitzmiller's husband, Dr. Jacobs, a Columbia professor, was a bad husband and father, although she did not know anything personal about him besides that he was Jewish.

494.    During the Gildersleeve workshop, when Dr. Kitzmiller noted an African American female professor who feared losing her professorship in Florida for teaching critical race theory, Dr. Abu El-Haj demonstrated hostility by publicly exploding at Dr. Kitzmiller and bizarrely accused her of being anti-Palestinian, a baseless falsehood that was racist in itself, and not on topic.

495.    Dr. Kitzmiller asked Dr. Elizabeth Scott-Francis, Director of Barnard's Office of Nondiscrimination and Title IX, to investigate Dr. Abu El-Haj's outburst.  Dr. Scott-Francis agreed, requested, and received Dr. Kessi's contact information from Dr. Kitzmiller but then never even contacted her. There have been no known consequences for Dr. Abu El-Haj who unnecessarily, viciously, and publicly humiliated Dr. Kitzmiller in an open forum.

496.    Plaintiff was treated less well than other applicants in the tenure track hiring process because of her association with her Jewish husband.

497.    Defendants' refusal to hire Plaintiff was motivated, at least in part, by discriminatory animus toward Jewish individuals and/or persons associated with Jewish individuals.

498.    Defendants' conduct subjected Plaintiff to inferior terms, conditions, and privileges of employment based on a protected characteristic.

499.    Defendants' conduct was more than a petty slight or trivial inconvenience.

500.    As a result of Defendants' conduct, Dr. Kitzmiller has suffered damages including, but not limited to, the loss of employment wages and benefits, loss of advancement opportunities, out-of-pocket expenses, emotional distress, harm to reputation, and other compensatory damages.

501.    Dr. Kitzmiller seeks all remedies and damages permitted under the New York City Human Rights Law including, but not limited to, back pay, front pay, emotional distress, medical harm, reputation harm damages, reinstatement, punitive damages, attorney's fees, costs, pre-judgment and post-judgment interest, and any other relief the Court deems just and proper.

**COUNT XII**
**Race and Ethnicity Association Discrimination**
**and/or Religious Discrimination Violation of**
**New York State Human Rights Law**
**(Plaintiff v. Barnard, Columbia, and Abu El-Haj)**

502.    The preceding paragraphs are incorporated as if set forth at length herein.

503.    Dr. Kitzmiller asserts that she was subjected to employment discrimination because her husband is Jewish.

504.    Plaintiff is married to Dr. Jacobs, who is Jewish and of Jewish ancestry, a racial/ethnic group protected under the NYC Human Rights Law.

505.    Defendants were aware of Plaintiff's marriage to, and association with, her Jewish husband at the time it made the hiring decision.

506.    Dr. Kitzmiller was qualified for the Assistant Professor positions based on her qualifications and experience.

507.    Dr. Kitzmiller applied for the positions.

508.    Dr. Kitzmiller suffered an adverse action when Defendants failed to hire her for the positions.

509.    Defendants' decisions occurred under circumstances giving rise to an inference of discrimination.

510.    Defendants declined to hire Plaintiff for the tenure track positions and instead selected candidates outside the protected association.

511.    In the winter of 2020, Dr. Abu El-Haj visited Dr. Kitzmiller's office, falsely and bizarrely noted that some wall posters were "anti-Muslim," and implied that Dr. Kitzmiller was anti-Muslim as well. Dr. Abu El-Haj is a supporter of the Boycott, Divestment, Sanctions (BDS) movement. The BDS movement contains anti-Semitic aspects aimed at delegitimizing and pressuring Israel, through the diplomatic, financial, professional, academic and cultural isolation of Israel, Israeli individuals, Israeli institutions, and, increasingly, Jews who support Israel's right to exist.

512.    Subsequently Dr. Abu El-Haj was hostile to Dr. Kitzmiller without a legitimate basis.

513.    During Dr. Kitzmiller's interview process, Dr. Abu El-Haj vocally presumed that Dr. Kitzmiller's husband, Dr. Jacobs, a Columbia professor, was a bad husband and father, although she did not know anything personal about him besides that he was Jewish.

514.    During the Gildersleeve workshop, when Dr. Kitzmiller noted an African American female professor who feared losing her professorship in Florida for teaching critical race theory, Dr. Abu El-Haj demonstrated hostility by publicly exploding at Dr. Kitzmiller and bizarrely accused her of being anti-Palestinian, a baseless falsehood that was racist in itself, and not on topic.

515.    Dr. Kitzmiller asked Dr. Elizabeth Scott-Francis, Director of Barnard's Office of Nondiscrimination and Title IX, to investigate Dr. Abu El-Haj's outburst. Dr. Scott-Francis agreed, requested, and received Dr. Kessi's contact information from Dr. Kitzmiller but then never even contacted her. There have been no known consequences for Dr. Abu El-Haj who unnecessarily, viciously, and publicly humiliated Dr. Kitzmiller in an open forum.

516.    Plaintiff's association with her Jewish husband was a motivating factor in Defendants' decisions not to hire her.

517.    As a result of Defendants' conduct, Dr. Kitzmiller has suffered damages including, but not limited to, the loss of employment wages and benefits, loss of advancement opportunities, out-of-pocket expenses, emotional distress, harm to reputation, and other compensatory damages.

518.    Dr. Kitzmiller seeks all remedies and damages permitted under the New York State Human Rights Law including, but not limited to, back pay, front pay, emotional distress, medical harm, reputation harm damages, reinstatement, punitive damages, attorney's fees, costs, pre-judgment and post-judgment interest, and any other relief the Court deems just and proper.

**COUNT XIII**
**NYCHRL Aiding and Abetting**
**(Plaintiff v. Scott-Francis, Olinto, Bell, Beilock, and Rosenbury)**

519.    The preceding paragraphs are incorporated as if set forth at length herein.

520.    Dr. Scott-Francis, Dr. Olinto, Dr. Bell, Dr. Beilock, and Dr. Rosenbury  were in positions of authority and failed to act to correct the alleged discrimination and retaliation and, thus, are subject to aiding and abetting and deliberate inaction liability under the New York City Human Rights Law.

521.    The individual Defendants occupied supervisory and administrative roles with authority to receive complaints of discrimination, conduct or direct investigations, recommend corrective action, and implement remedial measures affecting Plaintiff's employment.

522.    Plaintiff informed Defendants of the discrimination and retaliation described herein on multiple occasions thereby providing Defendant with actual knowledge of the discriminatory and retaliatory conduct.

523.    Despite possessing authority and responsibility to act, Defendants failed to conduct a fair and adequate investigation, failed to take reasonable corrective measures, and permitted the discriminatory decision and its effects to stand.

524.    Defendant's knowing failure to intervene, investigate, or remedy the situation enabled and perpetuated the discriminatory conduct and constituted aiding ad abetting in violation of the NYCHRL.

525.    As a result of Defendants' conduct, Dr. Kitzmiller has suffered damages including, but not limited to, the loss of employment wages and benefits, loss of advancement opportunities, out-of-pocket expenses, emotional distress, harm to reputation, and other compensatory damages

526.    Dr. Kitzmiller seeks all remedies and damages permitted under the New York City Human Rights Law including, but not limited to, back pay, front pay, emotional distress, medical harm, reputation harm damages, reinstatement, punitive damages, attorney's fees, costs, pre-judgment and post-judgment interest, and any other relief the Court deems just and proper.

## COUNT XIV
### NYSHRL Aiding and Abetting
### (Plaintiff v. Scott-Francis, Olinto, Bell, Beilock, and Rosenbury)

527.    The preceding paragraphs are incorporated as if set forth at length herein.

528.    Dr. Scott-Francis, Dr. Olinto, Dr. Bell, Dr. Beilock, and Dr. Rosenbury were in positions of authority and failed to act to correct the alleged discrimination and retaliation and, thus, are subject to to aiding and abetting and deliberate inaction liability under the New York City Human Rights Law.

529.    The individual Defendants occupied supervisory and administrative roles with authority to receive complaints of discrimination, conduct or direct investigations, recommend

corrective action, and implement remedial measures affecting Plaintiff's employment.

530.   Plaintiff informed Defendants of the discrimination and retaliation described herein on multiple occasions thereby providing Defendant with actual knowledge of the discriminatory and retaliatory conduct.

531.   Despite possessing authority and responsibility to act, Defendants failed to conduct a fair and adequate investigation, failed to take reasonable corrective measures, and permitted the discriminatory decision and its effects to stand.

532.   Defendants' knowing failure to intervene, investigate, or remedy the discrimination enabled and perpetuated the discriminatory conduct and constituted aiding and abetting in violation of the NYCHRL.

