**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------

|  |  |  |
|---|---|---|
| ERIKA KITZMILLER, | : | |
| | : | |
| Plaintiff, | : | Case No.: 1:25-cv-08634-ER |
| | : | |
| BARNARD COLLEGE AND THE TRUSTEES | : | |
| OF COLUMBIA UNIVERSITY IN THE CITY | : | |
| OF NEW YORK,THEA ABU EL-HAJ, MARIA | : | |
| RIVERA MAULUCCI, ELIZABETH SCOTT- | : | |
| FRANCIS, ANGELA OLINTO, LINDA BELL, | : | |
| SIAN BEILOCK, LAURA ANN ROSENBURY, | : | |
| and LESLEY A. SHARP, | : | |
| | : | |
| Defendants. | : | |
| | : | |

------------------------------------------------------------------

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANTS  THE TRUSTEES OF COLUMBIA UNIVERSITY'S**
**AND COLUMBIA PROVOST ANGELA OLINTO'S MOTION TO DISMISS**
**PLAINTIFF'S FIRST AMENDED COMPLAINT (ECF NO. 58)**

LIEBER HAMMER HUBER PAUL
& HOFFMAN, P.C.

James B. Lieber
Pa. I.D. No. 21748
Thomas M. Huber
Pa. I.D. No. 83053
Jacob M. Simon
Pa. I.D. No. 202610
1722 Murray Avenue, 2nd Floor
Pittsburgh, PA 15217
Counsel for Plaintiff
jlieber@lhhb-law.com
thuber@lhhb-law.com
jsimon@lhhb-law.com

Counsel for Plaintiff Erika Kitzmiller

**TABLE OF CONTENTS**

I.      Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        A.    Plaintiff's Claims are Timely . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        B.    Barnard and Columbia Were a Single Employer or Joint Employers. . . . . . . . . . . 4

              1.    Plaintiff Plausibly Alleges a Single Integrated Enterprise . . . . . . . . . . . . . 4

              2.    Plaintiff Plausibly Alleges Joint Employment . . . . . . . . . . . . . . . . . . . . . . 7

        C.    Columbia's Memorandum Misrepresents the Statutes and the
              Amended Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        D.    Plaintiff Adequately Pled Claims For Discrimination . . . . . . . . . . . . . . . . . . . . . 13

              1.    Plaintiff Sufficiently Pled Sex Discrimination Based on Gender
                    Stereotypes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

              2.    Plaintiff Sufficiently Pled Caregiver/Parental Discrimination . . . . . . . . . 16

              3.    Plaintiff Sufficiently Pled Race Discrimination . . . . . . . . . . . . . . . . . . . . 16

              4.    Plaintiff Sufficiently Pled Age Discrimination . . . . . . . . . . . . . . . . . . . . . 18

              5.    Plaintiff Sufficiently Pled Race Association Discrimination . . . . . . . . . . 19

        E.    Plaintiff Sufficiently Pled Retaliation Claims Against Olinto and Columbia . . . 21

        F.    Plaintiff Sufficiently Pled Claims For Hostile Work Environment . . . . . . . . . . . 24

        G.    Plaintiff's Equal Pay Claims Should Not Be Dismissed . . . . . . . . . . . . . . . . . . . 26

        H.    Plaintiff Sufficiently Alleged Breach of Contract Claims . . . . . . . . . . . . . . . . . 28

        I.    Plaintiff Pled Aiding and Abetting and Failure to Prevent Discrimination
              Against Columbia Provost Olinto . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

III.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

## TABLE OF AUTHORITIES

**Cases:**

*Arculeo v. On-Site Sales & Mktg., LLC,* 425 F.3d 193 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . 4

*Arista Recs., LLC v. Doe 3,* 604 F.3d 110 (2d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107
(2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 16, 25

*Bautista v. PR Gramercy Square Condo.*, 642 F. Supp. 3d 411
(S.D.N.Y. 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 7, 8, 10, 11, 14

*Belfi v. Prendergast*, 191 F.3d 129 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Brikman v. Westchester Med. Ctr. Ad.Phys. Servs., P.C.*, 2025 WL 2371315
(S.D.N.Y. Aug. 13, 2025). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Brown v. Daikin Am. Inc.*, 756 F.3d 219 (2d Cir. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 6

*Castillo v. Albert Einstein Coll. of Med. Inc.*, 2025 WL 692124
(S.D.N.Y. Mar. 4, 2025) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 11

*Chang Yan Chen v. Lilis 200 W. 57th Corp.,* 2020 WL 7774345
(S.D.N.Y. Dec. 30, 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Chiara v. Town of New Castle*, 126 A.D.3d 111, 2 N.Y.S.3d 132 (2015) . . . . . . . . . . . . . . . . . 20

*Comcast Corp. v. National Ass'n of African American-Owned Media*, 590 U.S. 327
(2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Cummings v. City of New York*, 246 A.D.3d 560, 251 N.Y.S.3d 91 (2026). . . . . . . . . . . . . . . . 26

*D'Cunha v. Genovese/Eckerd Corp.*, 479 F.3d 193 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . 19

*DiBartolo v. Segal Grp., Inc.*, 2025 WL 2172643 (S.D.N.Y. July 31, 2025). . . . . . . . . . . . 18, 19

*Dietrich v. City of New York*, 2019 WL 2236585 (S.D.N.Y. May 16, 2019). . . . . . . . . . . . . . . 19

*Dobrosmylov v. DeSales Media Grp., Inc.*, 532 F. Supp. 3d 54 (E.D.N.Y. 2021) . . . . . . . . . . . . 5

*Doe v. McQuaid Jesuit*, 2024 WL 4905278 (W.D.N.Y. Nov. 27, 2024) . . . . . . . . . . . . . . . 14, 16

*Duplan v. City of New York*, 888 F.3d 612 (2d Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Feingold v. New York*, 366 F.3d 138 (2d Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 30

*France v. Touro Coll.*, 2016 WL 1105400 (E.D.N.Y. Feb. 16, 2016),
R&R adopted, 2016 WL 1117459 (E.D.N.Y. Mar. 21, 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Garcia v. ROC Nation LLC*, 2025 WL 1865965 (S.D.N.Y. July 2, 2025). . . . . . . . . . . . . . . . . 11

*Gittens-Bridges v. City of New York*, 2020 WL 3100213 (S.D.N.Y. June 11, 2020). . . . . . . . . 19

*Gonzalez v. Wicked Taco LLC*, 764 F. Supp. 3d 77 (E.D.N.Y. 2025) . . . . . . . . . . . . . . . . . . . . . 5

*Holcomb v. Iona Coll.*, 521 F.3d 130 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Huer Huang v. Shanghai City Corp.,* 459 F. Supp. 3d 580 (S.D.N.Y. 2020). . . . . . . . . . . . . . . . 5

*Konteye v. NYC City Dep't of Educ.*, 2019 WL 4418647 (S.D.N.Y. Apr. 10, 2019) . . . . . . . . . 23

*Konyukhova v. Walgreen Co.*, 2026 WL 880381 (S.D.N.Y. Mar. 31, 2026) . . . . . . . . . . . . . . . 16

*Kurtanidze v. Mizuho Bank, Ltd.*, 2024 WL 1117180 (S.D.N.Y. Mar. 13, 2024) . . . . . . . . . . . 16

*Lenzi v. Systemax, Inc.*, 944 F.3d 97 (2d Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Littlejohn v. City of N.Y.*, 795 F.3d 297 (2d Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15, 17

*Livingston v. City of New York*, 563 F. Supp. 3d 201 (S.D.N.Y. 2021) . . . . . . . . . . . . . . . . . 16, 21

*Mangahas v. Eight Oranges Inc.*, 754 F. Supp. 3d 468 (S.D.N.Y. 2024) . . . . . . . . . . . . . . . . . . . 7

*Mhany Management, Inc. v. County of Nassau*, 819 F.3d 581 (2d Cir. 2016) . . . . . . . . . . . . . . 17

*Mihalik v. Credit Agricole Cheuvreux N. Amer., Inc.*, 715 F.3d 102
(2d Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 17, 23, 24

*Muldrow v. City of St. Louis*, 601 U.S. 346 (2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Mumin v. City of New York*, 2025 WL 2733229 (S.D.N.Y. Sept. 25, 2025) . . . . . . . . . . . . . . . 18

*Palmer v. Cook*, 108 N.Y.S.3d 297 (N.Y. Sup. Ct. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Parker v. Columbia Pictures Industries*, 204 F.3d 326 (2d Cir.2000) . . . . . . . . . . . . . . . . . . . . . 5

*Pell v. Trs. of Columbia Univ. In City of New York*, 1998 WL 19989

(S.D.N.Y. Jan. 21, 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Pellegrini v. Sovereign Hotels, Inc.*, 740 F. Supp. 2d 344 (N.D.N.Y. 2010) . . . . . . . . . . . . . 28, 30

*Rosenblatt v. Bivona & Cohen, P.C.*, 946 F. Supp. 298 (S.D.N.Y. 1996) . . . . . . . . . . . . . . . . 20

*Shamciyan v. Acacia Network, Inc.*, 2023 WL 6214546 (S.D.N.Y. Sept. 24, 2023) . . . . . . . . . 18