533.   As a result of Defendants' conduct, Dr. Kitzmiller has suffered damages including, but not limited to, the loss of employment wages and benefits, loss of advancement opportunities, out-of-pocket expenses, emotional distress, harm to reputation, and other compensatory damages.

534.   Dr. Kitzmiller seeks all remedies and damages permitted under the New York City Human Rights Law including, but not limited to, back pay, front pay, emotional distress, medical harm, reputation harm damages, reinstatement, punitive damages, attorney's fees, costs, pre-judgment and post-judgment interest, and any other relief the Court deems just and proper.

### COUNT XV
### Retaliation in Violation of Title IX 20 U.S.C. § 1681 et seq.
### (Plaintiff v. Barnard and Columbia)

535.   The preceding paragraphs are incorporated as if set forth at length herein.

536.   Dr. Kitzmiller engaged in activity protected under Title IX including when she complained that Barnard faculty received less benefits that Columbia faculty, and filed complaints

of sex discrimination with the Office of Nondiscrimination and Title IX and participated in a Title IX investigation.

537.    Plaintiff had a good faith, reasonable belief that the conduct complained of was unlawful.

538.    In 2019, Dr. Kitzmiller complained to Provost Bell that childhood tuition benefits were higher for Columbia faculty than for Barnard faculty, but Provost Bell incredibly professed not to know of this difference.

539.    In 2019, Dr. Kitzmiller likewise complained to Dr. Abu El-Haj that childhood tuition benefits were higher for Columbia faculty than for Barnard faculty.

540.    Dr. Kitzmiller has learned that contingent (non-tenure track) faculty and staff at Columbia receive K-12 school benefits for their children but contingent faculty at Barnard do not, which reflects Barnard's relatively anti-family environment and clear inequities.

541.    On January 12, 2023, Dr. Kitzmiller filed a complaint with Barnard's Office of Nondiscrimination and Title IX.  She alleged discrimination on the basis of race, age, parental status, marital status, and retaliation.

542.    After interviewing Dr. Kitzmiller, the Director of Barnard's Office of Nondiscrimination and Title IX, Dr. Elizabeth Scott-Francis, said that there are "climate" concerns about the Education Studies Program that needed to be addressed, which evidently pertained to race, age, and/or gender.

543.    Dr. Scott-Francis further told Dr. Kitzmiller that the conflicts of interest among the members of the Search Committees that considered her recent applications would not even be allowed in a staff hiring committee.

544.   Following the protected activity, Dr. Kitzmiller suffered adverse actions including that Defendants failed to hire her for either Assistant Professor tenure track position, failed to support her grant activity, and/or failed to properly investigate her discrimination claims.

545.    Defendants were aware of her protected activities.

546.   In the past before it was clear that Dr. Kitzmiller was challenging her adverse treatment, the Provost's Office helped her to secure grant funding, which is in the interest of Barnard and Columbia.

547.   On December 14, 2023, Dr. Kitzmiller emailed Provost Bell requesting permission to submit a grant proposal for up to $600,000 in funding with the WT Grant Foundation, which a staff member from Barnard's Institutional Funding & Sponsored Research Office had approached Dr. Kitzmiller about.  Dr. Kitzmiller asked Provost Bell if she would support the grant. Provost Bell never responded.

548.   On December 23, 2023, Dr. Kitzmiller sent an email to Provost Bell about a grant proposal involving the Columbia Global Center in Amman, Jordan that could bring hundreds of thousands of dollars to the University. Dr. Kitzmiller asked Provost Bell if she would support the grant. Provost Bell never responded.

549.   On January 5, 2024, Dr. Kitzmiller sent an email to new Barnard President Laura Rosenbury informing her that she (Dr. Kitzmiller) had been selected as a semifinalist for a large Spencer Foundation grant, one of the most competitive and prestigious grants in her field.  President Rosenbury never responded.

550.   On January 5, 2024, Dr. Kitzmiller sent an email to Provost Bell informing her that she (Dr. Kitzmiller) had been selected as a semifinalist for the Spencer grant. Provost Bell never

responded.

551.    So eager were Barnard officials to discriminate against Dr. Kitzmiller, that they became uninterested in her financial support even when it would benefit the institution.

552.    A causal connection exists based on timing, antagonism, and pretext.

553.    Defendants' justifications for the failure to hire Dr. Kitzmiller are a pretext for retaliation.

554.    As a result of the retaliation Dr. Kitzmiller has suffered damages including, but not limited to, the loss of employment wages and benefits, loss of advancement opportunities, out-of-pocket expenses, emotional distress, harm to reputation, and other compensatory damages.

555.    Dr. Kitzmiller seeks all remedies and damages permitted under Title IX including, but not limited to, back pay, front pay, attorney's fees, costs, pre-judgment and post-judgment interest, and such other relief as the Court deems just and proper.

## COUNT XVI
### Retaliation in Violation of New York City Human Rights Law
### (Plaintiff v. Columbia, Barnard, Scott-Francis, Olinto, Bell, Beilock, and Rosenbury)

556.    The preceding paragraphs are incorporated as if set forth at length herein.

557.    Dr. Kitzmiller engaged in activity protected under the NYC Human Rights Law including when she complained that Barnard faculty received less benefits than Columbia faculty, and filed complaints of discrimination with the Office of Nondiscrimination and Title IX and participated in a Title IX investigation.

558.    Plaintiff had a good faith, reasonable belief that the conduct complained of was unlawful.

559.    Following the protected activity, Dr. Kitzmiller suffered adverse actions including

that Defendants failed to hire her for either Assistant Professor tenure track position, failed to support her grant activity, and/or failed to properly investigate her discrimination claims.

560.    Defendants took actions that would be reasonably likely to deter a person from engaging in protected activity.

561.    Such conduct was reasonably likely to deter a person from opposing discriminatory practices and was undertaken at least in part because of Plaintiff's protected activity, in violation of N.Y.C. Admin. Code § 8-107(7).

562.    Defendants were aware of her protected activities.

563.    A causal connection exists based on timing, antagonism, and pretext.

564.    Defendants' justifications for the failures to hire Dr. Kitzmiller are a pretext for retaliation.

565.    As a result of the retaliation Dr. Kitzmiller has suffered damages including, but not limited to, the loss of employment wages and benefits, loss of advancement opportunities, out-of-pocket expenses, emotional distress, harm to reputation, and other compensatory damages.

566.    Dr. Kitzmiller seeks all remedies and damages permitted under the NYC Human Rights Law, including, but not limited to, back pay, front pay, attorney's fees, costs, pre-judgment and post-judgment interest, emotional distress, punitive damages, and such other relief as the Court deems just and proper.

## COUNT XVII
### Retaliation in Violation of New York State Human Rights Law
### (Plaintiff v. Barnard, Columbia, Scott-Francis, Olinto, Bell, Beilock, and Rosenbury)

567.    The preceding paragraphs are incorporated as if set forth at length herein.

568.    Dr. Kitzmiller engaged in activity protected under the NYS Human Rights Law

68

including when she complained that Barnard faculty received less benefits that Columbia faculty, and filed complaints of discrimination with the Office of Nondiscrimination and Title IX and participated in a Title IX investigation.

569.    Plaintiff had a good faith, reasonable belief that the conduct complained of was unlawful.

570.    Following the protected activity, Dr. Kitzmiller suffered adverse actions including that Defendants failed to hire her for either Assistant Professor tenure track position, failed to support her grant activity, and/or failed to properly investigate her discrimination claims.

571.    Defendants took actions that would be reasonably likely to deter a person from engaging in protected activity.

572.    Defendants were aware of her protected activities.

573.    A causal connection exists based on timing, antagonism, and pretext.

574.    Defendants' justifications for the failures to hire Dr. Kitzmiller are a pretext for retaliation.

575.    As a result of the retaliation Dr. Kitzmiller has suffered damages including, but not limited to, the loss of employment wages and benefits, loss of advancement opportunities, out-of-pocket expenses, emotional distress, harm to reputation, and other compensatory damages.

576.    Dr. Kitzmiller seeks all remedies and damages permitted under the NYS Human Rights Law, including, but not limited to, back pay, front pay, attorney's fees, costs, pre-judgment and post-judgment interest, and such other relief as the Court deems just and proper.