*Sotomayor v. City of New York*, 862 F. Supp. 2d 226 (E.D.N.Y. 2012),
*aff'd*, 713 F.3d 163 (2d Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Steinberg v. Cushman & Wakefield, Inc.*, WL 1084646 (S.D.N.Y. Mar. 11, 2025),
R& R adopted, 2025 WL 1080725 (S.D.N.Y. Apr. 9, 2025) . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Stern v. Trs. of Columbia Univ.*, 131 F.3d 305 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . 16

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Thompson v. N. Am. Stainless, L.P.*, 562 U.S. 170 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Tolbert v. Smith*, 790 F.3d 427 (2d Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Trezza v. The Hartford, Inc.*, 1998 WL 912101 (S.D.N.Y. Dec. 30, 1998) . . . . . . . . . . . . . . . . 14

*Vega v. Hempstead Union Free School District*, 801 F.3d 72
(2d Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 21, 22, 23

*Ward v. Cohen Media Publications LLC*, 2023 WL 5353342
(S.D.N.Y. Aug. 21, 2023). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10, 11, 26

*Weinstock v. Columbia Univ.*, 224 F.3d 33 (2d Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Weiss v. La Suisse*, 260 F.Supp.2d 644 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Whaley v. City Univ. of New York*, 555 F. Supp. 2d 381 (S.D.N.Y. 2008). . . . . . . . . . . . . . . . . 23

**Other Authorities:**

29 U.S.C. § 206(d)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

42 U.S.C. § 1981. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

N.Y. Exec. Law § 296(1)(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

N.Y. Exec. Law § 296(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

N.Y.C. Admin. Code §§ 8-107(1)(a) & 8-102 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

 N.Y.C. Admin. Code § 8-107(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

N.Y.C. Admin. Code § 8-107(7). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

N.Y.C. Admin. Code § 8-107(20). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

## I.  STATEMENT OF FACTS

Dr. Erika Kitzmiller, born in 1977, is the mother of two young children and wife of a Jewish former Columbia professor.  Am. Compl. ¶¶ 55, 64-65.  An accomplished educational historian and scholar of inequality, she holds two Ph.D.'s from the Univ. of Pennsylvania, and taught at Harvard, Penn, and Columbia.  *Id.* ¶¶ 56-66.  From 2019 through June 2024, she served as a Term Assistant Professor at Barnard College and Columbia University and established a strong record of teaching, scholarship, and service, authored a well-regarded book, numerous peer-reviewed publications, secured $667,525 in grants, mentored many Barnard and Columbia students, and advocated for racial equity, educational access, and equal treatment of faculty.  *Id.* ¶¶ 69-75, 78-80, 90-101.

In 2022, Barnard/Columbia conducted searches for tenure-track positions in Education Studies and Education and Urban Studies ("Urban Studies").  Dr. Kitzmiller was exceptionally qualified for both positions and had been encouraged by senior administrators to pursue tenure-track opportunities.  *Id.* ¶¶ 86-89, 103-108.  Yet, search committees including Professors Thea Abu El-Haj, Maria Rivera Maulucci, and Lesley Sharp (who had an appointment to Columbia and works in a joint Columbia/Barnard Department) rejected her candidacy.  *Id.* ¶¶ 107-121.  Defendants hired less-qualified younger (below 40) individuals who did not have children or Jewish spouses.  *Id.* ¶¶ 288, 296, 472.  For Urban Studies, an African American was hired.  *Id.* ¶¶ 154, 160-68.

Search members made comments reflecting discrimination and hostility.  Dr. Maulucci said to Plaintiff: "You have young children. That dictates the times that you are available to teach. We need people to teach at night and you won't want to do that with children." *Id.* ¶¶ 179, 184.  She told another candidate that it was better for her to have accepted the job at Molloy University than to stay at Barnard because she would be a better mother at Molloy.  *Id.* ¶ 199.  Like Plaintiff, this rejected candidate felt "mommy-tracked." *Id.* ¶¶ 194-98.  Dr. Abu El-Haj oddly instructed Dr. Kitzmiller to

display photographs of her children in her office to show her maternal status. *Id.* ¶ 85. Search Committee member Dr. Aaron Passell of the Barnard-Columbia Urban Studies program told a rejected candidate with small children that the "timing just wasn't right" which she understood referred to when she had children, an inference of gender stereotype discrimination. *Id.* ¶ 197.

Dr. Abu El-Haj told Dr. Kitzmiller she was "not urban enough," a code word for race – Black or African American. *Id.* ¶ 372. The rationale was a pretext and could not have been based on Dr. Kitzmiller's superior Urban Studies background. She had more education (Certificate in Urban Studies), and years of experience (taught Urban Studies) than the chosen candidate, (*Id.* ¶¶ 362-85), as a jury will weigh. Dr. Passell told another rejected candidate who was not Black that she was not "urban enough," raising an inference of race discrimination. *Id.* ¶ 197. The hiring policy required candidate selection to be based on the wording of the advertisement but there was no "urbanness" criterion, further showing the pretextual nature of the justification. *Id.* ¶ 167.

Dr. Sharp interviewed Dr. Kitzmiller and disparaged her research insisting that Plaintiff's finding that a majority-Black school sent 100% of its graduates to college "cannot be true." *Id.* ¶¶ 130-32. After the interview, Dr. Kitzmiller was removed from consideration for Urban Studies and the only finalist interviewed on-campus who was removed. *Id.* ¶ 138. Kitzmiller was told by a Barnard Vice Provost and Diversity Officer that Sharp was an odd choice for the Committee because she had a reputation for being "anti-Black" and engaged in racially-prejudiced conduct. *Id.* ¶ 133-5.

Defendants picked individuals under 40. Dr. Abu El-Haj explained that the College preferred to hire tenure track faculty who were "younger and fresh out of their Ph.D. programs." *Id.* ¶¶ 432-33. She told Plaintiff that unlike other candidates who were instructed to discuss one key research contribution she should focus on multiple projects "since she was so far removed from [her]

Ph.D.," an ageist higher standard. *Id.* ¶ 434. Violations of the College's policies and procedures abounded including that Dr. Abu El-Haj recommended her own younger doctoral advisee (a conflict of interest) who was awarded the position. *Id.* ¶¶ 154, 160-68.

The discriminatory attitude toward Dr. Kitzmiller's Jewish husband surfaced during the interview process. Dr. Abu El-Haj (a supporter of the Boycott, Divestment and Sanctions (BDS) movement that contains anti-Semitic aspects) accused Dr. Jacobs of being a bad husband and father, although she did not know anything personal about him besides that he was Jewish. *Id.* ¶¶ 473, 476. She falsely charged that Dr. Kitzmiller's wall posters were "anti-Muslim," and implied that Plaintiff was anti-Muslim as well. *Id.* ¶ 473. During a workshop, Dr. Abu El-Haj exploded at Dr. Kitzmiller and falsely accused her of being anti-Palestinian. *Id.* ¶¶ 477-78.

Dr. Kitzmiller complained to Barnard officials, including Provost Linda Bell, President Sian Beilock, President Laura Ann Rosenbury, and Director of the Office of Nondiscrimination and Title IX Elizabeth Scott-Francis, of discrimination, retaliation, and irregularities in the search process. Am. Compl. ¶¶ 203-250. Senior administrators acknowledged that her concerns were serious but failed to take corrective action. *Id.* ¶¶ 213-250. Prior to complaints, the Administration assisted Plaintiff in securing grant funding. *Id.* ¶546. Following protected activity, however, Defendants failed to support grant applications and ignored repeated requests concerning funding opportunities worth hundreds of thousands of dollars to the institutions. *Id.* ¶¶ 544, 546-550.

Columbia retained supervisory authority over Barnard's academic leadership through Columbia Provost Angela Olinto, who oversaw Barnard's academic affairs because Barnard's President served as a Dean of Columbia. *Id.* ¶ 247. After being personally notified that Dr. Kitzmiller had suffered discrimination in blatant violation of Columbia and Barnard policies and that

Barnard's investigation was a sham, Provost Olinto acknowledged that she regularly communicated with Barnard's Provost and would address the matter with Barnard's leadership. *Id.* ¶¶ 248-253.

## II.  ARGUMENT

**A.      Plaintiff's Claims Are Timely.**

Plaintiff incorporates her discussion of the statute of limitations set forth in her Memorandum of Law in Opposition to Barnard's Motion to Dismiss (Section II(A)).

**B.      Barnard and Columbia Were a Single Employer or Joint Employers.**

Entities that are not a plaintiff's nominal employer may still be liable under the single-employer or joint-employer doctrines. *See Arculeo v. On-Site Sales & Mktg., LLC*, 425 F.3d 193, 198 (2d Cir. 2005).  Whether related entities are sufficiently integrated to constitute a single employer is generally a fact question not suitable for resolution on a motion to dismiss. *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 226-27 (2d Cir. 2014).  The same is true of joint-employer status. *Bautista v. PR Gramercy Square Condo.*, 642 F. Supp. 3d 411, 423-24 (S.D.N.Y. 2022).