**COUNT XVIII**
**Retaliation in Violation of Title VII**
**(Plaintiff v. Barnard and Columbia)**

577.    The preceding paragraphs are incorporated as if set forth at length herein.

578.    Barnard is a covered employer for purposes of Title VII.

579.    Columbia is a covered employer for purposes of Title VII.

580.    Dr. Kitzmiller engaged in activity protected under Title VII including when she complained that Barnard faculty received less benefits that Columbia faculty, and filed complaints of discrimination with the Office of Nondiscrimination and Title IX and participated in a Title IX investigation.

581.    Plaintiff had a good faith, reasonable belief that the conduct complained of was unlawful.

582.    Following the protected activity, Dr. Kitzmiller suffered adverse actions including that Defendants failed to support her grant activity, and/or failed to properly investigate her discrimination claims.

583.    Defendants took actions that would be reasonably likely to deter a person from engaging in protected activity.

584.    Defendants were aware of her protected activities.

585.    A causal connection exists based on timing, antagonism, and pretext.

586.    As a result of the retaliation Dr. Kitzmiller has suffered damages including, but not limited to, the loss of advancement opportunities, out-of-pocket expenses, emotional distress, harm to reputation, and other compensatory damages.

587.    Dr. Kitzmiller seeks all remedies and damages permitted under Title VII including, but not limited to, back pay, front pay, attorney's fees, costs, pre-judgment and post-judgment interest, and such other relief as the Court deems just and proper.

**COUNT XIX**
**Retaliation Violation of 42 U.S.C. § 1981**
**(Plaintiff v. Barnard Columbia, Abu El-Haj, Maulucci, Scott-Francis, Bell, Beilock, and Rosenbury)**

588.    The preceding paragraphs are incorporated as if set forth at length herein.

589.    Dr. Kitzmiller files this action under 42 U.S.C. § 1981 against Defendants for retaliation for engaging in activity protected under Section 1981.

590.    Dr. Kitzmiller engaged in protected conduct including when she advocated on behalf of minority students and complained that certain college policies, including caps on class size, disadvantaged minority students.

591.    She complained the caps were preventing racial minority students, who sometimes registered late for the semester due to financial challenges, from taking the classes and preventing them from majoring or minoring in Education Studies.

592.    The enrollment caps were unnecessary since Dr. Kitzmiller effectively had taught classes to more students previously and always received high ratings.

593.    Dr. Kitzmiller also engaged in protected activity when in January 2023 she filed a complaint with Barnard's Office of Nondiscrimination and Title IX alleged discrimination on the bases of, *inter alia*, race and retaliation.

594.    Defendants were aware of Plaintiff's protected conduct.

595.    Following the protected activity, Dr. Kitzmiller suffered an adverse action including that Defendants failed to hire her for either Assistant Professor tenure track position.

596.    Dr. Abu El-Haj made clear that she did not appreciate that Dr. Kitzmiller had framed the caps as a racial equity issue and even told Dr. Kitzmiller that she "would be happier at another institution" and "should consider leaving Barnard." Dr. Abu El-Haj was also frustrated that Dr.

71

Kitzmiller met with Provost Bell.

597.    In response to Dr. Kitzmiller's challenge to the enrollment cap, Professor Maria Rivera Maulucci, Ph.D., Chair of Education Studies, told Dr. Kitzmiller that she could not be a "good teacher" with more than 20 students in her course.

598.    In May 2021, Dr. Kitzmiller likewise told Provost Bell that the student caps were preventing racial minority students, who sometimes registered late for the semester due to financial challenges, from taking the classes and preventing them from majoring or minoring in Education Studies.

599.    In 2021, Dr. Kitzmiller and her junior colleagues in the Education Studies Program met with Barnard's Ombudsperson in 2021 to discuss inequitable policies and practices in the Education Studies Program including towards racial minorities.

600.    On September 12, 2022, Dr. Sian Beilock, then the President of Barnard College at Columbia University and now the President of Dartmouth College, noted during the convocation address that "Professor Erika Kitzmiller [helped] educators address learning delays caused by the pandemic."

601.    Dr. Kitzmiller's peer-reviewed and public scholarship on learning delays caused by the pandemic focused on racial inequalities in schools, and solutions to these inequalities.

602.    Dr. Kitzmiller had organized and participated in anti-racism pedagogy workshops conducted on Barnard's campus.

603.    Dr. Kitzmiller became known throughout the Barnard community, according to comments made by the Title IX coordinator, Dr. Elizabeth Scott-Francis, as an advocate for under-represented and racial minority students.

604.     Similarly, the Ombudsperson told Dr. Kitzmiller, "It sounds like you are just trying to make Barnard a better place."

605.     On September 21, 2022 when Dr. Kitzmiller met Dr. Abu El-Haj about academic matters, Dr. Abu El-Haj raised Dr. Kitzmiller's recognition from President Beilock at the convocation, and insultingly stated: "I don't even know how she [President Beilock] would know who you are."

606.     In context, Dr. Abu El-Haj's dismissive remark regarding the President's "shout out" above should be seen as diminishing Dr. Kitzmiller for her anti-racial discriminatory speech and advocacy.

607.     In a program meeting in the fall of 2022, Dr. Kitzmiller offered a colleague advice on how to write a book proposal after which Dr. Abu El-Haj gratuitously stated in front of other faculty: "Well, Erika, we aren't as famous as you."

608.     On January 12, 2023, Dr. Kitzmiller filed a complaint with Barnard's Office of Nondiscrimination and Title IX.  She alleged discrimination on the basis of race, age, parental status, marital status, and retaliation.

609.     After interviewing Dr. Kitzmiller, the Director of Barnard's Office of Nondiscrimination and Title IX, Dr. Elizabeth Scott-Francis, said that there are "climate" concerns about the Education Studies Program that needed to be addressed, which evidently pertained to race, age, and/or gender.

610.     Dr. Scott-Francis further told Dr. Kitzmiller that the conflicts of interest among the members of the Search Committees that considered her recent applications would not even be allowed in a staff hiring committee.

611.    Following the protected activity in January 2023 and throughout 2023, Defendants failed to support her grant activity, and failed to properly investigate her discrimination claims.

612.    The temporal proximity between Plaintiff's protected activity and the adverse actions, together with procedural irregularities and hostility directed toward Plaintiff after her protected activities, supports a plausible inference of retaliatory intent.

613.    But for Plaintiff's protected activity, Defendants would not have denied her tenure track appointments, refused to support her grant efforts, and failed to properly investigate her discrimination complaints.

614.    As a result of Defendants' conduct, Dr. Kitzmiller has suffered damages including, but not limited to, the loss of employment wages and benefits, loss of advancement opportunities, out-of-pocket expenses, emotional distress, harm to reputation, and other compensatory damages.

615.    Dr. Kitzmiller seeks all remedies and damages permitted under Section 1981, including, but not limited to, back pay, front pay, emotional distress, medical harm, reputation harm damages, reinstatement, punitive damages, attorney's fees, costs, pre-judgment and post-judgment interest, and any other relief the Court deems just and proper.

## COUNT XX
### Retaliation
### Violation of New York City Human Rights Law
### (Plaintiff v. Barnard, Columbia, Abu El-Haj, Maulucci, Scott-Francis, Bell, Beilock, and Rosenbury)

616.    The preceding paragraphs are incorporated as if set forth at length herein.

617.    Dr. Kitzmiller files this action under NYC Human Rights Law against Defendants for retaliation for engaging in activity protected under the NYCHRL.

618.    Dr. Kitzmiller engaged in protected conduct including when she advocated on behalf

of minority students and complained that certain college policies, including caps on class size, disadvantaged minority students.

619.    She complained the caps were preventing racial minority students, who sometimes registered late for the semester due to financial challenges, from taking the classes and preventing them from majoring or minoring in Education Studies.

620.    The enrollment caps were unnecessary since Dr. Kitzmiller effectively had taught classes to more students previously and always received high ratings.

621.    Dr. Kitzmiller also engaged in protected activity when in January 2023 she filed a complaint with Barnard's Office of Nondiscrimination and Title IX alleged discrimination on the bases of, *inter alia*, race and retaliation.

622.    Defendants were aware of Plaintiff's protected conduct.

623.    Following the protected activity, Dr. Kitzmiller suffered an adverse action including that Defendants failed to hire her for either Assistant Professor tenure track position.

624.    Following the protected activity in January 2023, Defendants failed to support her grant activity, and failed to properly investigate her discrimination claims.

625.    Such conduct was reasonably likely to deter a person from opposing discriminatory practices and was undertaken at least in part because of Plaintiff's protected activity, in violation of N.Y.C. Admin. Code § 8-107(7).

626.    The temporal proximity between Plaintiff's protected activity and the adverse actions, together with procedural irregularities and hostility directed toward Plaintiff after her protected activities, supports a plausible inference of retaliatory intent.