**1.      Plaintiff Plausibly Alleges a Single Integrated Enterprise.**

To plead a single-employer relationship, courts consider: "(1) interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership." *Brown*, 756 F.3d at 226. The "centralized control of labor relations" factor is ordinarily the most important, and the core question is which entity made or controlled the employment decisions at issue. *Brown*, 756 F.3d at 227.

The Amended Complaint alleges substantial interrelation of operations.  Barnard publicly represents itself as "an official college of Columbia University."  Am. Compl. ¶ 14.  Columbia advertised Barnard as an official school of Columbia.  *Id.* ¶ 40.  Barnard describes its mission as

providing a liberal arts education in partnership with Columbia. *Id.* ¶ 13. Barnard and Columbia share academic resources, extracurricular activities, athletic facilities, dining halls, course catalogs, cross-registration, academic programs, academic calendars, and campuses. *Id.* ¶¶ 15-16, 30-1. Barnard publicly advertises that "Barnard Professors are Columbia Professors, Too," all tenured Barnard professors simultaneously receive tenure at Columbia, the faculty have the same responsibilities, and the standards for tenure and promotion are the same. *Id.* ¶¶ 17-18. Barnard's conflict policy states that Columbia is not considered a separate outside institution for faculty collaboration. *Id.* ¶ 19. Columbia's Faculty Handbook permits years taught at Barnard to count toward seniority and tenure at Columbia, and vice versa. *Id.* ¶ 20.

The integration was especially direct with respect to Plaintiff's own academic program and the searches at issue. The Urban Studies Program where she applied explicitly describes itself as a "Barnard-Columbia" program. *Id.* ¶ 29. While a Term Assistant Professor, Columbia paid a portion of her salary. *Id.* ¶¶ 66-67. Barnard's pay stubs say "Columbia" on them. *Id.* ¶ 33. Columbia courses can be taught by Barnard faculty and enroll Barnard students, while Barnard courses can be taught by Columbia faculty and enroll Columbia students. *Id.* The searches therefore did not occur in a Barnard-only academic silo, but within a joint Barnard-Columbia program. *See Parker v. Columbia Pictures Industries*, 204 F.3d 326, 341 (2d Cir. 2000) (single enterprise included pay stubs that showed earnings as being "paid on behalf of Columbia Pictures Industries" through "SPE Corporate Services, Inc.").[1]

---

[1] Columbia's reliance on *Chang Yan Chen v. Lilis 200 W. 57th Corp.*, 2020 WL 7774345, at *3 (S.D.N.Y. Dec. 30, 2020), is misplaced because in contrast to this case there were "no allegations" tying defendant cafe to the other two restaurants in connection with plaintiff's employment. *Dobrosmylov v. DeSales Media Grp., Inc.*, 532 F. Supp. 3d 54, 62 (E.D.N.Y. 2021), was decided on summary judgment and did not involve a university. Columbia's citation to *Huer Huang v. Shanghai City Corp.*, 459 F. Supp. 3d 580, 586 (S.D.N.Y. 2020) "fares no better, as that case involved motions . . . where multiple restaurants had different owners, and the pleaded facts undercut the plaintiffs' allegations." *See Gonzalez v. Wicked Taco LLC*, 764 F. Supp. 3d 77, 100 (E.D.N.Y. 2025).

Plaintiff alleges common management and centralized academic governance. Columbia's statutes link Barnard and Columbia's administrations. Am. Compl. ¶ 35. A plaintiff need not allege that an entity exercises "total control or ultimate authority over hiring decisions," so long as there is "an amount of participation that is sufficient and necessary to the total employment process." *Brown*, 756 F.3d at 227. Barnard's President has the rank of Dean at Columbia and is appointed with the advice and consent of Columbia's President. *Id.* ¶ 36. Columbia's President is an ex officio member of Barnard's Board of Trustees, may attend Barnard faculty meetings, and must receive minutes of Barnard faculty meetings. *Id.* ¶ 37. Barnard faculty appointments require approval from Columbia's Board of Trustees. *Id.* ¶ 38.[2] Barnard degrees are bestowed by Columbia. *Id.* ¶ 25.

Plaintiff alleges centralized control over faculty labor relations and hiring. Columbia maintains the Tenure Review Advisory Committee ("TRAC"), which includes Barnard and Columbia faculty and considers appointments to both institutions. *Id.* ¶ 21. Columbia faculty are required to sit on Barnard hiring committees. *Id.* Barnard and Columbia cooperate in instructional appointments. *Id.* ¶ 23. Appointments to Barnard require approval by Columbia. *Id.* ¶ 24, 169. Dr. Abu El-Haj told Dr. Kitzmiller that the ability to earn tenure at Columbia was the most important factor in selecting tenure-track faculty. *Id.* ¶ 109. A Vice Provost told Plaintiff she was well positioned to earn tenure at Columbia based on his prior service on the TRAC. *Id.* ¶¶ 124-25.

The composition and conduct of the search committees further support Plaintiff's allegations. Dr. Sharp interviewed Dr. Kitzmiller, held appointments at both Barnard and Columbia, was in a joint Columbia-Barnard Department, and part of both Committees that rejected Plaintiff in favor of

---

[2]*Brown*, 756 F.3d at 228 (single employer allegations included that parent's approval was required for all significant actions by subsidiary).

candidates outside her protected classes. *Id.* ¶¶ 126-29.[3] Dr. Sharp disparaged Plaintiff's research insisting that no majority-Black school could send 100% of its graduates to college and, thereafter, Plaintiff was removed from consideration and the only candidate so removed. *Id.* ¶¶ 130-32. Urban Studies search committee member Dr. Passell was part of the Barnard-Columbia Urban Studies Program and rejected Plaintiff in favor of a less-qualified Black candidate. *Id.* ¶¶ 121, 163, 197. He told another rejected maternal candidate, Dr. Miranda, that the "timing just wasn't right" for her which she understood referred to her having young children and that she was "not urban enough," giving rise to inferences of gender stereotype and race discrimination. *Id.* ¶ 197. Columbia's Board of Trustees gives final approval over Barnard hiring. *Id.* ¶ 38. These allegations demonstrate the relevant search process was staffed by individuals connected to Columbia who participated in the challenged hiring decisions.

Based on the Amended Complaint allegations, Plaintiff plausibly alleged that Barnard and Columbia operated as a single integrated enterprise with respect to faculty hiring and appointment decisions. *See Bautista*, 642 F. Supp. 3d at 422-24; *Mangahas v. Eight Oranges Inc.*, 754 F. Supp. 3d 468, 488 (S.D.N.Y. 2024); *Steinberg v. Cushman & Wakefield, Inc.*, WL 1084646, at *6 (S.D.N.Y. Mar. 11, 2025), *R& R adopted*, 2025 WL 1080725 (S.D.N.Y. Apr. 9, 2025).

### 2.    Plaintiff Plausibly Alleges Joint Employment.

A joint employer relationship "may be found to exist where there is sufficient evidence that the respondent had immediate control over the company's employees." *Bautista*, 642 F. Supp. 3d at 423. The issue is whether "two or more employers exert[ed] significant control over the same

---

[3]Columbia cites alleged facts about Dr. Sharp's role at Columbia and email address that are outside the pleadings and inappropriate on a motion to dismiss, and should be probed in discovery.

employees ... [or] where ... it can be shown that they share or co-determine those matters governing essential terms and conditions of employment." *Id*.  Courts may look to "commonality of hiring, firing, discipline, pay, insurance, records, and supervision," in determining whether joint employer status is met. *Id.*

Plaintiff alleges that Columbia exercised authority over faculty hiring, participated in the search process, and possessed approval authority over the very appointments at issue.  Am. Compl. ¶¶ 21, 23-24, 38, 169.  These allegations readily permit the inference that Columbia functioned as a joint employer, or at minimum present factual questions that cannot be resolved on a  motion to dismiss.  *Bautista*, 642 F. Supp. 3d at 423 (allegations of commonality of hiring, firing, and pay between defendants supported joint employment); *Ward v. Cohen Media Publications LLC*, 2023 WL 5353342, at *8 (S.D.N.Y. Aug. 21, 2023)); *Castillo v. Albert Einstein Coll. of Med. Inc.*, 2025 WL 692124, at *5 (S.D.N.Y. Mar. 4, 2025) (joint-employer "require[s] discovery to resolve.").

Columbia participated directly in the hiring process itself.  Am. Compl. ¶¶ 21, 23-24, 169. Columbia faculty members are required to serve on Barnard hiring committees, and Columbia maintains the TRAC consisting of both Columbia and Barnard faculty, which considers faculty appointments affecting both institutions.  *Id.* ¶ 21. Columbia and Barnard "cooperate in their instructional appointments," and faculty appointments at Barnard cannot become effective unless approved by, *inter alia*, Columbia and Columbia's Board of Trustees.  *Id.* ¶¶ 23-24, 38, 169. Columbia possessed actual approval authority over the faculty appointments challenged in this action rather than merely maintaining an academic affiliation with Barnard.  *Id.* ¶¶ 24, 38, 169.