627.    As a result of Defendants' conduct, Dr. Kitzmiller has suffered damages including,

but not limited to, the loss of employment wages and benefits, loss of advancement opportunities, out-of-pocket expenses, emotional distress, harm to reputation, and other compensatory damages.

628.    Dr. Kitzmiller seeks all remedies and damages permitted under the NYCHRL including, but not limited to, back pay, front pay, emotional distress, medical harm, reputation harm damages, reinstatement, punitive damages, attorney's fees, costs, pre-judgment and post-judgment interest, and any other relief the Court deems just and proper.

## COUNT XXI
### Retaliation
### Violation of New York State Human Rights Law (Plaintiff v.Barnard, Columbia, Abu El-Haj, Maulucci, Scott-Francis, Bell, Beilock, and Rosenbury)

629.    The preceding paragraphs are incorporated as if set forth at length herein.

630.    Dr. Kitzmiller files this action under NYS Human Rights Law against Defendants for retaliation for engaging in activity protected under the NYSHRL.

631.    Dr. Kitzmiller engaged in protected conduct including when she advocated on behalf of minority students and complained that certain college policies, including caps on class size, disadvantaged minority students.

632.    She complained the caps were preventing racial minority students, who sometimes registered late for the semester due to financial challenges, from taking the classes and preventing them from majoring or minoring in Education Studies.

633.    The enrollment caps were unnecessary since Dr. Kitzmiller effectively had taught classes to more students previously and always received high ratings.

634.    Dr. Kitzmiller also engaged in protected activity when in January 2023 she filed a complaint with Barnard's Office of Nondiscrimination and Title IX alleged discrimination on the bases of, *inter alia*, race and retaliation.

635.    Defendants were aware of Plaintiff's protected conduct.

636.    Following the protected activity, Dr. Kitzmiller suffered an adverse action including that Defendants failed to hire her for either Assistant Professor tenure track position.

637.    Following the protected activity in January 2023, Defendants failed to support her grant activity, and failed to properly investigate her discrimination claims.

638.    The temporal proximity between Plaintiff's protected activity and the adverse actions, together with procedural irregularities and hostility directed toward Plaintiff after her protected activities, supports a plausible inference of retaliatory intent.

639.    But for Plaintiff's protected activity, Defendants would not have denied her tenure track appointments, refused to support her grant efforts, and failed to properly investigate her discrimination complaints.

640.    As a result of Defendants' conduct, Dr. Kitzmiller has suffered damages including, but not limited to, the loss of employment wages and benefits, loss of advancement opportunities, out-of-pocket expenses, emotional distress, harm to reputation, and other compensatory damages.

641.    Dr. Kitzmiller seeks all remedies and damages permitted under the NYSHRL including, but not limited to, back pay, front pay, emotional distress, medical harm, reputation harm damages, reinstatement, punitive damages, attorney's fees, costs, pre-judgment and post-judgment interest, and any other relief the Court deems just and proper.

## COUNT XXII
### Retaliation Violation of Title VII
### (Plaintiff v. Barnard and Columbia)

642.    The preceding paragraphs are incorporated as if set forth at length herein.

643.    Dr. Kitzmiller files this action under Title VII against Defendants for retaliation for

engaging in activity protected under Title VII.

644.    Dr. Kitzmiller engaged in protected conduct including when she advocated on behalf of minority students and complained that certain college policies, including caps on class size, disadvantaged minority students.

645.    She complained the caps were preventing racial minority students, who sometimes registered late for the semester due to financial challenges, from taking the classes and preventing them from majoring or minoring in Education Studies.

646.    The enrollment caps were unnecessary since Dr. Kitzmiller effectively had taught classes to more students previously and always received high ratings.

647.    Dr. Kitzmiller also engaged in protected activity when in January 2023 she filed a complaint with Barnard's Office of Nondiscrimination and Title IX alleged discrimination on the bases of, *inter alia*, race and retaliation.

648.    Defendants were aware of Plaintiff's protected conduct.

649.    Following the protected activity, Dr. Kitzmiller suffered an adverse action including that Defendants failed to hire her for either Assistant Professor tenure track position.

650.    Following the protected activity in January 2023, Defendants failed to support her grant activity, and failed to properly investigate her discrimination claims.

651.    The temporal proximity between Plaintiff's protected activity and the adverse actions, together with procedural irregularities and hostility directed toward Plaintiff after her protected activities, supports a plausible inference of retaliatory intent.

652.    But for Plaintiff's protected activity, Defendants would not have denied her tenure track appointments, refused to support her grant efforts, and failed to properly investigate her

discrimination complaints.

653.    As a result of Defendants' conduct, Dr. Kitzmiller has suffered damages including,but not limited to, the loss of employment wages and benefits, loss of advancement opportunities, out-of-pocket expenses, emotional distress, harm to reputation, and other compensatory damages.

654.    Dr. Kitzmiller seeks all remedies and damages permitted under Title VII including, but not limited to, back pay, front pay, emotional distress, medical harm, reputation harm damages, reinstatement, punitive damages, attorney's fees, costs, pre-judgment and post-judgment interest, and any other relief the Court deems just and proper.

## COUNT XXIII
## BREACH OF CONTRACT
### (Plaintiff v. Barnard and Columbia)

655.    The preceding paragraphs are incorporated as if set forth at length herein.

656.    A contract existed between Barnard and Columbia on one side and Dr. Kitzmiller and Dr. Jacobs on the other, the essential terms of which were that Dr. Jacobs would stay at Columbia provided that Dr. Kitzmiller would be fairly considered for a tenure track position at Barnard.

657.    Dr. Jacobs stayed and performed exceedingly well at Columbia.

658.    Dr. Kitzmiller performed exceedingly well at Barnard and applied for two tenure track jobs for which she was well qualified.

659.    However, Dr. Kitzmiller did not receive fair consideration for a tenure track job because the Defendants breached.

660.    As a result of Defendants' breaches of contract, Dr. Kitzmiller suffered damages including that she was not fairly evaluated and not hired for either of the tenure track positions.

661.    Dr. Kitzmiller demands all remedies and damages available to her for breach of contract.

## COUNT XXIV
## BREACH OF CONTRACT
### (Plaintiff v. Barnard and Columbia)

662.    A contract exists between Dr. Kitzmiller and the Defendants consisting of the Defendants' policies and procedures.

663.    As stated in Barnard's Academic Code as well as in Barnard's Faculty Handbook, "[r]ecommendations on appointments, reappointments, promotions, and tenure must be made by a majority vote of the department's Professors and Associate Professors holding rank higher than that of the person being considered."

664.    The composition of the search committees at issue violated Barnard's Academic Code and Faculty Handbook as three members held the lower ranks of Assistant Professor, Senior Lecturer, or Lecturer.

665.    Barnard prohibits conflicts of interest between applicants for hire and promotion and individuals involved in the recommendation and/or decision process.

666.    Here there were several conflicts of interest that were not remedied, including that Dr. Abu El-Haj evaluated her own student's application, rather than recusing herself as required by Barnard's policy, and this younger less well-qualified individual was eventually awarded the position.

667.    Barnard's policies stipulate that search committee members recuse themselves from evaluating their own students. Dr. Kitzmiller was told by Vice Provost Edward Barnaby that recusal did not occur in this case, which is a blatant violation of Barnard's policies. This nonrecusal was consequential because the search chair's student was eventually hired for the position, even as she

had no published papers at the time of the search.

668.    Shamefully, one non-tenure track member of the search committees actually was the brother-in-law of Dr. Abu El-Haj, the search chair. He was further conflicted because he had repeatedly and publicly voiced frustration that he had been denied promotion to a tenure track position from his current non-tenure track role.

669.    Another member of the search committee was Dr. Abu El-Haj's direct report.

670.    In January 2023, Barnard's Title IX administrator Dr. Scott-Francis told Dr. Kitzmiller that the conflicts of interest among the members of the Search Committees that considered her recent applications would not even be allowed in a staff hiring committee.

671.    Barnard policy stipulates that the search pools be narrowed based on criteria in the wording of the advertisement. However, Dr. Kitzmiller was informed that she was not considered for the joint Education/Urban Studies position because she was "not urban enough." This was improper because the advertisement did not discuss the "urbanness" of the candidate.

672.    As a result of Defendants' breaches of contract, Dr. Kitzmiller suffered damages including that she was not fairly evaluated and not hired for either of the tenure track positions.