Columbia was integrated into the very academic programs and employment relationship at issue.  *Id.* ¶¶ 29, 66-68.  Dr. Kitzmiller served as a Term Assistant Professor of Education Studies

"at Barnard and Columbia," the Urban Studies Program to which she applied expressly described itself as a "Barnard-Columbia" program, and Columbia paid a portion of Plaintiff's salary and benefits throughout her five-year appointment. *Id.* Dr. Kitzmiller supported Columbia students in research positions and independent studies. *Id.* ¶ 75. Certain employment benefits of Columbia and Barnard are linked including that Barnard faculty often live in Columbia faculty housing and both faculty use a common parking system. *Id.* ¶ 39. The Barnard logo includes the words "Columbia University," which also appears on Barnard's pay stubs (*Id.* ¶ 32-33). *See Castillo*, 2025 WL 692124, at *4 (sharing common logo supports finding of joint employer). These allegations demonstrate that Columbia was not passive but instead participated directly in Dr. Kitzmiller's employment relationship. *Id.* ¶¶ 29, 66-67.[4]

Plaintiff alleges that Columbia-affiliated personnel participated directly in evaluating candidates for the challenged tenure-track positions. Am. Compl. ¶¶ 120-121, 126-129, 163, 196-197. Dr. Sharp held appointments at both Barnard and Columbia, was in a joint Barnard-Columbia department, served on both search committees, interviewed Dr. Kitzmiller, falsely and hostilely challenged her research concerning a majority-Black Title I school, after which Dr. Kitzmiller was removed from the search and later was told by an administrator that Dr. Sharp had a reputation for anti-Black bias. Id. ¶¶ 11, 120-121, 126-135.

Professor Aaron Passell, a member of the Barnard-Columbia Urban Studies Program and Dr. Abu El-Haj's brother-in-law, served on the Urban Studies Committee and told another rejected

---

[4]Columbia's own filing confirms its involvement in Kitzmiller's hiring as a Barnard Term Assistant Professor. Columbia wrote "[t]o retain Dr. Jacobs on the Columbia faculty, Columbia agreed to reimburse Barnard for a portion of Plaintiff's salary". ECF 59, MTD at Page 4. Thus, Kitzmiller's hiring specifically benefits Columbia and was initiated at the request of Columbia. Whether that arrangement gave Columbia control over Plaintiff's employment goes to the heart of the single and joint-employer inquiry, a factual question that cannot be resolved on a motion to dismiss.

candidate in Dr. Kitzmiller's protected classes that the "timing just wasn't right" (e.g, because of when she had children) and that she was "not urban enough" (code for Black race), allegations that plausibly support discriminatory inferences based on caregiver status and race. *Id.* ¶¶ 139-41, 163, 196-197. These allegations, combined with Vice Provost Cooley's service on Columbia's TRAC and Abu El-Haj's statement that the ability to earn tenure at Columbia was the most important factor in selecting tenure-track faculty, plausibly support the inference that Columbia-affiliated personnel and Columbia's tenure standards materially influenced the hiring decisions. *Id.* ¶¶ 109, 124-125.

Plaintiff alleges that the hiring decisions were joint decisions. Am. Compl. ¶¶ 115, 117, 153, 157. She alleges that "Barnard/Columbia" failed to hire her and instead hired less-qualified candidates outside of her protected classes. *Id.* ¶¶ 115, 117, 153, 157.[5] She alleges that Columbia's approval authority was required before those appointments could become effective. *Id.* ¶¶ 21, 24, 38, 169. At the pleading stage, these allegations are more than sufficient to support the inference that Columbia participated in, approved, and exercised control over the challenged hiring decisions.

Plaintiff alleges that Columbia's senior academic leadership had supervisory authority over Barnard's academic administration and was notified of Plaintiff's discrimination complaints. Columbia Provost Olinto oversaw Barnard because Barnard's President is a Dean at Columbia reporting to her. *Id.* ¶ 247. Plaintiff's husband notified Provost Olinto that Plaintiff experienced discrimination and that Barnard's investigation was a sham. *Id.* ¶¶ 248, 252. Provost Olinto stated that she regularly spoke with Barnard's Provost and intended to address the matter with Barnard leadership, but never did. *Id.* ¶ 253.

---

[5] Columbia's argument about "group pleading" misses the mark. The group pleading in *Bautista* was not fatal to the complaint because the allegations still put defendants "on notice 'of what the claim is and the ground upon which it rests.'" *Bautista*, 642 F. Supp. 3d at 423. Although Dr. Kitzmiller at times refers to Defendants as a group, (Am. Compl. ¶¶ 271, 286, 295), Columbia is on notice of the claims and grounds for the claims, and there are sufficient allegations that Defendants share control over Plaintiff for purposes of single and joint employer theories of liability. *See Ward*, 2023 WL 5353342, at *8.

This was not simply a Barnard hiring process; rather, it was a Barnard-Columbia hiring process conducted by Barnard-Columbia faculty, applying Columbia tenure standards and requiring Columbia approval before appointments became effective.  As a result, Plaintiff sufficiently alleged a joint employment relationship between Columbia and Barnard.  *See Bautista*, 642 F. Supp. 3d at 423; *Ward*, 2023 WL 5353342, at *8 *Castillo*, 2025 WL 692124, at *5; *Garcia v. ROC Nation LLC*, 2025 WL 1865965, at *8 (S.D.N.Y. July 2, 2025).

Defendant's reliance on *France v. Touro Coll.*, 2016 WL 1105400, at *8 (E.D.N.Y. Feb. 16, 2016), *R&R adopted*, 2016 WL 1117459 (E.D.N.Y. Mar. 21, 2016), is misplaced because in contrast to this case which contains numerous allegations of Columbia's role in Plaintiff's employment and failure to hires, the security guard plaintiff employed by an outside contractor failed to allege "a single factual allegation" as to what role the college played in her employment.  *Pell v. Trs. of Columbia Univ. In City of New York*, 1998 WL 19989, at *1 (S.D.N.Y. Jan. 21, 1998), is not dispositive since the *pro se* plaintiff was not faculty and the Court did not reach "plaintiff's allegations that Barnard and Columbia should be treated as a single corporate employer." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 37–38 (2d Cir. 2000), is on point because the Court treated Columbia as a proper defendant for a discrimination claim arising from Barnard's tenure process, recognizing Columbia's direct participation in appointing and tenuring Barnard faculty.

## C.      Columbia's Memorandum Misrepresents the Statutes and the Amended Complaint.

Columbia asks the Court to resolve a fact-intensive single-and joint-employer question on a 191-page institutional document (Exh. A) and the pleadings, yet its citations to both cannot be squared with what the sources actually say.  First, Columbia tells the Court it "maintains, at most, a consultative role in faculty appointments at Barnard," citing § 234 of the Statutes. Section 234 says

11

the opposite: Barnard's officers of instruction "shall be appointed and reappointed by the University" subject to "the approval of the Trustees of the college and of the University"; their "standing shall be the same in all respects as that of other like officers in the University"; and their tenure is subject to "the University's participation in the procedures leading to the award of tenure." ECF 60-1 § 234. A power to appoint, reappoint, approve, and confer University-equivalent standing and tenure is not "at most, a consultative role."

Second, Columbia selectively quotes § 237 of the Statutes in a way that inverts its meaning. Columbia represents that it "expressly disclaims any obligation, responsibility, or liability whatsoever" for Barnard conditions of employment. The Statutes say no such thing: § 237 provides that Columbia is "under no implied obligation" (not an express disclaimer of all obligation) "except as stated in the Agreement." By omitting "implied" and the "except as stated in the Agreement", Columbia turned a narrow rule (no obligations except what the Agreement creates) into a blanket denial of all responsibility, which the actual text does not support.

Third, Columbia's quotation of Section 231 ends its ellipsis at "appointed by the Trustees of [Barnard]," omitting that Barnard's president is appointed only "with the advice and consent of the President of the University." ECF 60-1 § 231. It also ignores Section 230, that Columbia's own President is "a Trustee of [Barnard]" and must "exercise such supervision and direction of [Barnard] as will promote the effective coordination of its activities." *Id.* § 230. That control goes to the heart of the joint-employer inquiry: Columbia's President supervises and directs Barnard's activities and holds a seat on its Board.

Fourth, Columbia cites Chapter XIII of the Statutes for the statement that the institutions "maintain their own endowment, budget, payroll, benefits and employment policies." ECF 59 at 12.

12

However, Chapter XIII of the Statutes concerns the "Faculty of Medicine" and not Barnard. The Barnard provisions appear in Chapter XXIII (§§ 230-238). In any case, neither chapter addresses Barnard's endowment, payroll, benefits, or employment policies. Fifth, Columbia cites the Amended Complaint for the opposite of what it pleads. Columbia represents that the Complaint alleges that Plaintiff's "compensation was paid by Barnard," citing 66-68. ECF 59 at 27. Those paragraphs allege that "Columbia paid a portion of Dr. Kitzmiller's salary during the entire five year period she was at Barnard," including "half" from 2019-2022 and "one-third" from 2022-2024. Allegations that Columbia paid up to half of Plaintiff's salary refute Columbia's claim that Barnard alone paid her.