673.    Dr. Kitzmiller demands all remedies and damages available to her for breach of contract.

## COUNT XXV
### Breach of Contract
### Plaintiff v. Barnard and Columbia

674.    The preceding paragraphs are incorporated as if set forth at length herein.

675.    A contract exists between Dr. Kitzmiller and the Defendants consisting of the Defendants' policies and procedures.

676.     Those policies and procedures include, but are not limited to, Barnard's Title IX and anti-discrimination policies and procedures.

677.     Following the failures-to-hire, Dr. Kitzmiller followed every possible protocol at Barnard to get the issues resolved.

678.     On December 23, 2022, Dr. Kitzmiller emailed President Sian Beilock and Provost Linda Bell about the search. President Beilock told Dr. Kitzmiller to discuss her concerns with Provost Bell.

679.     In January 2023, Dr. Kitzmiller filed a complaint with Barnard's Office of Nondiscrimination and Title IX. She did so at the suggestion of Barnard's Chief Diversity Officer Dr. Jennifer Rosales who participated in the search and knew of Dr. Kitzmiller's experiences.

680.     In March 2023, Dr. Kitzmiller met with then-President Beilock and Provost Bell. 733. Dr. Rosales advised Dr. Kitzmiller on January 5, 2023 to meet with the Barnard Title IX office "for your [Dr. Kitzmiller's] protection before you meet with [Provost] Linda Bell."

681.     Dr. Rosales was knowledgeable about the events that occurred during the search because she participated in the search process and discussed the events afterwards with Dr. Kitzmiller.

682.     After interviewing Dr. Kitzmiller, the Director of Barnard's Office of Nondiscrimination and Title IX, Dr. Elizabeth Scott-Francis, said that there are "climate" concerns about the Education Studies Program that needed to be addressed

683.     Dr. Scott-Francis stated that she would conduct a thorough probe, including interviewing witnesses, and told Dr. Kitzmiller to expect a final report that would describe what she found in the investigation including redactions in cases of confidential search information.

684.     However, Dr. Scott-Francis conducted only an "inquiry," not an investigation, into Dr.

Kitzmiller's complaints and declined to provide a report.

685.    Barnard's policies distinguished between an "inquiry" and an "investigation."

686.    Under Barnard's policy at the time, an inquiry is time limited and "should not take longer than five-to-ten (5-10) business days."

687.    When Dr. Kitzmiller met with Dr. Scott-Francis in January 2023, Dr. Kitzmiller asked her to interview Dr. Rachel Throop, who could be expected to be supportive on the question of the search favoring younger faculty.

688.    In March 2023, Dr. Kitzmiller learned from Dr. Scott-Francis that she never interviewed Dr. Throop.

689.    In March 2023, Dr. Kitzmiller met with then Barnard President Sian Beilock and voiced concerns about the Office of Nondiscrimination and Title IX investigation because one of her suggested witnesses, Dr. Rachel Throop, was not contacted. President Beilock responded that they could not discuss the "investigation" while it was under way.

690.    In March 2023, Dr. Shose Kessi, the Dean of Humanities and Professor of Psychology at the University of Cape Town, South Africa, facilitated a Gildersleeve workshop on racial issues in education at Barnard.  Dr. Kitzmiller wrote the grant to bring Dr. Kessi to Barnard for this honor.

691.    When Dr. Kitzmiller noted an African American female professor who feared losing her professorship in Florida for teaching critical race theory, Dr. Abu El-Haj demonstrated hostility by publicly exploding at Dr. Kitzmiller and bizarrely accusing her of being anti-Palestinian, a baseless falsehood that was racist in itself, and not on topic.

692.    Dr. Kitzmiller asked Dr. Elizabeth Scott-Francis, Director of Nondiscrimination and Title IX and Title IX Coordinator, to investigate Dr. Abu El-Haj's outburst.  Dr. Scott-Francis agreed,

83

requested, and received Dr. Kessi's contact information from Dr. Kitzmiller but then never even contacted her. There have been no known consequences for Dr. Abu El-Haj who unnecessarily, viciously, and publicly humiliated Dr. Kitzmiller in an open forum.

693.   The process conducted by Dr. Scott-Francis continued for about five months and is thus even longer than expected in an "investigation," which should be completed "...within thirty to forty (30-40) business days," according to Barnard policy at the time.

694.   It was not until May 12, 2023 that Dr. Scott-Francis provided a final response that was negative, result- oriented, and pretextual.

695.   Dr. Scott-Francis interviewed Professor Yolanda Sealey-Ruiz ("Dr. Sealey-Ruiz"), a professor at Teachers College, Columbia University, because Dr. Kitzmiller suggested that Dr. Sealey-Ruiz could provide information relevant to Dr. Kitzmiller's complaint including her observations and concerns regarding Dr. Abu El- Haj retaliating and harassing Dr. Kitzmiller for her racial advocacy.

696.   Shortly thereafter Dr. Scott-Francis terminated the investigation and refused to provide information about this or any interviews.

697.   The effect of this cessation was to allow the Office of Nondiscrimination and Title IX not to follow its own rules, not to put evidence corroborating Dr. Kitzmiller in writing, and not to conduct interviews to gather supportive testimony.

698.   The evidence gathered by Dr. Scott-Francis apparently was not reviewed by an outside pool of individuals (as is required by Barnard's nondiscrimination policy) nor was Dr. Kitzmiller given the opportunity to respond to any findings or to provide a formal appeal.

699.   According to Barnard's policy, Dr. Kitzmiller should have been provided with a report

"that will include a summary of relevant information of each interview, provide a summary of factual information, and include any relevant documentation collected."

700.    Dr. Kitzmiller never received this report from Dr. Scott-Francis, and the apparent failure of Dr. Scott-Francis to conduct a complete investigation constitutes a violation of Barnard's internal rules, and a cover-up.

701.    As a result of Defendants' breaches of contract, Dr. Kitzmiller suffered damages including, but not limited to, that she was deprived of a fair investigation and subjected to additional harassment.

702.    Dr. Kitzmiller demands all remedies and damages available to her for breach of contract.

**COUNT XXVI**
**Intentional Discrimination on the Basis of Sex Violation of Title VII**
**(Plaintiff v. Barnard and Columbia)**

703.    The preceding paragraphs are incorporated as if set forth at length herein. 757. Dr. Kitzmiller suffered sex-based discrimination.

704.    The discrimination was intentional.

705.    Dr. Kitzmiller is a member of a protected class, female.

706.    Dr. Kitzmiller was qualified for the assistant professor positions based on her education and experience.

707.    Dr. Kitzmiller applied for these positions.

708.    Dr. Kitzmiller suffered adverse actions when Defendants failed to hire her for these positions.

709.    The adverse actions occurred under circumstances giving rise to an inference of sex

discrimination, including reliance on gender stereotypes about caregiving and motherhood.

710.  Instead of Dr. Kitzmiller, Barnard and Columbia hired less qualified applicants who in contrast to Dr. Kitzmiller did not have children (Dr. Gross and Dr. Herbert).

711.  The Search Committees did not recommend hiring any candidate who had children.

712.  The Search Committees recommended only candidates who did not have children.

713.  Search Committee members made statements reflecting stereotypes and assumptions about motherhood and caregiving.

714.  Statements included: "Erika, you have young children. That dictates the times that you are available to teach. We need people to teach at night and you won't want to do that with children." "Well that [having young children] affected when I taught.  It doesn't anymore because my children are grown. We have people in the program that have young children so it might affect them."

715.  A Search Committee member said to another rejected candidate with children that it was better for her to have accepted the job at Molloy University than to stay at Barnard because she would see in time that she would be a better mother and spend more time with her kids as a professor at Molloy.

716.  The rejected candidate with children complained that she had been "mommy tracked," and also told another Search Committee member that she did not get the job because of when she had children which he did not deny.

717.  Defendants' justifications for the failures to hire Dr. Kitzmiller are a pretext for discrimination.

718.  Plaintiff's sex was a motivating factor in Defendants' decision.

719.  As a result of the discrimination Dr. Kitzmiller has suffered damages including, but

not limited to, the loss of employment wages and benefits, loss of advancement opportunities, out-of-pocket expenses, emotional distress, harm to reputation, and other compensatory damages.

720.    Dr. Kitzmiller seeks all remedies and damages permitted under Title VII including, but not limited to, back pay, front pay, emotional distress damages, punitive damages for willful and wanton conduct and reckless indifference to protected rights, attorney's fees, costs, pre-judgment and post-judgment interest, and such other relief as the Court deems just and proper.