Sixth, Columbia's Motion attributes to Plaintiff an allegation she never made, that the search committees "were composed entirely of Barnard faculty," MTD at 11, yet concedes in footnote 10 that committee member Dr. Lesley Sharp is a "Senior Research Scientist in Columbia's Department of Sociomedical Sciences," *id.* n.10, which Plaintiff herself also pleads at ¶ 126-29. Plaintiff also alleged that Dr. Sharp is a member of the Department of Anthropology, which is a joint Barnard-Columbia department at ¶ 128. A committee that includes a member of multiple Columbia departments is not "composed entirely of Barnard faculty." The Court should not credit Columbia's characterizations in place of the allegations and documents themselves. The documents, read as written, support Plaintiff. Together, these mischaracterizations and discrepancies confirm that Barnard and Columbia's integration cannot be resolved from documents that, when read in full, support Plaintiff's allegations, as reasonable jurors likely would find.

## D.    Plaintiff Adequately Pled Claims For Discrimination.

Plaintiff stated claims for discrimination on the basis of sex (Counts I-III, XXVI), caregiver/parental status (Count IV – NYCHRL), race (Counts V-VII, XXVII), age (Counts VIII, IX,

13

XXVIII), or race association (Counts X-XII, XXIX).  At the pleading stage, there is a "minimal burden of showing facts suggesting an inference of discriminatory motivation."  *Littlejohn v. City of N.Y.*, 795 F.3d 297, 311 (2d Cir. 2015).  It can arise from circumstances including "the employer's criticism of the plaintiff's performance in ethically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." *Id.* at 312.  It can be shown where the employer hires someone outside the plaintiff's protected class.  *Bautista*, 642 F.Supp.3d at 424-25.  However, failure to identify comparators is not fatal.  *Id.*

### 1.    <u>Plaintiff Sufficiently Pled Sex Discrimination Based on Gender Stereotypes.</u>

Under Title IX, NYCHRL, NYSHRL, and Title VII, adverse employment actions based upon stereotypical assumptions regarding motherhood and caregiving constitute unlawful sex discrimination.  *Doe v. McQuaid Jesuit*, 2024 WL 4905278, at *6 (W.D.N.Y. Nov. 27, 2024) (Title IX).  Stereotypes concerning "the incompatibility of motherhood and employment" are gender-based and support liability under discrimination laws.  *Back v. Hastings On Hudson Union Free Sch. Dist.,* 365 F.3d 107, 117 (2d Cir. 2004).  An employer may not presume that a mother is less committed to her career, insufficiently devoted to her work, or incapable of balancing work and family responsibilities.  *Id.* at 119-22; *Trezza v. The Hartford, Inc.*, 1998 WL 912101, at *7–8 (S.D.N.Y. Dec. 30, 1998).  Nor is disparate treatment of fathers required.  *Id.* at 121–22.  The NYCHRL is construed "broadly in favor of discrimination plaintiffs."  *Mihalik v. Credit Agricole Cheuvreux N. Amer., Inc.*, 715 F.3d 102, 109-110 (2d Cir. 2013).

A mother of young children who applied for two open tenure-track positions, although qualified Plaintiff was not selected due to gender stereotyping.  Am. Compl. ¶¶ 64, 88, 112, 113,

14

114.  Defendants hired less qualified applicants who did not have children.  *Id.* ¶ 288, 296.  The Provost indicated that Dr. Kitzmiller "was in a strong position to be promoted so given her credentials, teaching, and scholarship."  *Id.* ¶ 88.  A member of both Committees, Dr. Maulucci, said: "[Y]ou have young children.  That dictates the times that you are available to teach.  We need people to teach at night and you won't want to do that with children."  *Id.* ¶¶ 179, 184.  The search committees including Dr. Sharp and Dr. Passell recommended the only two candidates who did not have children and rejected the three remaining candidates who did.  *Id.* ¶¶ 171-74.[6]  *Id.* ¶¶ 171-74.

A rejected candidate mother said that she was "mommy tracked," and told a Committee member that she did not get the job because of when she had children which he did not deny.  *Id.* ¶¶ 194-98, 200, 294.  Dr. Passell had told her that the "timing just wasn't right" for her to secure a tenure track position, raising the inference of stereotype discrimination for when she had children.  *Id.*[7]  Dr. Maulucci told her that "it was better for her to have accepted the job at Molloy University than to stay at Barnard because she would see in time that she would be a better mother and spend more time with her children as a professor at Molloy."  *Id.* ¶ 199.

The Director of the Title IX Office, Dr. Scott-Francis, admitted to Plaintiff that there were "climate" (i.e., discrimination) issues within the Education Studies Program that needed to be addressed.  *Id.* ¶ 298.  The search contained violations of the College's policies and procedures,

---

[6]Columbia's argument about pleading the candidates did not have children based on "information and belief" should be rejected because Plaintiff pled that Defendants hired applicants who did not have children (not based on information and belief), (Am. Compl. ¶ 114), and a plaintiff may plead facts alleged "upon information and belief'" where, as here, "the facts are peculiarly within the possession and control of the defendant," and "where the belief is based on factual information that makes the inference of culpability plausible."  *Arista Recs., LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010).

[7]Columbia's attempt to discount statements made to other faculty members in Plaintiff's protected classes is without merit since a plaintiff may plead an inference of discrimination based on "invidious comments about others in the employee's protected group."  *See Littlejohn*, 795 F.3d at 312.

15

including that Committee Chair Dr. Abu El-Haj recommended her own doctoral advisee who won the Urban Studies position, and Dr. Passell served on the Committee even though he is Dr. Abu El-Haj's brother-in-law. *Id.* ¶¶ 154, 160-68. Employer's violations of its own procedures provides the fact-finder with evidence of pretext and discrimination. *See Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 313, 320–21 (2d Cir. 1997) (reversing summary judgment based on evidence university deviated from normal decisionmaking procedures); *Tolbert v. Smith*, 790 F.3d 427, 437–38 (2d Cir. 2015). Plaintiff plainly has pled claims for sex discrimination based on gender stereotypes that Columbia should answer. *See Back,* 365 F.3d at 119-22; *McQuaid Jesuit*, 2024 WL 4905278, at *6.

### 2.      **Plaintiff Sufficiently Pled Caregiver/Parental Discrimination.**

The NYCHRL prohibits discrimination because of caregiver status for "a person who provides direct and ongoing care for a minor child." N.Y.C. Admin. Code §§ 8-107(1)(a) & 8-102; *Palmer v. Cook*, 108 N.Y.S.3d 297, 306 (N.Y. Sup. Ct. 2019). To establish a prima facie case of discrimination under the NYCHRL, a plaintiff need only "show differential treatment — that [he] was treated 'less well' — because of a discriminatory intent." *Livingston v. City of New York*, 563 F. Supp. 3d 201, 234 (S.D.N.Y. 2021). A mother of young children, Plaintiff applied for two open positions for which she was qualified but was not selected with inferences of discrimination. *See* Am. Compl. ¶¶ 64, 112, 113, 114, 301-21, & Section II(B)(1), *supra*, incorporated; *Kurtanidze v. Mizuho Bank, Ltd.*, 2024 WL 1117180, at *16 (S.D.N.Y. Mar. 13, 2024); *Konyukhova v. Walgreen Co.*, 2026 WL 880381, at *9 (S.D.N.Y. Mar. 31, 2026).

### 3.      **Plaintiff Sufficiently Pled Race Discrimination.**

At the pleading stage, a plaintiff asserting race discrimination need not establish a *prima facie* case under *McDonnell Douglas*. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510–12 (2002).

The complaint need contain only sufficient factual matter to provide "plausible support to a minimal inference of discriminatory motivation." *Littlejohn*, 795 F.3d at 311.  Title VII claims require only allegations that race was a motivating factor.  *Vega v. Hempstead Union Free School District*, 801 F.3d 72, 87 (2d Cir. 2015).  Claims under 42 U.S.C. § 1981 are subject to the same general pleading principles, although the plaintiff ultimately must establish that race was a but-for cause (not the sole cause).  *Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 590 U.S. 327 (2020).  NYCHRL requires only that one plausibly allege that she was treated "less well" in part because of a protected characteristic.  *Mihalik*, 715 F.3d at 109–10.

Plaintiff, a Caucasian, applied for a position in Urban Studies, was not selected, and supplied an inference of race discrimination.  Am. Compl. ¶¶ 362-85.  Defendants hired a less-qualified African American candidate who lacked peer-reviewed publications in contrast to Plaintiff's impressive publication record.  *Id.* ¶ 371.  Dr. Abu El-Haj said Dr. Kitzmiller lost because she was not "urban enough," code for race.  *Id.* ¶ 372.  "Racially charged code words may provide evidence of discriminatory intent."  *Mhany Management, Inc. v. County of Nassau*, 819 F.3d 581, 610 (2d Cir. 2016).  Search committee member Aaron Passell of the joint Barnard-Columbia Urban Studies Program likewise told another rejected non-Black candidate that she was "not urban enough."  Am. Compl. ¶ 197.  The hiring policy required that candidates be selected based on the wording of the advertisement, but "urbanness" or similar criterion was not included.  *Id.* ¶ 167.  The search was replete with violations of policies and procedures, including that Dr. Abu El-Haj recommended her own doctoral advisee who won the position.  *Id.* ¶¶ 154, 160-68.