## COUNT XXVII
### Intentional Discrimination on the Basis of Race Violation of Title VII
### (Plaintiff v. Barnard and Columbia)

721.    The preceding paragraphs are incorporated as if set forth at length herein.

722.    Dr. Kitzmiller is a member of a protected class, Caucasian/White.

723.    Dr. Kitzmiller was qualified for the joint Assistant Professor position in the Education Studies and Urban Studies Programs based on her qualifications and experience.

724.    Dr. Kitzmiller applied for the position

725.    Dr. Kitzmiller suffered an adverse action when Defendants failed to hire her for the position.

726.    The failure to hire occurred under circumstances giving rise to an inference of race discrimination.

727.    The Defendants cynically hired a less-qualified Black and African American candidate.

728.    The Search Chair, Dr. Abu El Haj, told Dr. Kitzmiller that she did not get the position because she was not "urban enough," a code word for race—specifically Black or African American – which is false and pretextual for the reasons stated above.

729.    Defendants' justifications for the failure to hire Dr. Kitzmiller are a pretext for discrimination.

730.    As a result of the discrimination Dr. Kitzmiller has suffered damages including, but not limited to, the loss of employment wages and benefits, loss of advancement opportunities, out- of-pocket expenses, emotional distress, harm to reputation, and other compensatory damages.

731.    Plaintiff seek all remedies and damages permitted under Title VII including, but not limited to, back pay, front pay, emotional distress damages, punitive damages for willful and wanton conduct and indifference to protected rights, attorney's fees, costs, pre-judgment and post-judgment interest, and such other relief as the Court deems just and proper.

## COUNT XXVIII
### Intentional Discrimination on the Basis of Age Violation of ADEA
### (Plaintiff v. Barnard and Columbia)

732.    The preceding paragraphs are incorporated as if set forth at length herein.

733.    Dr. Kitzmiller suffered age-based discrimination.

734.    The discrimination was intentional.

735.    Dr. Kitzmiller is a member of the protected age class (forty and over).

736.    Dr. Kitzmiller was qualified for the assistant professor positions based on her education and experience.

737.    Dr. Kitzmiller applied for these positions

738.    Dr. Kitzmiller suffered adverse actions when Defendants failed to hire her for these positions.

739.    The adverse actions occurred under circumstances giving rise to an inference of age discrimination.

88

740.    Instead of Dr. Kitzmiller, Barnard and Columbia hired less qualified applicants who are sufficiently younger to permit an inference of age discrimination.

741.    Dr. Kitzmiller was 44 at the time of the search.

742.    Barnard/Columbia hired Dr. Gross as Assistant Professor of Education.

743.    Based on information and belief, Dr. Gross is approximately 8 or more years younger than Dr. Kitzmiller and at the time of selection did not have children.

744.    Barnard/Columbia hired Dr. Herbert as Assistant Professor of Education and Urban Studies.

745.    Based on information and belief, Dr. Herbert is approximately 6 or more years younger than Dr. Kitzmiller, and at the time of selection did not have children.

746.    It is notable that there were six finalists, three who were under the age of 40 and three who were over the age of 40.

747.    The three candidates over the age of 40 are all mothers of school-aged children while none of the candidates under 40 were mothers at the time of the search.

748.    During the search, one of the candidates under 40 accepted a position at the University of Wisconsin and, thus, withdrew her application from consideration.

749.    The Search Committee recommended the two remaining candidates under the age of 40 who did not have children while it did not recommend any of the candidates over 40 who are mothers.

750.    Dr. Throop was a non-tenure track Professor in Barnard's Education Program.

751.    Dr. Throop told Dr. Kitzmiller that Dr. Abu El-Haj admitted that Barnard prefers to hire people who recently received their Ph.D. and "right out" of their Ph.D. programs, which reflects

ageism.

752.    Similarly, Dr. Kitzmiller was told by Dr. Miranda in October 2023 that she heard Dr. Abu El-Haj say that Barnard preferred to hire tenure track faculty who were younger and fresh out of their Ph.D. programs.

753.    When Dr. Kitzmiller spoke to Dr. Abu El-Haj about how to prepare her job talk, Dr. Abu El-Haj told Dr. Kitzmiller that unlike the other candidates who were instructed to discuss one key research contribution she should focus on multiple projects "since she was so far removed from [her] Ph.D.," which was reflective of disparate treatment and ageism.

754.    Defendants' justifications for the failures to hire Dr. Kitzmiller are a pretext for discrimination.

755.    As a result of the discrimination Dr. Kitzmiller has suffered damages including, but not limited to, the loss of employment wages and benefits, loss of advancement opportunities, out-of-pocket expenses, emotional distress, harm to reputation, and other compensatory damages.

756.    Dr. Kitzmiller seeks all remedies and damages permitted under the ADEA including, but not limited to, back pay, front pay, liquidated damages, costs, pre-judgment and post-judgment interest, and other relief deemed proper and just by the Court.

**COUNT XXIX**
**Race and Ethnicity Association Discrimination and/or Religious**
**Discrimination Violation of Title VII**
**(Plaintiff v. Barnard and Columbia)**

757.    The preceding paragraphs are incorporated as if set forth at length herein.

758.    Dr. Kitzmiller asserts that she was subjected to employment discrimination because her husband is Jewish.

759.    Plaintiff is married to Dr. Jacobs, who is Jewish and of Jewish ancestry, a racial/ethnic

group protected under Title VII.

760.    Defendants were aware of Plaintiff's marriage to, and association with, her Jewish husband at the time it made the hiring decision.

761.    Dr. Kitzmiller was qualified for the Assistant Professor positions based on her qualifications and experience.

762.    Dr. Kitzmiller applied for the positions.

763.    Dr. Kitzmiller suffered an adverse action when Defendants failed to hire her for the positions.

764.    Defendants' decisions occurred under circumstances giving rise to an inference of discrimination.

765.    Defendants declined to hire Plaintiff for the tenure track positions and instead selected candidates outside the protected association.

766.    In the winter of 2020, Dr. Abu El-Haj visited Dr. Kitzmiller's office, falsely and bizarrely noted that some wall posters were "anti-Muslim," and implied that Dr. Kitzmiller was anti-Muslim as well. Dr. Abu El-Haj is a supporter of the Boycott, Divestment, Sanctions (BDS) movement. The BDS movement contains anti-Semitic aspects aimed at delegitimizing and pressuring Israel, through the diplomatic, financial, professional, academic and cultural isolation of Israel, Israeli individuals, Israeli institutions, and, increasingly, Jews who support Israel's right to exist.

767.    Subsequently Dr. Abu El-Haj was hostile to Dr. Kitzmiller without a legitimate basis.

768.    During Dr. Kitzmiller's interview process, Dr. Abu El-Haj vocally presumed that Dr. Kitzmiller's husband, Dr. Jacobs, a Columbia professor, was a bad husband and father, although she did not know anything personal about him besides that he was Jewish.

769.    During the Gildersleeve workshop, when Dr. Kitzmiller noted an African American female professor who feared losing her professorship in Florida for teaching critical race theory, Dr. Abu El-Haj demonstrated hostility by publicly exploding at Dr. Kitzmiller and bizarrely accused her of being anti-Palestinian, a baseless falsehood that was racist in itself, and not on topic.

770.    Dr. Kitzmiller asked Dr. Elizabeth Scott-Francis, Director of Barnard's Office of Nondiscrimination and Title IX, to investigate Dr. Abu El-Haj's outburst.  Dr. Scott-Francis agreed, requested, and received Dr. Kessi's contact information from Dr. Kitzmiller but then never even contacted her. There have been no known consequences for Dr. Abu El-Haj who unnecessarily, viciously, and publicly humiliated Dr. Kitzmiller in an open forum.

771.    Plaintiff's association with her Jewish husband was a motivating factor in Defendants' decisions not to hire her.

772.    As a result of Defendants' conduct, Dr. Kitzmiller has suffered damages including, but not limited to, the loss of employment wages and benefits, loss of advancement opportunities, out-of-pocket expenses, emotional distress, harm to reputation, and other compensatory damages.

773.    Dr. Kitzmiller seeks all remedies and damages permitted under Title VII including, but not limited to, back pay, front pay, emotional distress, medical harm, reputation harm damages, reinstatement, punitive damages, attorney's fees, costs, pre-judgment and post-judgment interest, and any other relief the Court deems just and proper.

## COUNT XXX
### Retaliation Under All Listed Discrimination Statutes
### (Plaintiff v. Barnard and Columbia)

774.    The preceding paragraphs are incorporated as if set forth at length herein.

775.    Dr. Joshua Jacobs, Dr. Kitzmiller's husband, was a tenured Associate Professor of

Engineering at Columbia.