Contrary to Columbia's argument, Plaintiff does not rely solely on her subjective belief that she was better-qualified.  The "urbanness" charge was pretextual as Plaintiff was the only finalist

with an educational credential in the field, a Certificate in Urban Studies. *Id.* ¶ 373. Her doctoral advisor was a leading figure in urban studies and urban history. *Id.* ¶ 375. Plaintiff taught in the Urban Studies program in 2015-16 and received exemplary evaluations. *Id.* ¶ 376. She wrote "The Roots of Educational Inequality," the first book tracing the history of a public school in the context of its city neighborhood, was nominated for prizes, including by the Urban History Association. *Id.* ¶ 380-81. Her research of urban public schools spans nearly two decades, and she taught in them for 25 years. *Id.* ¶ 382. For the 1981 claim, Plaintiff pled that, "But for Plaintiff's race, Defendant would not have denied Plaintiff the tenure track position." *Id.* ¶ 384. Plaintiff sufficiently states claims for race discrimination that present jury questions. *See Shamciyan v. Acacia Network, Inc.*, 2023 WL 6214546, at *6 (S.D.N.Y. Sept. 24, 2023) (denying motion to dismiss race discrimination).

Since Plaintiff plausibly alleged race discrimination under Section 1981, her NYCHRL and NYSHRL claims pass muster under their "more liberal" applicable pleading standards. *See Mumin v. City of New York*, 2025 WL 2733229 (S.D.N.Y. Sept. 25, 2025) (denying motion to dismiss NYSHRL claims where court denied motion on Title VII claims); *Brikman v. Westchester Med. Ctr. Ad.Phys. Servs., P.C.*, 2025 WL 2371315 (S.D.N.Y. Aug. 13, 2025).

### 4. Plaintiff Sufficiently Pled Age Discrimination.

A plaintiff must be: (1) within the protected age group; (2) qualified; (3) subject to an adverse employment action; and (4) that occurred under circumstances giving rise to an inference of discrimination. *DiBartolo v. Segal Grp., Inc.*, 2025 WL 2172643, at *4 (S.D.N.Y. July 31, 2025). Plaintiff, 44 and within the protected age group, (Am. Compl. ¶ 422), qualified based on her education and experience, (*Id.* ¶ 55-63, 66, 417), was not hired under circumstances giving rise to an inference of age discrimination. *Id.* ¶¶ 420-34.

18

Barnard and Columbia chose less qualified applicants sufficiently younger permitting an inference of age discrimination. Successful applicant Dr. Gross was at least 8 years younger than Plaintiff and successful applicant Dr. Herbert was at least 6 years younger than Plaintiff, (Am. Compl. ¶¶ 116, 118). *D'Cunha v. Genovese/Eckerd Corp.*, 479 F.3d 193, 195 (2d Cir. 2007) (inference of age discrimination where individual offered position was eight years younger than plaintiff). The committees recommended only candidates under the age of 40. *Id.* ¶ 430. Plus ageist comments were made by decision-makers. *See Dietrich v. City of New York*, 2019 WL 2236585, at *5 (S.D.N.Y. May 16, 2019).

Dr. Abu El-Haj admitted that "Barnard preferred to hire tenure track faculty who were younger and fresh out of their Ph.D. programs." Am. Compl. ¶¶ 432-33. She directed Plaintiff that "unlike the other candidates who were instructed to discuss one key research contribution she should focus on multiple projects 'since she was so far removed from [her] Ph.D.,' which was reflective of disparate treatment and ageism." *Id.* ¶ 434. Defendants set a higher standard for Plaintiff while breaching practices and procedures in connection with the searches, (*Id.* ¶¶ 160-69), evidence of discrimination against older employees. *See Gittens-Bridges v. City of New York*, 2020 WL 3100213, at *15 (S.D.N.Y. June 11, 2020). The search was riddled with violations of policies and procedures. Am. Compl. ¶¶ 154, 160-68. Plaintiff adequately pled a cause of action for age discrimination under the NYCHRL, NYSHRL, and the ADEA. *See Dietrich*, 2019 WL 2236585, at *10; *DiBartolo*, 2025 WL 2172643, at *7–8.

### 5.     **Plaintiff Sufficiently Pled Race Association Discrimination**.

Dr. Kitzmiller pled employment discrimination because her husband is Jewish. Am. Compl. ¶¶ 466-516. Interracial relationships claims sound under the NYCHRL, the NYSHRL, § 1981 and

Title VII. *See* N.Y.C. Admin. Code § 8-107(20); *Chiara v. Town of New Castle*, 126 A.D.3d 111, 122, 2 N.Y.S.3d 132, 141 (2015) (NYSHRL); *Rosenblatt v. Bivona & Cohen, P.C.*, 946 F. Supp. 298, 300 (S.D.N.Y. 1996) (1981). Jewish individuals are a protected racial group under these statutes. *Weiss v. La Suisse*, 260 F.Supp.2d 644 (S.D.N.Y. 2003). Membership in the protected class exists "by virtue of the defendants' alleged discriminatory conduct stemming from his [or her] marriage to a Jewish person." *Chiara*, 2 N.Y.S.3d at 141; *Weiss*, 260 F.Supp.2d 644.

Dr. Jacobs was a Jewish Columbia professor, as Defendants were aware. Am. Compl. ¶¶ 467-68. Plaintiff was qualified, applied, and rejected under circumstances giving rise to an inference of interrelationship discrimination. *Id.* ¶¶ 469-72. During the interview process, Dr. Abu El-Haj attacked Dr. Jacobs as a bad husband and father, although she did not know anything personal about him besides that he was Jewish. *Id.* ¶ 476. She falsely attacked Dr. Kitzmiller for some wall posters as "anti-Muslim." *Id.* ¶ 473. She is a supporter of the BDS movement containing anti-Semitic aspects. *Id.* ¶ 473. Her partisan research reflects an interest in Palestinian American identity and citizenship. *Id.* ¶ 475. During a workshop, Dr. Abu El-Haj went off-topic and railed at Dr. Kitzmiller for being anti-Palestinian, a baseless falsehood. *Id.* ¶ 477. No action was taken against Dr. Abu El-Haj despite Plaintiff filing a complaint. *Id.* ¶ 478.

Plaintiff alleged Defendants selected candidates outside the protected association class (not married to Jews) who were less qualified. *Id.* ¶ 472. She adequately pled a claim for race association discrimination. *See Chiara*, 2 N.Y.S.3d at 142 (race association claim survived summary judgment where terminated plaintiff's wife was Jewish); *Holcomb v. Iona Coll.*, 521 F.3d 130, 140 (2d Cir. 2008) (white plaintiff produced evidence of firing because married to a black woman).

**E.**       **Plaintiff Sufficiently Pled Retaliation Claims Against Olinto and Columbia.**

A retaliation plaintiff need only plausibly allege that she engaged in protected activity, defendant was aware of that activity, she thereafter suffered adverse treatment, and the protected activity was a motivating factor in Defendant's actions. *See Vega*, 801 F.3d at 90-91. NYCHRL requires only conduct reasonably likely to deter a person from engaging in protected activity. N.Y.C. Admin. Code § 8-107(7). NYSHRL is construed liberally and substantially in accordance with the NYCHRL's remedial purposes. *Livingston*, 563 F. Supp. 3d at 233-34.

Plaintiff alleges repeated protected complaints of unlawful discrimination, all of which were known to Columbia's senior academic leadership. In March 2024, Dr. Jacobs notified Provost Angela Olinto that Dr. Kitzmiller had experienced discrimination and that Barnard's investigation of her complaints had been "a sham." Am. Compl. ¶ 248. Plaintiff further alleges that on April 7, 2024, she again complained in writing to Barnard's senior administrators that she had been subjected to unlawful gender stereotype discrimination, continuing discrimination, and harassment, and specifically requested that the administration enforce its anti-harassment policies and applicable federal, state, and local anti-discrimination laws. *Id.* ¶ 249.

The Amended Complaint alleges that Provost Olinto was repeatedly advised that Barnard had failed to properly investigate Plaintiff's complaints. On September 12, 2024, Dr. Jacobs informed Provost Olinto that Plaintiff's Title IX and discrimination complaints had "not [been] handled properly," in "blatant violation of Columbia and Barnard's policies," and that the faculty searches violated federal, state, and local anti-discrimination laws. *Id.* ¶ 252. After additional follow-up, Provost Olinto met personally with Dr. Jacobs on October 25, 2024, acknowledged that she regularly communicated with Barnard's Provost, and represented that she intended to discuss Plaintiff's

21

discrimination complaints with Barnard's Provost so they could be addressed. *Id.* ¶ 253. However, Provost Olinto never followed through on that commitment. Instead, despite repeated follow-up emails on Oct. 28, Nov. 3 and 25, 2024, and June 8, 2025 requesting assistance, Provost Olinto simply ignored Plaintiff's continued requests through Dr. Jacobs for intervention. *Id.* ¶ 254.

These allegations plausibly allege far more than an employer's mere failure to investigate a single complaint. Plaintiff alleges that Columbia's highest academic officer obtained actual knowledge of Plaintiff's protected activity, acknowledged the ongoing discrimination, represented that corrective action would be taken, possessed supervisory authority over Barnard's academic administration, regularly communicated with Barnard leadership, and nevertheless deliberately failed to intervene while ignoring repeated subsequent requests for assistance. *Id.* ¶¶ 247-254.