776.    A distinguished well-funded brain researcher he was invited to apply for a promotion to Full Professor.

777.    He complained about the discrimination against Dr. Kitzmiller internally and in public agencies.

778.    Despite receiving the unanimous vote of his Department, the promotion did not go through due to the contrived and pretextual application of promotion standards by Columbia officials who knew of Dr. Kitzmiller's protected discrimination claims.

779.    Dr. Kitzmiller has standing to raise retaliation, and does so here because a reasonable person would be disuaded from engaging in protected activity if she thought her spouse would be subjected to adverse employment action.

780.    WHEREFORE Dr. Kitzmiller seeks all damages permitted under the pertinent statutes.

## COUNT XXXI
### Federal Equal Pay Act, 29 U.S.C. § 206
### New York Equal Pay Act Law (New York Labor Law § 194)
### (Dr. Kitzmiller v. Barnard and Columbia)

781.    The preceding paragraphs are incorporated as if set forth at length herein.

782.    Plaintiff's compensation and benefits as a female term faculty member at Barnard, a women's college, are grossly deficient compared to those of a male term faculty member at Columbia performing substantially similar work under similar conditions.

783.    Plaintiff applied for a tenure track assistant professor position at Barnard with substantially similar work and conditions to those of a male assistant professor at Columbia, a position with higher pay and benefits.

784.    Plaintiff did not receive the tenure track position at Barnard after she raised the inequality with Columbia.

785.    WHEREFORE Plaintiff seeks a Declaration that the long standing persistent unreasonable sexist unequal treatment violates the Federal and/or New York Equal Pay Laws, as well as all available damages, and attorney's fees and costs.

**COUNT XXXII**
**Failure to Prevent Discrimination**
**(NYC Admin. Code § 8-107(13))**
**Against Barnard and Columbia**

786.    The preceding paragraphs are incorporated as if set forth at length herein.

787.    At all relevant times, Barnard and Columbia (collectively, the "Institutional Defendants") were employers within the meaning of the New York City Human Rights Law ("NYCHRL"), NYC Admin. Code § 8-102.

788.    The Institutional Defendants maintained the authority to hire, supervise, discipline, and promote faculty members, including tenure-track faculty, and exercised control over the hiring process for the tenure-track position for which Plaintiff applied.

789.    The NYCHRL requires employers to take reasonable steps to prevent discriminatory conduct in the workplace, including discrimination in hiring, pursuant to NYC Admin. Code § 8-107(13).

790.    As alleged above, Plaintiff was subjected to unlawful discrimination in the tenure-track hiring process on the basis of protected characteristics under the NYCHRL.

791.    Agents, administrators, and decision-makers acting on behalf of the Institutional Defendants were informed of facts and circumstances suggesting that discriminatory considerations were influencing and influenced the evaluation of Plaintiff's candidacy, including but not limited

to complaints, internal communications, and observable irregularities in the hiring process.

792.    The Institutional Defendants knew or should have known that discriminatory conduct was occurring in connection with the tenure-track hiring process affecting Plaintiff.

793.    Despite such knowledge, the Institutional Defendants failed to take reasonable and appropriate measures to investigate, correct, or prevent the discriminatory conduct, including but not limited to: failing to conduct a meaningful review of complaints or concerns regarding discriminatory bias in the hiring process; failing to intervene in or supervise the conduct of hiring-committee members and administrators involved in evaluating Plaintiff's candidacy; failing to implement or enforce policies designed to ensure nondiscriminatory hiring practices; and ratifying or acquiescing in the discriminatory decision not to hire Plaintiff.

794.    The Institutional Defendants' failure to take reasonable preventive and corrective measures enabled discriminatory conduct to occur and directly contributed to Plaintiff's non-selection for the tenure-track position.

795.    Pursuant to NYC Admin. Code § 8-107(13), the Institutional Defendants are liable for failing to exercise reasonable diligence to prevent discrimination in the workplace.

796.    As a direct and proximate result of the Institutional Defendants' unlawful failure to prevent discrimination, Plaintiff suffered economic loss, emotional distress, damage to professional reputation, and other compensable injuries.

797.    WHEREFORE, Plaintiff respectfully demands judgment against Defendants for compensatory damages including back pay and front pay; emotional distress damages; punitive damages as permitted by the NYCHRL; attorneys' fees and costs pursuant to NYC Admin. Code § 8-502(g); and such other and further relief as the Court deems just and proper.

## COUNT XXXIII
### Unequal Pay / Compensation Discrimination
### (NYC Admin. Code § 8-107(1))
### Against Defendants Barnard and Columbia

798.    The preceding paragraphs are incorporated as if set forth at length herein.

799.    Barnard and Columbia are employers within the meaning of the New York City Human Rights Law ("NYCHRL"), NYC Admin. Code § 8-102.

800.    Plaintiff is a woman and a member of a protected class under the NYCHRL.

801.    Plaintiff was employed as a Term faculty member and performed teaching, research, advising, and service responsibilities substantially similar to those performed by faculty members affiliated with Columbia University.

802.    Barnard College and Columbia University operate within an integrated academic environment characterized by overlapping governance structures, shared academic programs, joint faculty collaboration, cross-registration of students, and coordinated academic decision-making affecting faculty roles and compensation structures.

803.    At all relevant times, male faculty members affiliated with Columbia University performed substantially similar academic duties to Plaintiff, including teaching comparable courses, engaging in scholarship, advising students, and contributing to departmental service.

804.    Despite performing substantially similar work requiring comparable skill, effort, responsibility, and academic qualifications, Plaintiff was compensated at a lower rate than similarly situated male faculty members affiliated with Columbia University.

805.    The Institutional Defendants maintained knowledge of compensation disparities affecting Plaintiff and other women faculty members within the integrated academic structure shared by Barnard and Columbia.

806.    The compensation disparity was not justified by legitimate nondiscriminatory factors but instead reflected and perpetuated sex-based disparities in faculty compensation.

807.    By paying Plaintiff less than similarly situated male faculty members because of her sex, the Institutional Defendants treated Plaintiff less well with respect to compensation in violation of NYC Admin. Code § 8-107(1).

808.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff suffered lost wages, diminished earning capacity, emotional distress, and other compensable damages.

809.    WHEREFORE, Plaintiff respectfully demands judgment against Defendants Barnard College and Columbia University for back pay and compensation differentials; front pay and equitable compensation relief; emotional distress damages; punitive damages as permitted by the NYCHRL; attorneys' fees and costs; and such other and further relief as the Court deems just and proper.

### COUNT XXXIV
### Unequal Pay / Compensation Discrimination
### (New York State Human Rights Law)
### Against Defendants Barnard and Columbia

810.    The preceding paragraphs are incorporated as if set forth at length herein.

811.    Plaintiff is a woman and a member of a protected class under the NYSHRL.

812.    Plaintiff was employed as a term faculty member and performed teaching, scholarly, advising, and service responsibilities within the academic programs associated with Barnard and Columbia.  Barnard and Columbia operated as joint employers and/or an integrated enterprise with respect to faculty employment, including shared academic programming, coordinated hiring pipelines, cross-registration of students, collaborative faculty activities, and interrelated academic governance affecting faculty roles and compensation.

97

813.   At all relevant times, male faculty members affiliated with Columbia performed substantially similar academic work to Plaintiff, including teaching comparable courses, engaging in scholarship, advising students, and contributing to departmental and institutional service.

814.   The Institutional Defendants possessed authority over compensation practices affecting Plaintiff and similarly situated faculty and maintained knowledge of compensation structures applicable within the affiliated academic environment.

815.   Despite performing substantially similar work requiring comparable skill, effort, responsibility, experience, and academic qualifications, Plaintiff was compensated at a lower rate than similarly situated male faculty members affiliated with Columbia.

816.   The compensation disparity experienced by Plaintiff was motivated at least in part by Plaintiff's sex and reflects systemic disparities disadvantaging women faculty members.

817.   By compensating Plaintiff at a lower rate than similarly situated male faculty members because of her sex, the Institutional Defendants engaged in unlawful discrimination in compensation in violation of N.Y. Exec. Law § 296(1).

818.   As a direct and proximate result of Defendants' discriminatory conduct, Plaintiff suffered lost wages, diminished earning capacity, emotional distress, and other compensable injuries.

819.    WHEREFORE, Plaintiff respectfully demands judgment against Defendants Barnard and Columbia for: back pay and compensation differentials; front pay and equitable relief; compensatory damages including emotional distress; punitive damages as permitted under the NYSHRL; attorneys' fees and costs; and such other and further relief as the Court deems just and proper.