The Second Circuit repeatedly has recognized that anti-retaliation provisions extend beyond ultimate employment decisions and encompasses employer conduct that would deter reasonable employees from engaging in protected activity. *Burlington Northern*, 548 U.S. at 68; *Vega*, 801 F.3d at 90; *Littlejohn*, 795 F.3d at 315-16. Plaintiff's allegations satisfy that standard. Plaintiff does not merely allege that Columbia failed to investigate one complaint. Rather, Plaintiff alleges an ongoing course of retaliatory conduct after multiple protected complaints, during which Columbia's Provost repeatedly received notice of continuing discrimination, acknowledged the complaints, promised intervention, failed to act, ignored repeated follow-up communications, and thereby allowed the retaliation and discrimination to continue unabated. Am. Compl. ¶¶ 248-254. Viewed collectively, these allegations plausibly describe an institutional response that would discourage a reasonable employee from continuing to report discrimination. *See Muldrow v. City of St. Louis*, 601 U.S. 346, 355-60 (2024) (need show only "some harm" with respect to employment terms or conditions). A

22

reasonable faculty member who through her spouse repeatedly reports discrimination to the Provost of Columbia, is assured that corrective action will be taken, and then experiences complete inaction despite numerous follow-up requests reasonably could conclude that further complaints would be futile and potentially expose her to additional retaliation.

Plaintiff alleges causation based upon timing, antagonism, and pretext. Am. Compl. ¶¶ 552-553. The pattern of hostility occurred after she raised concerns regarding discrimination, race, parental status, and inequities at Barnard. *Id.* ¶¶ 541-543. She alleges that Defendant's explanations for refusing to hire her were pretextual. *Id.* ¶ 553. At the pleading stage, temporal proximity is not the exclusive means of establishing causation; a plaintiff may also rely upon a pattern of antagonism, retaliatory conduct, inconsistent explanations, and other circumstantial evidence. *Vega*, 801 F.3d at 90-91; *Duplan v. City of New York*, 888 F.3d 612, 625-26 (2d Cir. 2018). Viewed in the light most favorable to Plaintiff, the Amended Complaint plausibly alleges that Columbia and Olinto's conduct followed her protected complaints and was motivated by retaliatory animus.

Columbia's argument about the denial of administrative support improperly applies an unduly restrictive conception of adverse action. A reasonable employee certainly could be deterred from filing discrimination complaints if she knew that the employer would disregard its own nondiscrimination procedures and refuse to conduct a meaningful investigation. Whether Columbia and Olinto's conduct would deter a reasonable employee from engaging in protected activity presents a fact-intensive question inappropriate for resolution on a motion to dismiss. This is especially true under the NYCHRL which requires only conduct "reasonably likely to deter a person from engaging in protected activity." *Mihalik*, 715 F.3d at 112-13.[8]

---

[8]Columbia's reliance on *Whaley v. City Univ. of New York*, 555 F. Supp. 2d 381, 399–400 n.3 (S.D.N.Y. 2008), for a retaliation argument is misplaced since "[t]he acts under discussion are not alleged to have been retaliatory," but *discriminatory* which is a different analysis. Columbia erroneously cites a Title VII case, *Konteye v. NYC City Dep't of Educ.*, 2019 WL 4418647, at *9 (S.D.N.Y. Apr. 10, 2019), which under the circumstances is

23

**F.        Plaintiff Sufficiently Pled Claims For Hostile Work Environment.**

Under the NYCHRL, a plaintiff claiming a hostile work environment need demonstrate only that she was treated "less well" because of a protected characteristic. *See Mihalik*, 715 F.3d at 110. "[D]efendants' discriminatory conduct need not be 'severe or pervasive' to create an actionable hostile work environment." *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 261 (E.D.N.Y. 2012), *aff'd*, 713 F.3d 163 (2d Cir. 2013).   Liability exists when the conduct is more than "petty slights or trivial inconveniences." *Mihalik*, 715 F.3d at 110-13.  Just one "single comment may be actionable in the proper context." *Id.* at 113.  Likewise, the NYSHRL provides that harassment is unlawful when an individual is subjected to inferior terms, conditions, or privileges of employment because of a protected characteristic, unless the conduct constitutes no more than petty slights or trivial inconveniences. N.Y. Exec. Law § 296(1)(h).

Plaintiff alleges a multi-year pattern of discriminatory comments, stereotyping, professional disparagement, exclusion from opportunities, and hostility directed toward her because she was an older female professor with young children, because of her race and association with racial advocacy, and because of her association with her Jewish husband.  Defendants selected two substantially younger less-qualified candidates without children for the positions.  Am. Compl. ¶¶ 114-119, 153-158, 176-178.  These allegations provide inferences that Plaintiff's age, parental status, and gender were viewed negatively by decisionmakers.

There are allegations of repeated unlawful sex-based and caregiver stereotyping.  Dr. Abu El-Haj directed Plaintiff to display photographs of her young children in her office.  Am. Compl. ¶ 85.  Dr. Maulucci stated: "Erika, you have young children. That dictates the times that you are

_____

inapplicable to the NYCHRL and NYSHRL analysis.

available to teach. We need people to teach at night and you won't want to do that with children." *Id.* ¶ 184. Even after Plaintiff explained that having children never affected her availability, Dr. Maulucci persisted. *Id.* ¶¶ 185-186. Dr. Maulucci made similar comments to another older female faculty member with young children. *Id.* ¶ 199. Such allegations reflect precisely the type of discriminatory stereotyping condemned by the Second Circuit in *Back*, recognizing assumptions that mothers are less available or committed constitute actionable sex discrimination.

Plaintiff alleges repeated race-based and race-related hostility. After Plaintiff advocated on behalf of racial-minority students and raised concerns that enrollment caps disproportionately harmed minority students, Dr. Abu El-Haj reacted negatively, told Plaintiff she would be happier elsewhere, and suggested that she leave Barnard. Am. Compl. ¶¶ 90, 92, 94. During her one-on-one interview Dr. Sharp expressed disbelief that a majority-Black high school in Philadelphia could achieve a 100% college-going rate and baselessly challenged Plaintiff's research findings. *Id.* ¶¶ 130-132. The Chief Diversity Officer disclosed that Dr. Sharp had a reputation for being anti-Black and had engaged in racially prejudiced conduct. *Id.* ¶ 135. Dr. Abu El-Haj publicly exploded at Plaintiff during a workshop after she discussed discrimination affecting an African-American professor, falsely accusing Plaintiff of being anti-Palestinian and humiliating her. *Id.* ¶¶ 222-223. In addition, Dr. Abu El-Haj rejected Plaintiff for the Urban Studies position because she was "not urban enough," coded language for race. *Id.* ¶¶ 139-140. A jury should weigh whether Plaintiff was subjected to hostility because of race-related considerations and advocacy concerning racial equality.

Plaintiff alleged that the hostile environment extended to discrimination based upon race association with her husband whom Dr. Abu El-Haj criticized as a deficient spouse and father immediately before Plaintiff's final interview despite never having met him and knowing virtually

25

nothing about him other than that he was Jewish. Am. Compl. ¶¶ 136-137. She falsely implied that Plaintiff herself was anti-Muslim. *Id.* ¶ 81. Plaintiff was repeatedly demeaned and undermined by comments suggesting she was not qualified, insufficiently "urban," should leave Barnard, was receiving recognition she did not deserve, and was improperly seeking opportunities for advancement. *Id.* ¶¶ 92, 102, 104, 110, 139.

Taken together with Barnard's admitted climate concerns regarding the Education Studies Program, Plaintiff's internal discrimination complaints, and Defendant's failure to meaningfully investigate those complaints, (Am. Compl. ¶¶ 208, 210, 213-214, 230-232, 298), the Amended Complaint plausibly alleges far more than isolated slights, supports the conclusion that Plaintiff was treated less well because of her protected characteristics and states hostile work environment claims under the NYCHRL and the NYSHRL. *See Ward*, 2023 WL 5353342, at *12–13 (denying motion to dismiss ADEA, NYSCHRL, and NYCHRL hostile environment claims based on allegations regarding supervisor's focus on putting Plaintiff down for being an older woman who dressed modestly as a Mormon); *Cummings v. City of New York*, 246 A.D.3d 560, 561, 251 N.Y.S.3d 91, 92–93 (2026) (supervisor implied that plaintiff received high evaluation scores because she was engaging in sexual relations with higher-ups).

## G.    Plaintiff's Equal Pay Claims Should Not Be Dismissed.

An Equal Pay Act plaintiff simply must show that the employer paid different wages to employees of the opposite sex for equal work requiring equal skill, effort, and responsibility and performed under similar working conditions. See 29 U.S.C. § 206(d)(1); *Belfi v. Prendergast*, 191 F.3d 129, 135 (2d Cir. 1999). At the pleading stage, however, she is not required to prove her claim or plead every detail of a comparator's daily work. Dr. Kitzmiller alleges that Barnard and Columbia

26

faculty have the same responsibilities in teaching, scholarship, and service; are evaluated according to the same tenure and promotion standards; are reviewed by the same final committees; operate within an integrated academic environment; and perform comparable teaching, scholarship, advising, and service work. Am. Compl. ¶¶ 257, 265, 801-804, 812-815. Those allegations provide the necessary factual comparator detail.