## COUNT XXXV
### Sex Discrimination in Compensation
### (Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a))
### Against Barnard and Columbia

820.    The preceding paragraphs are incorporated as if set forth at length herein.

821.    At all relevant times, Defendants Barnard and Columbia were employers within the meaning of Title VII, 42 U.S.C. § 2000e(b), and were engaged in an industry affecting commerce.

822.    Plaintiff is a woman and therefore a member of a protected class under Title VII.

823.    Plaintiff was employed by Defendants as a term faculty member and performed teaching, scholarship, advising, and service responsibilities within academic programs associated with Barnard and Columbia.

824.    Barnard and Columbia operated as joint employers and/or an integrated enterprise with respect to faculty employment, including coordinated academic programs, shared governance structures, cross-registration of students, collaborative faculty activity, and interrelated decision-making affecting faculty roles and compensation.

825.    At all relevant times, male faculty members affiliated with Columbia performed substantially similar academic work to Plaintiff, including teaching comparable courses, engaging in scholarship, advising students, and contributing to departmental and institutional service.

826.    Despite performing substantially similar work requiring comparable qualifications, skill, effort, and responsibility, Plaintiff was compensated at a lower rate than similarly situated male faculty members affiliated with Columbia.

827.    The Institutional Defendants possessed knowledge of compensation practices affecting Plaintiff and similarly situated faculty and maintained authority over compensation structures within the affiliated academic environment.

828.    Plaintiff's sex was a motivating factor in the compensation disparity she experienced.

829.    By paying Plaintiff less than similarly situated male faculty members because of her sex, the Institutional Defendants discriminated against Plaintiff with respect to compensation in violation of Title VII.

830.    As a direct and proximate result of Defendants' discriminatory conduct, Plaintiff suffered lost wages, diminished earning capacity, emotional distress, and other damages.

834.    WHEREFORE, Plaintiff respectfully demands judgment against Defendants Barnard and Columbia for: back pay and compensation differentials; front pay and equitable compensation relief; compensatory damages pursuant to 42 U.S.C. § 1981a; punitive damages as permitted by law; attorneys' fees and costs; and such other and further relief as the Court deems just and proper

### COUNT XXXVI
**Hostile Work Environment and Harassing Conduct**
**(New York City Human Rights Law, NYC Admin. Code § 8-107(1))**
**Against Defendants Barnard and Columbia**

835.    The preceding paragraphs are incorporated as if set forth at length herein.

836.    Plaintiff is a member of protected classes under the NYCHRL.

837.    Plaintiff was employed as a faculty member within the academic environment jointly occupied and influenced by Barnard College and Columbia University, including shared academic programs, collaborative scholarship, and coordinated faculty activities.

838.    During the course of her employment and candidacy for advancement, Plaintiff was subjected to discriminatory treatment including, but not limited to, her non-selection for two tenure-track faculty positions for which she was qualified.

839.    The discriminatory denial of tenure-track positions contributed to an ongoing hostile

100

and discriminatory professional environment affecting Plaintiff's work conditions, professional advancement, and academic standing.

840.    Plaintiff and her husband complained to administrators and agents of the Institutional Defendants regarding discriminatory treatment and irregularities in hiring and evaluation processes.

841.    Despite such complaints, the Institutional Defendants failed to conduct a prompt, impartial, and meaningful investigation into Plaintiff's concerns and failed to take appropriate remedial action.

842.    Following Plaintiff's complaints and protected activity, the Institutional Defendants and their agents engaged in further harassing and retaliatory conduct toward Plaintiff, including but not limited to: failing or refusing to support Plaintiff's grant applications, research initiatives, and professional development opportunities customarily afforded to similarly situated faculty; subjecting Plaintiff to differential treatment in collegial interactions; and engaging in conduct reasonably perceived by Plaintiff as punitive and isolating following her complaints.

843.    The conduct described above constituted a continuing pattern of discriminatory and retaliatory treatment that caused Plaintiff to be treated less well than other faculty members because of her protected characteristics and protected activity.

844.    The Institutional Defendants knew or should have known of the harassing conduct and either directly participated in it or failed to take reasonable steps to prevent and correct it.

845.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff suffered emotional distress, professional harm, lost career opportunities, reputational injury, and other compensable damages.

846.    WHEREFORE, Plaintiff respectfully demands judgment against Barnard and Columbia for: compensatory damages including emotional distress; economic damages including lost professional opportunities; punitive damages as permitted by the NYCHRL; attorneys' fees and costs; and such other and further relief as the Court deems just and proper.

## COUNT XXXVII
### Hostile Work Environment
### (New York State Human Rights Law)
### Against Barnard College and Columbia

847.    The preceding paragraphs are incorporated as if set forth at length herein.

848.    Plaintiff is a member of protected classes under the NYSHRL.

849.    Plaintiff was employed as a faculty member within the academic environment jointly occupied and influenced by Barnard and Columbia, including shared academic programming, collaborative scholarship, cross-registration of students, and coordinated faculty activities.

850.    Barnard and Columbia operated as joint employers and/or an integrated enterprise with respect to faculty employment, including interrelated operations, shared academic structures, coordinated hiring pipelines, and overlapping decision-making affecting faculty advancement and working conditions.

851.    During her employment and candidacy for advancement, Plaintiff was subjected to discriminatory treatment including, but not limited to, her non-selection for two tenure-track faculty positions for which she was qualified.

852.    The discriminatory denial of tenure-track positions contributed to a workplace environment that adversely affected Plaintiff's professional standing, opportunities for advancement, and working conditions.

853.    Plaintiff and her husband complained to administrators and agents of the Institutional Defendants regarding discriminatory treatment and irregularities in hiring and evaluation processes.

854.    The Institutional Defendants failed to conduct a prompt, thorough, and impartial investigation into Plaintiff's complaints and failed to take appropriate corrective or remedial action.

855.    Following Plaintiff's complaints and protected activity, the Institutional Defendants and their agents engaged in additional conduct that further contributed to a hostile work environment, including but not limited to:  withholding institutional support for Plaintiff's grant applications, research initiatives, and professional development opportunities customarily afforded to similarly situated faculty;  subjecting Plaintiff to differential treatment in access to institutional resources and collegial collaboration; and  engaging in conduct reasonably perceived by Plaintiff as punitive and retaliatory.

856.    The conduct described above constituted a continuing pattern of discriminatory and retaliatory treatment that subjected Plaintiff to inferior terms, conditions, and privileges of employment because of her protected characteristics and protected activity.

857.    The Institutional Defendants knew or should have known of the discriminatory and harassing conduct and either directly participated in it or failed to take reasonable steps to prevent and correct it.

858.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff suffered emotional distress, professional harm, reputational injury, lost career opportunities, and other compensable damages.

859.    WHEREFORE, Plaintiff respectfully demands judgment against Barnard and

Columbia for: compensatory damages including emotional distress and economic loss; punitive

damages as permitted under the NYSHRL; attorneys' fees and costs pursuant to N.Y. Exec. Law §

297(10); and such other and further relief as the Court deems just and proper.

Respectfully Submitted,

LIEBER HAMMER HUBER PAUL
& HOFFMAN, P.C.


s/James B. Lieber
James B. Lieber
Pa. I.D. No. 21748
Thomas M. Huber
Pa. I.D. No. 83053
Jacob M. Simon
Pa. I.D. No. 202610
1722 Murray Avenue, 2nd Floor
Pittsburgh, PA 15217
Counsel for Plaintiff
jlieber@lhhb-law.com
thuber@lhhb-law.com
jsimon@lhhb-law.com

Admitted *Pro Hac Vice*

## CERTIFICATE OF SERVICE

I hereby certify that on February 23, 2026, I electronically filed the foregoing with the Clerk

of Court using the CM/ECF system, which shall serve notice upon the following:

Jacqueline Phipps Polito, Esq.
Erin Train, Esq.
Littler Mendelson
375 Woodcliff Drive, Suite 2D
Fairport, N.Y. 14450
585-203-3400 (tel.)
585-203-3414 (fax)
jpolito@littler.com
etrain@littler.com

Emily Gaines
Littler Mendelson
900 Third Avenue
New York, NY 10022
914-803-2032 (tel.)
egaines@littler.com

Counsel for Defendant Barnard College

Evandro Cristiano Gigante, Esq.
Edna Doris Guerrasio, Esq.
Proskauer Rose LLP
11 Times Square
New York, NY 10036
(212) 969-3132 (tel.)
(212) 969-2900 (fax)
egigante@proskauer.com
eguerrasio@proskauer.com

Counsel for Defendant Trustees of Columbia University in the City of New York

s/James B. Lieber_____
James B. Lieber
Counsel for Defendant