The Amended Complaint plausibly alleges a sex-based compensation disparity. *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 110 (2d Cir. 2019) ("Title VII plaintiff alleging a discriminatory compensation practice need not establish that she performed equal work for unequal pay"). Plaintiff alleges that historically Columbia faculty have earned higher salaries than Barnard faculty, that Assistant Professor salaries at Columbia exceeded Barnard salaries by an average of $35,764 during the 2022-2023 academic year, and that Barnard faculty receive lesser benefits, including childcare, education, housing, insurance, and retirement benefits. Am. Compl. ¶¶ 255, 260-262. Plaintiff further alleges that the lower-paid Barnard faculty population is mostly female while the higher-paid Columbia faculty population is mostly male, and that Barnard's own historical documents recognized that the Barnard-Columbia salary disparity "implies that teaching women has less value than teaching men." *Id.* ¶¶ 256, 263-266.[9] These allegations plead not merely a generalized institutional disparity, but a sex-linked compensation structure affecting faculty who perform substantially similar work within an integrated Barnard-Columbia academic system. *Id.* ¶¶ 782-784, 798-808, 810-819.

---

[9]In addition to treating its mostly female faculty worse than Columbia's mostly male faculty, there is additional sex discrimination within Barnard. At Barnard, women are concentrated in non-tenure track faculty positions, where they receive lower pay and short term contracts, with no room for professional advancement. Seventy-five percent (75%) of Barnard's non-tenure track faculty are women, according to IPEDS for the 2022-2023 academic year. Am. Compl. ¶¶ 267-68.

Columbia does not dispute the pay disparity itself. The existence of the Barnard-Columbia gender-based compensation differential is therefore not in genuine dispute. Whether Barnard and Columbia faculty work in an integrated academic system is factual question tied to the single- and joint-employer inquiry, and cannot be resolved on a motion to dismiss. Defendants' argument also fails because Plaintiff's NYSHRL and NYCHRL claims are broader than the federal EPA. The NYCHRL requires independent and liberal construction and prohibits treating an employee "less well" with respect to compensation because of sex. *See Mihalik*, 715 F.3d at 109-13. Plaintiff alleges that she performed teaching, research, advising, and service responsibilities substantially similar to male Columbia-affiliated faculty, but was compensated at a lower rate because of sex. Am. Compl. ¶¶ 799-808, 811-819. These allegations independently state claims under the NY Equal Pay Act, NYCHRL and NYSHRL even if Defendants dispute whether the federal EPA's more technical "equal work" standard is satisfied.

## H.    Plaintiff Sufficiently Alleged Breach of Contract Claims.

Plaintiff incorporates her discussion of the breach of contract issues as set forth in her Brief in Opposition to Barnard's Motion to Dismiss (Section II(F)) filed contemporaneously herewith.

## I.    Plaintiff Pled Aiding and Abetting and Failure to Prevent Discrimination Against Columbia Provost Olinto.

The NYSHRL and NYCHRL impose liability on any person who "aid[s], abet[s], incite[s], compel[s] or coerce[s]" discriminatory conduct, N.Y. Exec. Law § 296(6); N.Y.C. Admin. Code § 8-107(6), and courts hold that an individual may be liable where she "actually participates" in the discriminatory practice, including by failing to investigate or take corrective action after acquiring knowledge of discrimination. *Feingold v. New York*, 366 F.3d 138, 157-58 (2d Cir. 2004); *Pellegrini v. Sovereign Hotels, Inc.*, 740 F. Supp. 2d 344, 356 (N.D.N.Y. 2010).

28

Dr. Olinto was Columbia's Provost, oversaw Columbia academic affairs and Barnard, and that Barnard's President sat under her because Barnard's President is a Dean at Columbia. Am. Compl. ¶¶ 7, 247. Dr. Olinto was notified in March 2024 that Dr. Kitzmiller had experienced discrimination and that Barnard's investigation was a sham; was again informed on September 12, 2024 that Plaintiff's Barnard and Columbia discrimination complaints were mishandled in violation of policy and law; and then met with Dr. Jacobs on October 25, 2024, stated that she regularly spoke with Barnard's Provost, and represented that she would raise the matter so Barnard could address it. *Id.* ¶¶ 248, 252-253.

Those allegations plausibly establish more than passive inaction. Provost Olinto had actual notice of the discrimination, the sham investigation, and Barnard's failure to remedy the misconduct; had institutional authority and a regular channel of communication with Barnard leadership; publicly represented that Columbia took discrimination seriously; promised to intervene; and then failed to do so, ignoring repeated follow-up requests on October 28, November 3, November 25, 2024, and June 8, 2025. Am. Compl. ¶¶ 251, 253-254.

As Columbia's Provost, Olinto could have referred the discrimination and the faulty investigation to Columbia's Nondiscrimination Office, or ensured Plaintiff was offered a position. She did neither. Columbia argues Dr. Olinto owed "no duty to intervene at a different institution." But the University Statutes discussed above say otherwise: they make Columbia's President "ex officio a Trustee of [Barnard]" and direct that President to "exercise such supervision and direction of [Barnard] as will promote the effective coordination of its activities." ECF 60-1 § 230. Dr. Olinto, as Provost, sat at the top of exactly that chain of supervision - as already alleged, Barnard's President answered to Olinto because she held the rank of Dean at Columbia. Am. Compl. ¶¶ 7, 247.

29

Reasonable jurors may draw the inference that Olinto had the authority to intervene regarding the discrimination of Dr. Kitzmiller, chose not to, and hid her culpability by failing even to get back to Dr. Jacobs.[10] At the pleading stage, that is sufficient to allege that Olinto "actually participated" in the unlawful conduct by knowingly allowing it to continue and by failing to take available corrective action. *See Feingold*, 366 F.3d at 158; *Pellegrini*, 740 F. Supp. 2d at 356. The Aiding-and-Abetting and Failure to Prevesnt Discrimination claims therefore should not be dismissed.

## III.  CONCLUSION

Defendant Columbia's separatist position which must be weighed by the fact-finder strains credulity.  Until now, Barnard has seen itself as a part of Columbia University. *See e.g.*, Am. Compl. ¶¶ 12-41.  Indeed, in their numerous email signatures and publications Barnard faculty identify themselves as part of Columbia (*Id.* ¶ 31) to add value to their communications.  Arguably the most important product of faculty and student labor at Barnard College is its undergraduate degrees, which are critical to employers, graduate institutions, and the students' well-being over a lifetime.  These credentials are conferred by Columbia University, (*Id.* ¶ 31), which arguably is a joint or single employer as a New York jury reasonably can infer.  In fact, it may be surprised by Columbia's convenient position and see it as a litigation contrivance.  It is respectfully submitted that the Court should deny Columbia's Motion to Dismiss in its entirety.

Respectfully submitted,

s/James B. Lieber
James B. Lieber
Pa. I.D. No. 21748

---

[10]Plaintiff raised the matter of retaliation involving Dr. Jacobs in Count XXX. After advocating on behalf of Plaintiff, his deserved promotion was blocked which she has standing to raise. *See Thompson v. N. Am. Stainless, L.P.*, 562 U.S. 170, 174 (2011).

Thomas M. Huber
Pa. I.D. No. 83053
LIEBER HAMMER HUBER PAUL &
& HOFFMAN, P.C.
1722 Murray Avenue, 2nd Floor
Pittsburgh, PA 15217
(412) 687-2231 (telephone)
(412) 687-3140 (fax)
jlieber@lhhb-law.com
thuber@lhhb-law.com
Counsel for Plaintiff

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that the foregoing brief contains 9,118 words, excluding the

parts of the document that are exempted by Local Civil Rule 7.1(c). The undersigned relied on

the word count of the word-processing program used to prepare this document.


s/James B. Lieber
James B. Lieber
Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on July 6, 2026, I electronically filed the foregoing with the Clerk of

Court using the CM/ECF system, which shall serve notice upon the following:

Jacqueline Phipps Polito, Esq.
Erin Train, Esq.
Littler Mendelson
375 Woodcliff Drive, Suite 2D
Fairport, N.Y. 14450
585-203-3400 (tel.)
585-203-3414 (fax)
jpolito@littler.com
etrain@littler.com

Emily Gaines
Littler Mendelson
900 Third Avenue
New York, NY 10022
914-803-2032 (tel.)
egaine@littler.com

Counsel for Defendant Barnard College, Thea Abu El-Haj, Maria Rivera Maulucci,
Elizabeth Scott-Francis, Linda Bell, Sian Beilock, Laura Ann Rosenbury, and Lesley A. Sharp

Evandro Cristiano Gigante, Esq.
Edna Doris Guerrasio, Esq.
Proskauer Rose LLP
11 Times Square
New York, NY 10036
(212) 969-3132 (tel.)
(212) 969-2900 (fax)
egigante@proskauer.com
eguerrasio@proskauer.com

Counsel for Defendant Trustees of Columbia University
in the City of New York and Angela Olinto

s/James B. Lieber
James B. Lieber
Counsel for Plaintiff